# Plaintiff's Complaint Exhibit 1

Initial 93A Demand Letter (with Exhibits B-E)

24 pages

**JOHN ANTHONY TAYLOR, ESQUIRE**
**TAYLOR LEGAL COUNSEL**
***(Practicing Exclusively in Massachusetts)***
18 CENTRAL SQUARE
BRISTOL, NEW HAMPSHIRE  03222
(603) 744-8000
(603) 744-8585 (Fax)

ANTHONY TAYLOR (1749-1826)
AMOS TAYLOR (1784-1866)
MOSES L. TAYLOR (1810-1892)
FRANKLIN L. TAYLOR (1844-1929)
AMOS L. TAYLOR (1877-1965)
A. LEAVITT TAYLOR (1912-1991)

OF COUNSEL
ADAMS & BLINN, P.C.
43 THORNDIKE STREET
CAMBRIDGE, MA 02141
(617) 577-9700
(617) 494-9068 (FAX)

October 6, 2015

Joshua Spafford, aka Joshua Darling
c/o Diane Hodel
66 SW Buttonbush Court
Palm City, FL  34990

Monica Jensen, aka Nica Noelle
P.O. Box 3063
18 South Vine Lane
West Tisbury, MA  02575

Jon Blitt, d/b/a Mile High Media/Distribution
8148 Chemin Devonshire
Mont-Royal, Quebec,  H4P 2K3
Canada

Re:  Claims of unfair or deceptive acts or practices arising from unauthorized
      commercial and offensive use of Leah Bassett's residential premises

**Attention to** the above-named persons, both individually and in their
      respective pseudonym, d/b/a, and/or corporate capacities:

        This letter is written on behalf of Leah Bassett, and is intended to meet the
threshold procedural requirements of a so-called "demand letter" pursuant to Section 9 of
the Massachusetts Consumer Protection Act.  *See* Mass. Gen. Laws, Chapter 93A;
Cassano v. Gogos, 20 Mass.App.Ct. 348, 350-52 (1985).  Your respective attorneys may
advise you in greater detail as to the niceties of that Act, but basically, it is broadly
designed to prohibit, and penalize, any person or company that engages in
business/commercial activities with person(s) (or other businesses) within Massachusetts
from committing "*unfair or deceptive acts or practices in the conduct of any trade or
commerce.*"

        The factual starting point for this demand letter on my client's part was Mr.
Spafford's response to Ms. Bassett's non-broker advertisement about a Winter rental of
her personal residence in Aquinnah, Massachusetts on the island of Martha's Vineyard.
Because it **is** her personal residence and comes fully-furnished, Ms. Bassett is very careful

and selective in choosing any "new" prospective tenant. Consequently, she engaged in a series of Internet exchanges and face-to-face meetings with Mr. Spafford over the course of several weeks before selecting him over other applicants as her tenant. Mr. Spafford represented that he was a well-respected and serious stage actor and photographer, and that he was especially attracted to her residence as a peaceful, secluded, and secure place in which to concentrate on several projects during the Vineyard's "off season" months. He introduced Ms. Bassett to his very personable girlfriend, whether in retrospect it was a real or a faux relationship, for the purpose of using her to impress my client with his stature as a responsible, sincere, and "normal" guy. Neither her Internet search nor her review of the attached 'newspaper' articles about Mr. Spafford led to any discovery on Ms. Bassett's part of his pseudonym identity or career activities as "Joshua Darling". Trusting that Mr. Spafford was who, and what, he represented to be, as well as his stated purposes for renting her premises, Ms. Bassett entered into the enclosed Massachusetts Residential Lease Agreement with Mr. Spafford on October 4, 2014.

As you are all aware, Mr. Spafford proceeded to "skip out" on the lease prior to its termination date of May 15, 2015 per his enclosed "explanatory" email, dated March 15, 2015. Besides the nonpayment of rent issue, Ms. Bassett learned through her parents that the premises had been abandoned in a very unsatisfactory condition, -- leading to her issuance of the enclosed letter to Mr. Spafford, dated March 22, 2015.[1] Upon my client's return to the Vineyard in mid-May, she discovered to her dismay upon her more thorough and familiar inspection of her residence that the damages were considerably more extensive than her parents had realized/reported. An updated list of damages, along with

---

[1] Following receipt of that 3/15/15 email, Ms. Bassett asked her mother, Barbara Bassett, to check on the premises. In doing so, Mrs. Bassett discovered several "strangers" unpacking their luggage with the stated intention of residing in her daughter's home. They rather defensively put her in touch with Ms. Jensen, who drove to the home and expressed her intention/desire to "take over" the Lease. Mrs. Bassett told Ms. Jensen that she could not do so without her daughter's permission; provided her with my client's contact information; and, demanded both that the "new" people immediately vacate the premises and that Ms. Jensen give her the key that she had reportedly received from Mr. Spafford, -- pending her daughter's assent to the new tenant(s).

Ms. Jensen then spoke with my client, and introduced herself as a single mother who was residing on the Vineyard while her "daughter" was receiving unspecified medical treatments in Boston. She indicated that she was a production manager for product and stock photography and a freelance writer. She stated that she was both Mr. Spafford's employer, as well as his friend, and that she was looking to assume his Lease for the remainder of its term so that she could periodically have models stay there while they were on the Vineyard to "shoot product and generic stock photos". In view of the time of year, Ms. Bassett skeptically asked her what kind of modeling/photography was involved, and whether any of it would be taking place on her premises? Ms. Jensen laughingly and emphatically assured her that it was all very legitimate, and advertising-related, and that none of it would be taking place on her premises. (During an ensuing text exchange, Ms. Jensen forwarded a link to an article that she had written for MV Magazine in an apparent effort to further mislead Ms. Bassett). Nonetheless, Ms. Bassett decided that she did not feel comfortable renting her personal residence to Ms. Jensen on an assigned or sublet basis, and she did not consider Ms. Jensen's stated association with Mr. Spafford as a positive endorsement in view of the highly unfavorable reports from her parents as to the condition in which he had left the premises (which differed materially from his 3/15/15 email's representation that: *"The house is in good condition, I think. I had two maids come and clean before all this happened..."*).

their known or estimated costs, is enclosed herewith.

Per that 3/22/15 letter, drafted with my input, Ms. Bassett offered to accept a discounted sum of $4,000 in settlement of the unpaid rent and the known damages to the premises. That led her to a series of phone and/or email exchanges with both Mr. Spafford and Ms. Jensen, along with repeated assurances that the $4,000 would be tendered forthwith. Instead, she received an ensuing series of excuses as to the failure to pay the $4,000, wholly or in part. That failure, augmented by disturbing reports after-the-fact from Ms. Bassett's parents about an unusually high level of vehicular traffic, late-night activities/noises, the break in to her bedroom storage closet, etc. while Mr. Spafford was in residence; as well as the derogatory reports by Ms. Jensen, both verbally and per her text exchange of March 29, 2015, as to Mr. Spafford's "true" character, -- contributed to an increasing level of suspicion as to the actual circumstances behind the Autumn/Winter lease of her residence.

And then a male friend made Ms. Bassett aware that he had just seen a gay male porn video that appeared to have been "shot" at her residence! Upon reviewing that video herself, she was, among a host of other strong emotions, stunned, sickened, and outraged. For my part, I find it nearly unfathomable that some one, or combination of the three of you, didn't just promptly pay the proffered $4,000 settlement figure while you had reason to know that my client was clueless as to the true use(s) that had been made of her residence. I do not know if that conscious decision to ignore, and/or stall, her demands for that modest recompense was attributable more to stupidity, hubris, or sleaziness. That discovery, however, does dramatically change both the nature and the scope of the actionable wrongs committed against Ms. Bassett. Before stating the reformulated demands for relief on behalf of my client, there are several other factors that merit being brought to your attention.

First, please do understand that the three of you did not conspire to lease and engage in unauthorized commercial uses on an investment property owned by a professional landlord. Rather, you did so on Leah Bassett's personal residence. That personal residence is part of a private, and secluded, family compound created by her grandparents. Separate from the now deceased grandparents' own former residence, her particular private road, Skye Lane, has four distinctive homes on it, -- each one built by her carpenter father as the general contractor between the years 1978-2013, and owned and occupied respectively by her father and his domestic partner of some 30 years; her mother; her younger sister and only sibling, Meadow Bassett; and her. Ms. Bassett utilized both her father's expertise, as well as her own artistic credentials marked by her BFA from the Rhode Island School of Design, to create and define both the exterior and interior styles of her home. Aided by her several contractor uncles and various friends, it took Ms. Bassett and her father four years to painstakingly and lovingly build her home from the ground up. As a 7th generation Vineyarder, Ms. Bassett can not imagine ever selling her home.

At the same time, it is terribly expensive to own property and live on the

Vineyard, and since her employment income tends to be unpredictable, she does rely heavily on her ability to seasonably rent out her house (more typically in the "high demand" Summer months). For the past eight years, Ms. Bassett had worked very hard to establish her home's reputation throughout the realtor community on the Vineyard and rental websites as a family-friendly, highly-regarded, and sought-after rental, and one that is easily recognizable by its distinct interior design advertised in photos viewed by thousands of the Vineyard's other landowners and seasonal visitors. As you might imagine, and as certainly any jury will appreciate if this matter goes that far, my client is positively apoplectic by the "new reality" of having her home's reputation as a family-friendly rental tarnished by its use as the location site for scores of pornographic films and "still" photos featuring nudity, homosexuality, transexuality, and graphic scenes of both oral and anal sodomy.

Second, Ms. Bassett is neither homophobic nor exceedingly prurient in her social and sexual views of other people's chosen lifestyles. As a woman with strong family values and strong feminist leanings, she has very negative views towards the so-called porn industry for a variety of reasons that do not need to be explained herein. In short, she would **never** have consented to her home being utilized for the commercial production of porn at **any** negotiated rental price. The fact that it was done without her knowledge and consent, and indeed by clearly-intended false pretenses, is more than just galling to Ms. Bassett; she feels piercingly that she was emotionally and psychologically raped by your actions, and it has compelled her to seek mental health counseling in dealing with the insomnia, shock, disgust, embarrassment, fits of anger, and the overall sense of personal violation of her house, her furnishings and beddings, her personal photos, journals, etc., in her locked bedroom closet, and, her trust in others.

Compounding that sense of personal violation, Ms. Bassett remains very concerned and affected by the fall out from this unwanted development on those other people in her life whom she holds dear. Her parents were concerned by the amount of noise and activity taking place at their daughter's house, but simply thought that she had improvidently picked a first-time tenant who had turned out to be much more of a "party animal" than he had disclosed. They had no idea what was truly going on "next door". Besides being the primary carpenter in building (and rendering repairs as needed) to her house, Ms. Bassett's father is a conservative and well-known Vineyarder. He voluntarily joined the Marine Corps immediately upon graduating from the Vineyard's only high school, so that he could patriotically and honorably serve his country in the Vietnam War, and he created and ran the island's only Martial Arts youth and mentoring program on a non-profit basis for several decades. Over the past 20 years, he and his domestic partner, Lee Taylor (not so coincidentally, my sister), have co-owned and co-skippered one of New England's most venerable charter yachts, Magic Carpet, out of Edgartown Harbor every Summer. Our current U.S. President chartered their yacht for his family previously to this past Summer, and there is grave concern that having the Bassett family's good name tarnished by this unwitting and unwanted association with renting (their) properties for the production and propagation of graphic porn will have a long-lasting impact upon

Ms. Bassett's entire family and their respective properties on Skye Lane and elsewhere.[2]

Third, a review of various Internet sites has revealed a considerable amount of "public" information to date, both about the interconnections between the three of you, as well as the unseemingly large number of porn films and stills that were shot on my client's premises over that relatively short span of months (and that number would presumably have been considerably higher if Ms. Bassett's mother had not had the fortuitous opportunity to inform Ms. Jensen that "sublets" were not to her knowledge permitted without her daughter's express consent). For instance, Ms. Jensen engaged in some self-promotion for herself and Mr. Spafford via their respective porn pseudonyms in an emag site, called Ostermag, on February 19, 2015 by reporting that: *"My creative partner (photographer Joshua Darling) and I have started a little independent film studio called Noelle Darling Films...".* Without getting into further specifics herein, the marketing of various porn videos and stills shot with Ms. Bassett's premises and/or furnishings identifiable in the background or foreground under an array of studio names, such as Icon Male Films as just one example, associated either with Nica Noelle and/or Mile High Media or Mile High Distributions shows quite evidently that this was a three-person joint venture and fraudulent conspiracy orchestrated against my client with respect to the unauthorized use of her premises.

Fourth, Ms. Bassett had the good sense to require Mr. Spafford to sign a written lease, despite the relatively short term of the proposed rental, and she utilized a detailed and plainly-worded lease form that has become quite standard in Massachusetts. While Mr. Spafford was the only disclosed "tenant" and the lone signatory, it appears that he was acting primarily as an agent for Ms. Jensen and Mr. Blitt (the latter being upon information and belief her unidentified "partner" in her post-vacancy communications with Ms. Bassett). The terms of that Lease were violated in numerous respects, most notably and fundamentally for Chapter 93A purposes per Clause 1's unequivocable proviso that the Tenant's use of Ms. Bassett's premises was restricted *"solely for use as a personal residence, excluding all other uses".* Obviously, the three of you decided to use Ms. Bassett's personal residence for "other", and plainly commercial, "uses", which was not only a blatant contractual violation of the Lease as to my client, -- but it was also a blatant and unlawful violation of the Town of Aquinnah's state-empowered Zoning By-Laws requiring any commercial use within a designated residential district to be predicated upon the issuance of either a Special Permit for any proposed commercial use of a one-time or otherwise limited nature, or a broader Variance. The Town could pursue civil, or criminal, action against the persons it deemed to be responsible for your unauthorized (and certainly offensive to the residents of Skye Lane and other local citizens) use of Ms. Bassett's premises, or for a more serious violation of this nature, it could refer the matter to the Dukes County District Attorney's Office and/or the Massachusetts Attorney General's Office for investigation and prospective prosecution.

---

[2] As perhaps a gratuitous aside as someone who has known Tod Bassett even longer than my sister has, Mr. Spafford is probably extremely fortunate that he vacated the premises **before** Tod discovered what his daughter's home was actually being used for without her knowledge or consent.

Clause 2 prohibited Ms. Bassett's residence from being occupied or used by anyone other than the Tenant or his immediate family, except for persons specifically identified by name and age to the Landlord by advance written notice. Obviously, that provision was breached.[3] Similarly, Clause 11 expressly provides that no portion of the leased premises shall *"be assigned or sub-let by Tenant without the prior written consent of Landlord."* That is what Ms. Jensen attempted to do in violation of the Lease before Barbara Bassett interceded.

You already know about the breaches for Non-payment of Rent (i.e., Clause 5), as well as for any non-incidental damages to the Condition of Leased Premises (i.e., Clauses 10, 13, & 35).

Clause 15 (titled No Illegal Use) prohibits the Tenant from perpetrating or allowing others to perpetrate any acts or conduct *"contrary to law or ordinance"* from being *"carried out upon the leased premises or in any common area".* Besides the failure to secure a proper permit from the Town for the commercial filming activities, that provision would extend to the health ordinance violations arising from the improper storage/non-removal of trash both inside and outside the premises, as well as the broken padlock and unauthorized entry/trespass into Ms. Bassett's bedroom closet.

Clause 20 required Mr. Spafford to serve written notice to Ms. Bassett of any absence from her residence *"for seven (7) or more consecutive days"*, which I/we do not believe was done.[4] In this instance, such a notice might have helped her mitigate at least some of the damages relative to the rotting trash, unwatered plants, etc., if she had known sooner to ask her mother to do "a wellness check" on her residence. On the other hand, Ms. Jensen was residing on the Vineyard in the days/weeks after her *"creative partner"* took off for parts unknown as to my client, and she certainly didn't do anything to mitigate the physical damages and deplorable disorder to the premises suffered by Ms. Bassett.

Clause 35 specifically prohibits, *inter alii,* pets, smoking, or parties on the premises, while also prohibiting entry into any of the identified locked storage areas intended *"for storage of her personal property".* While I/we do not presently know about any pets being brought onto the premises, it would seem likely in view both of the sheer number of persons Mr. Spafford and Ms. Jensen "invited" into Ms. Bassett's home, as well as the extraordinary lack of respect they appear generally to have shown for another person's home. There is no question that those other three Lease restrictions were

---

[3]  It remains to be determined where all of the porn production crew members and performers were residing while on the Vineyard, but it is very clear that there was an uncommon amount of "wear and tear" to Ms. Bassett's premises in such a relatively short span.

[4]  Ms. Bassett sent him emails on 2/20, 2/22, 2/23, 3/3, 3/11, and 3/13/15 respectively, receiving no response until his enclosed 3/15/15 "notification" of the anticipatory breach of Lease.

breached.

With those numerous Lease violations as the base starting point, there are a number of legal grounds or theories upon which Ms. Bassett could initiate legal action against one or all of you.  Besides the obvious Breach of Contract-based grounds stemming from the sundry Lease violations outlined above, my client is far more upset, and feels far more violated, by the unauthorized use of her residence for the commercial production of pornography.  That tortious conduct is prospectively actionable on so-called "common law" grounds of Fraud, Civil Conspiracy, Trespass, Damage to One's Reputation or Business Relations, and, Negligent or Intentional Infliction of Emotional and Mental Distress.

Additionally, there are at least two statutory-based grounds for prospectively suing the three of you, as well as any other persons or business entities found to have independently or vicariously played a significant role in violating Ms. Bassett's personal and property rights.[5]  At the state level, there is the aforereferenced Massachusetts Consumer Protection Act, which has prompted this lengthy tome in compliance with its requirement that a so-called "demand letter" be sent at least 30 days in advance of initiating a formal lawsuit for violation of the Act.[6]

At the federal level, I strongly suspect that there would be sufficient grounds to bring suit against one or more of you (while Mr. Spafford seems like the least likely candidate on a "follow the money trail" basis) pursuant to the Racketeer Influenced and Corrupt Organizations Act.  *See* Blythe v. Deutsche Bank AG, 399 F.Supp.2d 274, 278 (S.D.N.Y., 2005) (*"RICO provides for civil and criminal liability for entities engaged in 'a pattern of racketeering activity'.  A person who suffers injury as a result of a RICO violation may sue an entity pursuant to 18 U.S.C. s. 1964.  To demonstrate a 'pattern' of racketeering activity, a plaintiff must show at least two predicate acts of racketeering*

---

[5]  My client further informs me that her furnishings included a number of original and copyrighted works of art, which would prospectively give rise to infringement claims under the U.S. Copyright Act per Title 17 of the U.S. Code, as to their "background" display in your commercial films and/or photo "stills" without her permission by way of written release.

[6]  Notwithstanding the Act's specific reference in its title to "Consumer Protection", it also creates a separate cause of action per Section 11 therein for any business or businessperson which/who has been aggrieved within MA by unfair or deceptive acts or practices committed by another business or businessperson.  While I do not believe that Ms. Bassett falls under the definition of a businessperson under the Act in relation to her periodic rental of her personal residence, it will not matter if she opts to file suit whether she falls under Section 9 or Section 11 since the prospective measures of damages would be the same.  The one practical difference for present purposes is that Section 11 does not include the 30-day demand letter requirement in the case of a 'business against business' lawsuit.

*activity occurring within a ten-year period.").*[7]

Both of those Acts have proven to be veritable game changers via the effect they've had in making it feasible and worthwhile for private individuals (and plaintiff-oriented attorneys) to go after well-healed defendants which/who have engaged in unscrupulous or otherwise offensive business practices. Both Acts permit, or mandate, the imposition of triple damages as a punitive measure designed to discourage and penalize defendants from engaging in such practices. Both Acts mandate an award of attorneys' fees and other court costs to a prevailing plaintiff.[8]

Fifth, the intended purpose of the MA Act's demand letter requirement is to afford the recipient(s) an opportunity to avoid the initiation of a formal lawsuit, along with the Act's punitive measures and mandated attorneys' fees for prevailing plaintiffs, by reaching a reasonable and mutually-agreeable settlement with the aggrieved sender within the prescribed 30-day window. Obviously, that requirement works to the sender's advantage as well in those instances when such a relatively prompt settlement is reached. It can also work to the sender's advantage when a settlement is not promptly reached, since there is a long string of appellate cases establishing the principle that a failure on the demand letter recipient(s)' part to reach a reasonable settlement with the sender within that 30-day response period may constitute, in and of itself, a wilful violation of the Act for purposes of imposing punitive damages.

The foregoing recitation leads at long last to this letter's demand section. After extensive consultation with my client, her demand(s) fall into two overarching components: (1) There is the much simpler and more readily ascertainable component

---

[7]   While not presently known, there is a strong suspicion that Ms. Bassett was not the first person to have her personal and property rights violated by you and/or your shady companies in some similarly fraudulent manner within the past 10 years. And then there is the known instance of doing so against her in violation of Aquinnah's town ordinances during a period spanning both 2014 and 2015. As a far more serious issue prospectively for RICO purposes, I have not yet checked into whether you have filed all of the requisite tax forms with the MA Dept. of Revenue and/or the IRS for the commercial activity conducted on the Vineyard in 2014 and 2015 in terms of W2s or their equivalent for all of the "actors" and film crew members, Estimated Tax payments, and of course, Annual Tax Returns and payments for all of the income arising from the film/video sales or subscribed viewings from "scenes" shot in MA.

Since tax compliance law is really not my area of interest or expertise (unlike my older brother, David, who has been an admitted member of the U.S. Tax Court for 45 years), I have already advised Ms. Bassett of my intention to bring in a long-time friend and colleague, Barry Laterman, into this case either as my co-counsel or as our expert consultant if the matter proceeds to litigation. While a less experienced litigator generally than myself, Atty. Laterman has more experience in the MA federal courts after a 40+ year career with the IRS's Northeast Division, headquartered in Boston. He retired last year from his long-standing position as that Division's Senior Counsel, and has indicated a readiness to work with me part-time on selected cases.

[8]   One difference is that the RICO Act requires that notice of the claimed statutory violation be provided to the U.S. Attorney's Office so that it may review the Plaintiff's Complaint and related materials in order to independently decide whether to initiate its own criminal or civil action(s) on behalf of the federal government.

attributable to the non-payment of rent and physical damages, clean-up costs, and attorney's fees from those breaches of the Lease; and, (2.) There is the far wider-reaching, but presently less readily ascertainable, damages claim(s) from the unauthorized use of Ms. Bassett's personal residence for the graphic and disgusting porn.

As to that first component, you may refer to the itemization of damages and their actual or estimated costs set forth in Ms. Bassett's enclosed letters of March 22 and July 21, 2015. Since she has been "jerked around" for the past 7+ months in whatever proportionate amounts to be assigned among the three of you, resulting in a tender of $.00 to date, neither of us see any reason to continue to offer any discounted sum (and the discount was originally premised on the dual beliefs that Mr. Spafford was the only tenant and legally responsible party to the Lease, and that he might prove difficult to "chase down" out of state/country in collecting the full amount owed). Thus, some one or all of you will tender within the next 30 days: (a.) $16,093 as the base amount due per those two letters; (b.) Interest thereon at the MA statutory, pre-judgment, interest rate of 6% from March 1 onward (and unless any of you or your attorneys wish to calculate that figure precisely on a daily amortizing rate, Ms. Bassett will accept an estimated interest figure of $552 as of September 30, 2015, and a per diem rate of $2.58 thereafter; and, (c.) $3,500 towards my attorney's fees and associated costs to date per Clause 28 of the Lease.[9]

As to that second component, we have decided to offer you the choice of two options. Per Option A, you can pay a liquidated damages sum of $3,000,000, split between the three of you or any related co-conspirators any way you decide between yourselves, and further conditioned upon a mutually-executed Settlement Agreement that includes at a minimum: (i.) A clause apportioning those damages as between Ms. Bassett's emotional distress claim, fraud claim, etc.; (ii.) A clause prohibiting any further dissemination of the films and stills shot on her premises on your or any related entities' part respectively; and, (iii.) A confidentiality/non-disclosure clause.

As the more complicated Option B, you can pay $100,000 as a base "rental" charge for each porn film/video that was shot on Ms. Bassett's premises and separately marketed for sale, along with a $100 charge for each film/video actually sold to, or subscribed/viewed by, a paying customer/voyeur; along with $10,000 as a "rental" charge for each still photo that was shot on Ms. Bassett's premises and separately marketed either

---

[9]  My overall attorney's fees at my standard hourly rate of $400 ($500 for court time) would be **much** higher if it included the considerable amount of time on my part stemming from my client's discovery of your use of her residence for the production of commercial porn. For example, the preparation of this demand letter alone occupied over 12 hours of my time from the initial draft, revisions, review and discussions with Ms. Bassett, review of file materials, and its finalization. Yet, $3,500 strikes me as a fair apportionment under the circumstances.

for sale or for advertising purposes.[10]  That option would also be further conditioned upon a Settlement Agreement along the same lines set forth in the preceding paragraph.  An additional agreement would have to be reached on how to disclose, and verify, the number of film/videos and their actual sales or subscribed viewings, along with the number of stills that were separately shot/developed.

If you are not willing to accept Option A or Option B as presented in principle, choosing instead either to propose a Counteroffer or an outright rejection, then Ms. Bassett demands that you provide her with the following information as a relevant predicate to her decision whether to formally file a lawsuit against one or some of you, or to pursue some other legal actions at her discretion:

(i)  The legal name; any porn industry pseudonym; age; social security number; last known physical address; email contact information; and, wages and/or other forms of monetary compensation paid while on the Vineyard in 2014-15 for each actor or other film crew member who was physically present at any time on Ms. Bassett's premises;

(ii)  The calendar dates on which any porn-related activities, including without limitation script-writing, staging, food catering, filming, clean up, etc., took place on Ms. Bassett's premises;

(iii)  A copy of all employment contracts and compensation-related records for each actor or other film crew member who was physically present at any time on Ms. Bassett's premises;

(iv)  A copy of all permit applications or other documents filed with the Town of Aquinnah or any other municipality or state agency within Massachusetts in relation to engaging in porn-related or other entertainment-related commercial activities on Ms. Bassett's premises or elsewhere within MA during 2014 and 2015;

(v)  A list by title of all films/videos shot in toto, or in part, on Ms. Bassett's premises, including both a written summation of all film "credits" listed thereon in terms of writer, director, producer, actors, etc., as well as an actual copy of each such film/video;

---

[10]  If it appears to you that one of Ms. Bassett's settlement-related goals is to prevent you from realizing any actual, or at least significant, profit from your unauthorized porn activities on her premises, you would be correct.  My personal and professional opinion is that any jury reviewing your conduct in this matter at trial will seek to achieve that same goal on far harsher monetary terms, compounded by the additur of triple damages and court-awarded attorneys' fees and costs.

In that regard, Ms. Bassett is very likely to request that the base damages for this component of her 93A claim, and/or her RICO claim, be set by her election at the figures outlined in Demand Options A or B above at a minimum, if no settlement is reached within the next 30-35 days, and tripled as punitive damages.  Obviously, you would be free to argue for a lesser measure of damages, although the three of you would appear to occupy a less than empathetic position.

(vi)  A copy of all documentary records showing the out-of-pocket production costs of each film/video shot in toto, or in part, on Ms. Bassett's premises;

(vii)  A copy of all documentary records showing the number of sales/viewings, the date and method of sale/viewing, and the sale or viewing subscription price, for all films/videos shot in toto, or in part, on Ms. Bassett's premises;

(viii)  A list of all films/videos shot in toto, or in part, on premises in Martha's Vineyard or elsewhere in MA other than Ms. Bassett's in 2014 and 2015, including in your response the name(s) and property address of each such premise's owner of record to the best of your knowledge;

(ix)  A list of all photo shoots leading to the creation of "stills" for profit and/or portfolio purposes conducted in toto, or in part, on Ms. Bassett's premises, which were not otherwise encompassed within your response to Informational Demands i. thru viii. above, including the model's name and contact information, as well as copies of all such stills;

(x)  Aside from the production of adult videos and photo shoots, a list of all other "for profit" activities conducted on Ms. Bassett's premises during Mr. Spafford's leasehold period, whether in the nature of prostitution services or any other description;

(xi)  A list of all pseudonyms or aliases used by each of the three named recipients/addressees of this Demand Letter within the past 10 years;

(xii)  A list of all incorporated and unincorporated business entities in which each of the three named recipients/addressees of this Demand Letter have had either an ownership interest in, and/or, an employment or consulting relationship with over the past 10 years; and,

(xiii)  Any other documentary information falling outside the scope of Informational Demands i. thru xii. above, which you feel may be exculpatory in any way as to your personal liability to Ms. Bassett in this matter, and/or conversely, which you feel may be relevant to the liability respectively of the other two recipients/addressees of this Demand Letter to Ms. Bassett in this matter.

In the absence of a negotiated settlement agreement, Ms. Bassett will contend in the ensuing lawsuit that any failure on your respective parts to "voluntarily" and fully provide a written response to each of those above-numerated informational requests that fall within your knowledge and/or accessible records within the next 30-35 days should be treated as a separate and wilful violation directed against my client of the MA Consumer Protection Act.

While I know that both Mr. Spafford and Ms. Jensen engaged in direct communications with Ms. Bassett in the aftermath of Mr. Spafford's premature

abandonment of the leased premises, which was entirely permissible at the time, please be advised that you (and your agents) are hereby placed on notice to refrain from any further direct communications with my client, -- save for the unlikely event that **she** decides to initiate direct communications with one or more of you.

I will anticipate receiving a written response, whether jointly or separately, within the next 35 days from the posting of this letter (allowing a courtesy 5 day extension for postal and/or email transmission).  Please direct that response to me at my letterhead's NH office address.  If you or your attorney(s) wish to communicate with me for some reason in advance of your "formal" response to this demand letter, the most time-efficient means of doing so would be via my email address of:  jataylor317@gmail.com.  My hope is that we will be able to resolve this unfortunate, and certainly sordid, matter expeditiously and relatively quietly.

Very truly yours,

John A. Taylor

JAT/pp
cc: Ms. Leah Bassett

# MASSACHUSETTS RESIDENTIAL LEASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 4th day of October 2014, by and between the Lessor: **Leah Bassett**, 7 Skye Lane, Aquinnah, MA. 02535, whose email address is leahbassett@hotmail.com and telephone number is (508)645-7890 (hereinafter referred to as "Landlord"), and the Lessee: **Joshua Spafford**, 34990 SW Buttonbush Ct., Palm City, FL. 34900, whose email address is joshspafford@yahoo.com and telephone number is (917) 208-7597 (hereinafter referred to as "Tenant"). The Lessee is bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

**1. GRANT OF LEASE:** Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Dukes County, Massachusetts, with address of: 7 Skye Lane, Aquinnah, MA. 02535,

including the following items of personal property: _please see attached inventory list._

**2. NATURE OF OCCUPANCY:** As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

**3. TERM OF LEASE:** This Lease shall commence on the **4th day of October, 2014**, and extend until its expiration on the **15th day of May, 2015**. The Tenant agrees to vacate the premises at the expiration of the Lease, unless the Lease is renewed or extended pursuant to the terms herein.

**4. SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit the sum of **$1,200.00** to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant, and **$1200.00** for rent for the final month of this lease. Tenant may not apply the security deposit to any rent due under this lease, nor shall any damages claimed (if any) be limited to the amount of said security deposit. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease, and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

In compliance with Massachusetts General Laws 186-15B:

Landlord shall provide Tenant with a written statement of the present condition of the premises to be leased, listing any damage then existing. Tenant shall determine whether the statement is correct, and sign if so. If not correct in Tenant's opinion, then Tenant shall make corrections and/or additions to Landlord's statement and sign same.

The security deposit shall be placed, within 30 days of its receipt by Landlord, in a separate interest bearing bank account, and a receipt given to Tenant reflecting the account information. Interest shall be paid to Tenant on a yearly basis for the amount of interest made by the deposit for each year, or the portion of the year prior to termination of the Lease.

Within 30 days of the termination of the Lease, Landlord shall return to the Tenant the security deposit less any deductions therefrom, including any unpaid rent and/or any reasonable amount necessary to repair any damage caused to the dwelling unit by the Tenant or other for who the Tenant was responsible (reasonable wear and tear excluded). A statement of damages shall be mailed, along with any refund, to Tenant's forwarding address, which shall be provided by Tenant within seven (7) days of Tenant's moving out, or Tenant forfeits any claim on the security deposit.

**5. RENT PAYMENTS:** Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of **$1,200.00**, said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the **1st day of October, 2014**.

Tenant agrees that if rent is not paid in full on or before the **30th day of the month**, Tenant will pay a late charge of **$50.00** as allowed by applicable Massachusetts law.

The prorated rent from the commencement of this Lease to the first day of the following month is **$1,084.00**, which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):

EXHIBIT B (7 pages)

[ X ] cash, [ X ] personal check, [ X ] money order, [ X ] cashier's check.

Rent payments shall be made payable to **Leah Bassett** and mailed to 7 Skye Lane, Aquinnah, MA. 02535. The information listed above (Name & Address) can also be used when setting up recurring monthly payments, using your bank's online banking application. All notices from Tenant to Landlord under this Lease and applicable Massachusetts law shall be delivered to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered paid, and rent will be considered unpaid until actual receipt thereof.

**6.   CONSEQUENCES OF BREACH BY TENANT:** If Tenant, by any act or omission, or by the act or omission of any of Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other documents made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease.

In case of such breach, Landlord may deliver a written notice to the Tenant in breach specifying the acts and omissions constituting the breach and that the Lease Agreement will terminate upon a date not less than thirty (30) days after receipt of the notice if the breach is not remedied within a reasonable time not in excess of thirty (30) days; and the Lease Agreement shall terminate and the Tenant shall surrender possession as provided in the notice subject to the following:

(a) If the breach is remediable by repairs, the payment of damages, or otherwise, and the Tenant adequately remedies the breach prior to the date specified in the notice, the Lease Agreement shall not terminate;

(b) In the absence of a showing of due care by the Tenant, if substantially the same act or omission which constituted a prior noncompliance of which notice was given recurs within six (6) months, the Landlord party may terminate the Lease Agreement upon at least fourteen (14) days written notice specifying the breach and the date of termination of the Lease Agreement;

If the Lease Agreement is terminated, Landlord shall return all prepaid and unearned rent, and any amount of the security deposit recoverable by the Tenant.

Under Massachusetts General Laws 186-11:

If the breach by the Tenant is **nonpayment of rent,** the Landlord shall not be required to deliver thirty (30) days'

written notice as provided above. In such event, fourteen days' notice to quit, given in writing by the landlord to the tenant, shall be sufficient to terminate the lease, unless the tenant, on or before the day the answer is due, in an action by the landlord to recover possession of the premises, pays or tenders to the landlord or to his attorney all rent then due, with interest and costs of suit. If failure to pay the rent due was caused by a failure or delay of the federal government, the commonwealth or any municipality, or any departments, agencies or authorities thereof, in the mailing or delivery of any subsistence or rental payment, check or voucher **other than a salary** payment to either the tenant or the landlord, the court in any such action shall continue the hearing not less than seven days in order to furnish notice of such action to the appropriate agency and shall, if all rent due with interest and costs of suit has been tendered to the landlord within such time, treat the Lease as not having been terminated.

Tenant expressly agrees and understands that upon Landlord's termination of this Lease, the entire remaining balance of unpaid rent for the remaining term of this Lease shall **ACCELERATE**, whereby the entire sum shall become immediately due, payable, and collectable. Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated rent.

**7.   DELIVERY OF NOTICES:** Any giving of notice under this Lease or applicable Massachusetts law shall be made by Tenant in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail.   Certified or registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed in Tenant's mailbox.

**8.   UTILITIES:**   Tenant will promptly reimburse the landlord monthly for the following utilities (indicate those that apply):
[ X ] Electric,   [   ] Gas,   [ X ] Telephone,   [ X ] Cable Television, [ X ] Internet, [   ] Water, [   ] Garbage pick-up or disposal.

Landlord will provide and pay for the following utilities (indicate those that apply):
[   ] Electric,   [   ] Gas,   [   ] Telephone,   [   ] Cable Television, [   ] Internet, [ X ] Water, [   ] Garbage pick-up or disposal.

Tenant will pay for the following utilities (indicate those that apply):

[ ] Electric, [ X ] Gas (propane), [ ] Telephone, [ ] Cable Television, [ ] Internet, [ ] Water, [ X ] Garbage pick-up or disposal.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any utilities not listed above.  Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the leased premises back unto Landlord upon termination or expiration of this Lease.  Tenant shall not add any utility service, such as a satellite dish, that requires alterations, physical or visual, to the property.
Landlord shall provide a filled propane tank for the tenant's arrival.  The tenant shall have the propane tank filled just subsequent to the termination of the Lease.
Tenant shall be responsible for removing trash from the property at least weekly.

**9.  OBLIGATIONS AND DUTIES OF LANDLORD:**

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

**10.  OBLIGATIONS AND DUTIES OF TENANT:**

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste in a clean and safe manner in compliance with community standards.  No trash, refuse or ash storage is permitted in the basement;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

**11.  NO ASSIGNMENT:**  Tenant expressly agrees that the leased premises nor any portion thereof shall be assigned or sub-let by Tenant without the prior written consent of Landlord.

**12.  TENANT INSURANCE:**  Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents.    Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from any and all damages.  The Tenant agrees to indemnify and hold the Landlord harmless from any nuisance made or suffered on the premises by the Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests to/from any negligence or illegal and improper conduct of said persons.  The Tenant is to use caution with respect to the water frontage.  The use of the water frontage is the responsibility of the Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests.

**13.  CONDITION OF LEASED PREMISES:**  Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination.  Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Massachusetts law.  Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or

omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

**14. ALTERATIONS:** Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

**15. NO ILLEGAL USE:** Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

**16. NOTICE OF INJURIES:** In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

**17. LANDLORD'S RIGHT TO MORTGAGE:** Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

**18. DELAY IN REPAIRS:** Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

**19. ABANDONMENT:** Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Massachusetts law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Massachusetts law, and terminate this Lease without notice to Tenant.

**20. NOTICE OF ABSENCE FROM PREMISES:** If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: _____

_____

_____

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

**21. POSSESSION OF PREMISES:** Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), and last month's rent is paid in full and the premises designated for lease is vacated by the prior tenant.

**22. DELAY OF POSSESSION:** Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

**23. MATERIALITY OF APPLICATION TO RENT:**

All representations made by Tenant(s) on the Application to Rent (or like-titled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

**24.   MODIFICATION OF THIS LEASE:** Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

**25.   REMEDIES NOT EXCLUSIVE:** The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Massachusetts law.

**26.   SEVERABILITY:** If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

**27.   NO WAIVER:** The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon which Tenant may rely upon if contrary to the terms and conditions of this Lease.

**28.   ATTORNEY FEES:** In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

**29.   HEIRS AND ASSIGNS:** It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

**30.   DESTRUCTION OF PREMISES:** In the event the leased premises shall be destroyed or rendered totally untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said premises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

**31.   EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

**32. LANDLORD ENTRY AND LIEN:** In addition to the rights provided by applicable Massachusetts law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premises or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

**33. GOVERNING LAW:** This Lease is governed by the statutory and case law of the State of Massachusetts.

**34. LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVED A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

[X]  The leased premises was constructed in 1978 or later.

[ ]  The leased premises was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the <u>Lead-Based Paint Disclosure Form</u> attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

**35. ADDITIONAL PROVISIONS:**

- No Pets.
- No Smoking.
- No person shall tamper with fire protection devices, including smoke & CO detectors
- Approval is required prior to storing any personal items in the basement.
- All heating devices such as space heaters must be approved by the Landlord prior to use.
- All trash should be disposed of weekly or more frequently.
- Parties are prohibited.
- Utility bills should be paid by the Tenant to the Landlord promptly upon receipt.
- The fireplace is not to be used by the Tenant for the duration of the Lease. No fires of any kind are permitted in the house or on the property. No firewood or ashes are to be stored in the house or on the property.
- The Landlord may store outdoor furniture, remove screens and shut off outside shower(s) at her discretion.
- The Landlord reserves the right to the exclusive use of locked storage areas in the closets, basement and attic for storage of her personal property.

***********************

WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:

LANDLORD

Sign: _Leah Bassett_____     Print: _Leah Bassett_____     Date: _Oct. 4, 2014_

TENANT

Sign: _J.E. Jffd._____     Print: _JOSHUA SPAFFORD____     Date: _Oct. 4, 2014_

Outlook.com Print Message                                                                                3/15/15 4:48 PM

Print                                                                                                         Close

From:  **Joshua Spafford** (joshspafford@yahoo.com)
Sent:  Sun 3/15/15 1:33 PM
To:    Leah Bassett (leahbassett@hotmail.com)

Hi Leah, I apologize sincerely for taking so long in getting back to you. I've been coping with some incredibly difficult life events namely I have been let go from my job, my long term singular source of income without warning. It's been debilitating for me and I'm fighting now for severance pay and other payouts which I feel is owed me.

It also means I am now completely unable to finish my payments on my lease from March to the end (May) which I'm incredibly sorry for. I'll assume you'll take the deposit I made as some cushion against this unforeseen event.

I can provide you with proof of my work termination if that helped explain this. I am currently out of state trying claim my severance and probably can't make it back as I cope with this and other pressing family matters.

The house is in good condition, I think. I had had two maids come and clean before all this happened. I'll apologize in advance for whatever had been left there-it's honestly not much and can just be thrown (or given away). There are some clothes in the upstairs closet and in the downstairs closet by the door some jackets and shoes. They can be thrown away or donated. They're good things.

There is some photo gear in the basement which  fashioned into a studio and I don't know what else to say other than to throw or give it away too. If anyone is a photography enthusiast a tripod is down there which is really good and someone might find good use for it.

There had been so many snowed in days and I had frequently been renting cars at strategic dates for errands and garbage runs. I know the outside garbage container has garbage and I had a few bags in the basement waiting to be brought out too. I left incredibly last minute and unfortunately that day was not in conduction with the days the garbage dump was open. I think addressing the garbage is pressing.

Lastly, a few nights ago nearly every single carbon monoxide alarm in the house went off almost at once in the middle of the night. The batteries were dying it seems. It took a long hunt to find them all. One of them was in your closet inside the master closet. I feel bad for having had to open that door and it was a last resort as I couldn't trace where the very loud noise was coming from. I hadn't had a chance to replace the many batteries so I collected all of alarms and put them in a bag along with the dead batteries by the door. I hadn't have a chance to write you about this in the stress of the past few days. It was 3 in the morning otherwise I would have gone to your families house to fix this. I didn't know what else to do.

My phone was damaged and I'm waiting for a replacement phone to be sent to me but if you tell me when a good time to contact you might be I can call from a friend's phone to discuss these things further.

I'm incredibly sorry for this. It's absolutely out of my control.  I hope you might be able to understand my situation.

Sincerely,

Joshua

https://blu172.mail.live.com/ol/mail.mvc/PrintMessages?mkt=en-us

Page 1 of 2
(blank 2-d page)

EXHIBIT  C    (1 page)



John Taylor <jataylor317@gmail.com>

---

## RE: House
3 messages

---

**Leah Bassett** <leahbassett@hotmail.com>                                        Sun, Mar 22, 2015 at 11:00 PM
To: Joshua Spafford <joshspafford@yahoo.com>, John Taylor <jataylor317@gmail.com>

Leah Bassett

7 Skye Lane

Aquinnah, MA 02535


22 March, 2015


Joshua Spafford

% Diane Hodel

66 SW Buttonbush CT,

Palm City, FL  34990


Joshua,


I am a very reasonable person and if the circumstances of your email (dated 3/15/15) were true, I would probably have a different response. I don't think you anticipated the possibility that Nica Jensen and I would communicate after your disappearance.


When I spoke with Nica, she said that she gave you $2333 to pay for your March rent bill and that she also offered to pay for your rent and utilities until the end of the lease. She said she was employing you and had advanced you $4000 or so for your impending work. Nica offered to sign an affidavit stating all of this. I can't imagine why you would run off after her act of generosity, but that isn't my problem. My problem is that you and I had a contract and now you are in breach of that contract. In fact, you are in breach of multiple terms of the lease, but I won't get into those details now. My main concern is compensation. According to the terms of the lease, you abandoned the property. In this circumstance, it is my right to terminate the lease and immediately collect the entire remaining balance of unpaid rent, utility bills and incidentals. I have attached a signed copy of the lease for your reference.


My conversation with Nica also revealed that you sublet the house without my knowledge. You accepted payment from a 3rd party (Nica) in exchange for letting other people stay at the house. After I received your email, my mother checked on the house and there were strangers, not authorized guests, unpacking their luggage. Yet, you say that you "think" the house was cleaned and left in good condition after your departure. Between the photos I've seen and my parents' assessment of the condition of the house, it is

EXHIBIT D  ( 4 pages)

clear that it needs additional cleaning, including cleaning out the fridge and garbage from the kitchen, tending to laundry and organizing the linen closets, cleaning of the laundry room, stairways and the basement, vacuuming the entire house, collecting cigarette butts on the lawn, removing a large stain from the 1st floor tile area, reinstalling all of the smoke and CO detectors, and disposing the items you left in the house, just to name a few of the tasks. The house is disheveled and looks very much "lived in". The furniture, art work and chattels need to be organized and returned to their proper place. You also left a great amount of recycling material and 10 full garbage bags rotting in the basement in addition to the completely full outdoor bin which holds 3 giant barrels (approximately 15 bags). The neglected garbage in the outdoor bin turned into quite a mess, attracting rodents and maggots. One barrel will have to be replaced and the wooden storage shed will need partial re-building due to rodent damage. I had to pay to have the garbage removed and the areas cleaned. In the lease you agreed to not store garbage in the basement and dispose of it weekly. My parents have noticed a few other items that were damaged and neglected. The condition of the house has been well documented. Let me remind you that I have a signed inventory and statement of condition with photos of the house at the commencement of your lease. Either I or my representative will assess any damage to the house. Most unsettling is that you admit to breaking into my private storage area, which was reserved for my exclusive use; legally, this is considered "breaking and entering". Your story about the alarm sounding, even if true, isn't grounds for breaking and entering. The lease states, " No person shall tamper with fire protection devices, including smoke & CO detectors". After feeling deceived by your actions and misleading letter, how can I assume that you wouldn't steal my possessions? I feel violated and pressured to fly back to Martha's Vineyard now to personally inspect the house.

I do have your last month's rent and security deposit (totaling $2400) held in escrow, but this doesn't cover the amount that you legally owe me. You are bound by the contract to pay rent and utilities until May 15, 2015 plus any incidentals. Listed below is an estimation of that amount:

$2333    March rent and utilities.

$1542    April rent and utilities (not including propane).

$1058    May rent and utilities (not including propane).

$1000    Based on the history of your propane use, I would estimate that the amount owed between the last tank filling and the end of the

lease would be around $1000.

$300    Final cleaning.

$200    Garbage disposal and clean up.

$200    According to Massachusetts law, I am entitled to the cost of installing a new lock.

$150    Late fee for 3 remaining rent bills. "Tenant agrees that if rent is not paid in full on or before the 30th day of the month, Tenant

will pay a late charge of $50.00 as allowed by applicable Massachusetts law."

$250    Legal advice to date.

$900    I will seek reimbursement for travel expenses if I fly home to assess damage and check for any stolen items from my storage

areas.

TBD    Damages (either I or my representative will make an assessment).

That comes to a minimum of $7933. Subtracting $2400 (held in escrow), brings it to a minimum of $5533. I say "minimum" because this amount does not include damage fees. I am prepared to take you to Court and if I am forced to do so, according to the lease, you will also be responsible for my attorney's fees. But as I mentioned earlier, I am a reasonable person. I would prefer to keep this as simple as possible and avoid exercising the legal system, and so I am willing to accept a lesser amount. $4000 would cover the unpaid rent, utilities and cleaning. If you reject this offer, you will leave me no choice but to sue you for the full amount plus attorney's fees. I have been advised that if you do not show up to court, the court will most likely award my full claim. If you do not pay the claim, you will be in contempt of court and face a much bigger headache. My lawyer has also suggested that I press criminal charges against you for the breaking and entering that you have already admitted to. The advantage of this is that the Police and the District Attorney's Office can require you to make full restitution to my claims as a condition to dismissing or reducing the charges filed against you. If you avoid those charges, you will have an outstanding warrant for your arrest.

I am aware that you are leaving the country to go to the Philippines soon. If I do not hear from you within a week from now, I will pursue legal action. I am saddened and disappointed that things have turned out this way. It is upsetting that you treated my home (and me) with such disregard, especially after the kindness my family and I extended to you.

Sincerely,

Leah Bassett

cc: John A. Taylor

Adams & Blinn Counsellors at Law, P.C.

43 Thorndike Street

Cambridge, MA 02141

---

Date: Sun, 15 Mar 2015 17:33:37 +0000
From: joshspafford@yahoo.com
To: leahbassett@hotmail.com
Subject: House

Hi Leah, I apologize sincerely for taking so long in getting back to you. I've been coping with some incredibly difficult life events namely I have been let go from my job, my long term singular source of income without warning. It's been debilitating for me and I'm fighting now for severance pay and other payouts which I feel is owed me.

It also means I am now completely unable to finish my payments on my lease from March to the end (May) which I'm incredibly sorry for. I'll assume you'll take the deposit I made as some cushion against this unforeseen event.

I can provide you with proof of my work termination if that helped explain this. I am currently out of state trying claim my severance and probably can't make it back as I cope with this and other pressing family matters.

The house is in good condition, I think. I had had two maids come and clean before all this happened. I'll apologize in advance for whatever had been left there-it's honestly not much and can just be thrown (or given away). There are some clothes in the upstairs closet and in the downstairs closet by the door some jackets and shoes. They can be thrown away or donated. They're good things.

There is some photo gear in the basement which fashioned into a studio and I don't know what else to say other than to throw or give it away too. If anyone is a photography enthusiast a tripod is down there which is really good and someone might find good use for it.

There had been so many snowed in days and I had frequently been renting cars at strategic dates for errands and garbage runs. I know the outside garbage container has garbage and I had a few bags in the basement waiting to be brought out too. I left incredibly last minute and unfortunately that day was not in conduction with the days the garbage dump was open. I think addressing the garbage is pressing.

Lastly, a few nights ago nearly every single carbon monoxide alarm in the house went off almost at once in the middle of the night. The batteries were dying it seems. It took a long hunt to find them all. One of them was in your closet inside the master closet. I feel bad for having had to open that door and it was a last resort as I couldn't trace where the very loud noise was coming from. I hadn't had a chance to replace the many batteries so I collected all of alarms and put them in a bag along with the dead batteries by the door. I hadn't have a chance to write you about this in the stress of the past few days. It was 3 in the morning otherwise I would have gone to your families house to fix this. I didn't know what else to do.

My phone was damaged and I'm waiting for a replacement phone to be sent to me but if you tell me when a good time to contact you might be I can call from a friend's phone to discuss these things further.

I'm incredibly sorry for this. It's absolutely out of my control. I hope you might be able to understand my situation.

Sincerely,

Joshua

---

**7 attachments**



**Joshua Spafford Signed Lease.jpeg**
2151K

**Joshua Spafford Signed Lease 1.jpeg**
2155K

21 July, 2015

Hi Joshua,

You were correct in your last email to me dated 5/28…I did return to Martha's Vineyard and indeed observed that nothing looked out of place in my personal storage room (which does not guarantee that personal items were not perused and/or stolen). My delay in responding to you is due to the numerous other problems that I discovered at the house. It took a few weeks to clean and repair that which we were able to repair. At the suggestion of my lawyer, I have revised the amount of my original itemized letter to include the listed damages that you will find in the email I've forwarded below.  Because I have waited 4+ months with no sign of payment from you, I have rescinded my generous offer on 3/22 to accept a reduced amount. You will now see that amount in full, plus interest.

Initial list of charges from 3/22 letter:

| | |
|---|---|
| $2333 | March Rent and Utilities per my 3/3 email. |
| $1542 | April Rent and Utilities (not including propane). |
| $900 | May Rent and Utilities (not including propane). |
| $629 | Propane. |
| $400 | Initial cleaning, garbage disposal and maintenance after your departure. |
| $200 | According to Massachusetts law, I am entitled to the cost of installing a new lock. |
| $150 | A late fee for the 3 unpaid rent bills, as per the conditions of the lease. |
| $250 | Legal advice. |
| $20 | Postage and handling fees for mailed documents to Florida. |
| $540 | Reimbursement for travel expenses as I was forced to return home to assess my storage area that you broke in to, and attend to the mess and damages you left behind. |
| Subtotal: | $6,964 |

Additional charges pertaining to the list of damages dated 6/12:

| | |
|---|---|
| $1000 | Re-tile damaged tile area. |
| $2,500 | Replacement cost of broken couch |
| $500 | Replacement of the following damaged or missing items: garbage barrel, washing machine door handle, dimming light switch, cuisinart part, wine glasses, BBQ cover, waste basket, hair dryer, 2 umbrellas, toothbrush holder, vintage mirror, missing books, missing linens. |
| $40 | Disposal of abandoned belongings and remaining garbage at the house. |
| $3360 | Extensive cleaning and laundry, repairs to damaged areas and material costs. Hours charged at a standard rate for MV. |
| $3250 | Further legal advice |
| Subtotal: | $10,650 |

Final summation:

| | |
|---|---|
| $10,650 | Subtotal from 6/12 letter |
| + $6,964 | Subtotal from 3/22 letter |
| - $2,400 | Amount that was held in escrow |
| + $395 | Interest thru July at non-amortized $2.58 per day |
| =$15,609 | **Amount due** |



EXHIBIT E    ( 1 page) ( Plus 4 sample photos of the mess/damages)