UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * *

LEAH BASSETT,

Plaintiff

vs.

                               CIVIL ACTION
                               No. 18-cv-10576-PBS

MONICA JENSEN, d/b/a NICA NOELLE;
JON BLITT, personally and d/b/a MILE
   HIGH MEDIA, d/b/a ICON MALE;
   d/b/a TRANSSENSUAL;
MILE HIGH DISTRIBUTION, INC.;
ET ALS.

         Defendants

* * * * * * * * * * * * * * * * *

## PLAINTIFF'S OPPOSITION RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.  Introduction

Defendants' counsel start their Memorandum's Introduction section with this opening

paragraph:

> *This case should never have been brought in federal court.. What should have been a run-of-the-mill breach of contract case has morphed into a federal lawsuit that includes claims under the U.S. Copyright Act and the Racketeer Influenced and Corrupt Organizations Act.* [Mile High Memo ("MH Memo") at 1]

That opening speaks volumes about the intractible speciousness of their stated position, dating

back to their original Response Letter over four years ago to the formal Demand Letter, dated

October 6, 2015, that Ms. Bassett had sent to them pursuant to Chapter 93A, Section 9 of the

Massachusetts Consumer Protection Act.[1]

---

[1] Both letters are attached as Exhibits 1 & 4 respectively of Plaintiff's Verified Complaint. [Doc.#1]

Defendants would have this Court believe that the **only** person who bears **any** liability to Ms. Bassett is Joshua Spafford as the lessee of her residential premises per a written Lease that ran from October 4, 2014 to May, 15, 2015.  By extension, they appear to insist that her **only** recoverable damages, and from him alone, are the unpaid rent and utilities that he skipped out on when he notified Ms. Bassett on March 15, 2015 that he had vacated the premises and was "unable" to pay the contractual balances due per the Lease.  They also insist that they bear no liability for the subsequently discovered $15,000+ in physical damages, cleaning costs, etc., which were committed during **his** tenancy.

In short, Defendants would have this Court believe that it is legally inconsequential that Mr. Spafford's **sole** reason for entering into that Lease in the first place was due to his retention per his porn pseudonym of Joshua Darling to be the joint Director of Photography and the sole Still Photographer for a plethora of porn films that were to be shot on Martha's Vineyard and elsewhere in New England for the Quebec-based Mile High-associated Defendants per their porn studios/brands known as <u>Icon Male</u> and <u>Transsensual</u> respectively.

They contend that it is legally inconsequential that a majority of the 22,000+ Still photographs that "Mr. Darling" shot during his retention as their Still Photographer were created **on Ms. Bassett's premises** as marketing shots: (1.) Of actors who were hired by Ms. Jensen in her capacity as Mile High's studio head for those two porn lines/brands, and brought onto the Vineyard for the sole purpose of appearing in the Mile High-owned films and Stills and, (2.) Of film scenes being shot on several private residences, **including Ms. Bassett's**.

They contend that it is legally inconsequential that Ms. Bassett has identified to date 21 of the Mile High-owned <u>Icon Male</u> and <u>Transsensual</u> porn films that feature either action scenes

and/or modeling Stills that were shot on her premises without her knowledge or lawful authority.[2]

They contend that it is legally inconsequential that they deliberately opted to incorporate into their porn films and Stills Ms. Bassett's numerous images of her home's structural exterior and interior design; her home's furnishings; and, many of her own artistic creations, as well as the artistic creations of several other fine artists; -- without seeking either permission to use those images in their commercial porn films and Stills, or to exhibit any concern prior to, or after, releasing those porn films and Stills onto the marketplace whether any of those images in her house were Copyright-protected.

They contend that it is legally inconsequential that Ms. Jensen instructed 30+ of the actors and crewmembers whom she had hired in her capacity as Mile High's studio head to **reside on** Ms. Bassett's residential premises during their respective stays on the Vineyard without her knowledge or permission.[3]

They contend that it is legally inconsequential that they were shooting/creating porn for commercial purposes in known and/or reckless disregard of the fact that doing so was in violation both of the written terms of the Lease and of local zoning ordinances both in Aquinnah and West Tisbury.[4]

They contend that it is legally inconsequential that neither Ms. Jensen, conducting her porn activities on the Vineyard at the time per a shell "foreign" corporation known as Toaster

---

[2] See Affidavit of Leah Bassett, para.16, previously filed as Doc.#62. An additional point averred in that Affidavit and its attached photos was that Ms. Bassett was still able to readily find on the Internet circa July/August 2019 numerous on-going advertisements for, and film clips or Stills of, the porn films that had been shot on her premises, as well as numerous posts by the actors themselves on their Social Media sites that still included photos of them in her house (typically posed in front of her Copyright-certified fireplace facade).

[3] See Joshua Spafford's 93A Response Letter, attached herewith as Exhibit 2 of Taylor's Affidavit. He listed over 30 actors and crew who had been present on Ms. Bassett's for housing and/or porn shoot purposes.

[4] See Part III, Section C of Plaintiff's Cross-Motion for Summary Judgment Memo filed herewith.

Kid, Inc., nor Mr. Blitt/Mile High, conducting their porn activities on the Vineyard at the time per at least two "foreign" corporations known as Mile High Distribution, Inc. and Mile High Media, Inc. respectively, sought and secured a "doing business" registration certificate with the Massachusetts Secretary of State's Office as required per Mass. Gen. Laws, Chapter 156D.[5]

Harkening back to their Memo's opening sentence, Defendants' counsel chose to deliberately "ignore" the indisputable fact that **none** of their Mile High-associated clients, -- nor the person they seek to cast as their scapegoat, Mr. Spafford/Darling, -- were residing or maintaining any place of business in Massachusetts at the time of this lawsuit's initiation. As stated in the Verified Complaint's Section II's Jurisdictional Statement:

> *This Court has jurisdiction due both to Ms. Bassett's federal claims arising from asserted violations of the U.S. Copyright Act and the civil-based provisions of the U.S. "RICO" Act respectively, as well as on the basis of diversity of citizenship arising from the out-of-state or out-of-country residential and/or business locations of various Defendants named herein.*

In short, this Court would properly have jurisdiction over Ms. Bassett's state-based 93A statutory claim, as well as her several common law claims, even if there were no federal-based statutory claims. Defendants evidently felt that openly acknowledging that fact would detract from the blustery hyperbole of their claim that "*This case should have never been brought in federal court.*"

## II. Applicable Law

Defendants' counsel purportedly recited the review standard for a Summary Judgment Motion per Fed. R. C. P., Rule 56, as summarized by the caselaw that they cite in their "Applicable Law" section of their Memo. A closer examination of their recitation, however,

---

[5] See Part III, Section D of Plaintiff's Cross-Motion for Summary Judgment Memorandum filed herewith.

reveals that they **omitted** a key provision of the review standard; to wit, that portion that reads: "*The Court must review the entire record in the light most favorable to the non-moving party and indulge all reasonable references in that party's favor.*"  IvyMedia v. iLIKEBUS, Inc., 252 F.Supp.3d 34, 37 (D. Mass. 2017)( citing O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)). As will emerge as a disturbing pattern raised in this Opposition Response, it appears that Defendants' counsel has adopted a deliberate, and certainly unethical, tactic of failing to disclose any facts pertinent to this case, or any controlling legal authority, that they determined to be adverse to their clients' interests.

## III. The Copyright Infringement Claim

Somewhat surprisingly in the face of Ms. Bassett's 93A-based claim, Defendants appear to be particularly focused on her Copyright Infringement Count, electing to devote 24 of their 44 page Memo to that one Count (versus less than two pages at 38-39 by contrast to the 93A Count). Consequently, Ms. Bassett will direct the majority of this Response in refuting the panoply of factual mistatements and erroneous analyses of the controlling law that Defendants put forth in their Memo in regards to the Copyright Count.

[A.] In Defendants' Part I, Section A, they assert that: "*Plaintiff's Copyright Registrations are Defective.*" [MH Memo at 6 & 7].  They correctly note that the three Copyright Certificates that Ms. Bassett secured from the U.S. Copyright Office were issued on their face on the basis "*that the works were 'unpublished collections'*", which was followed by their entirely incorrect claim that: "*However, Plaintiff's works had been previously published.*" [MH Memo at 7]. Defendants cite to para. 29 of their Undisputed Statement of Facts as their sole purported support for that conclusion, which reads in its entirety as follows:

*Prior to filing her copyright registrations, Plaintiff promoted or sold her artworks on*

*the internet. On March 7, 2014, she launched a website with the address of "www.leahbassett.com". In the summer of 2014, she activated an Esty online shop.* [citing to selected pages from Ms. Bassett's Deposition attached as Kaufman's Ex. D]

A review of those Deposition excerpts reveals that Ms. Bassett did not testify at any point that she had sold and/or displayed on those two internet sites **any** of the works that she subsequently itemized on those three Copyright applications for registration! In short, Defendants simply assert as an "Undisputed Fact" a specific claim for which they have absolutely zero admissible evidentiary support per Rule 56(c)(1). Moreover, that factual claim simply is not true.[6] Moreover, it really defies common sense to credit that she would have even tried to sell over the Internet her home's roughly one ton fireplace facade, and/or any or all of her hand-sewn decorative pillows and slipcovers; her pottery pieces; or any of her wall-hanging artwork that she had created years earlier as part of her own home's distinctive interior design.

That factually erroneous claim leads to Defendants' conclusion that:

> *Designating works as unpublished when they have in fact been published renders a copyright registration invalid if the plaintiff knows the information is inaccurate, and the Copyright Office would have refused registration if it had been aware of the inaccuracy.*[7] [MH Memo at 7].

---

[6] See Bassett Affidavit, filed herewith. As defined in Section 101 of the Copyright Act: *"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.*

Defendants offer zero evidence from those two websites established in 2014 by Ms. Bassett that she had ever "sold, rented, leased, or lent" any one of the 53 Works that were still present in her home when she secured the Copyright Certifications for them in September 2016. Likewise, they offer zero evidence that she ever posted any images of them on those two websites. See Archie MD, Inc. v. Elsevier, 261 F.Supp.3d 512, 516 (S.D.N.Y. 2017) (Quoting Getaped.com Inc. v. Cangemi, 188 F.Supp.2d 398,401 (S.D.N.Y. 2002) for the proposition that *"the key factor bearing on whether a work is published through its being posted online is the ability of the user to 'gain a proprietary or possessory interest' in the work."*).

[7] Defendants advanced their own hypothetical in opining as follows:  *"In fact, even if only some of the works were published on her website, that would still invalidate the registrations..."* [ MH Memo at 8. Underlined emphasis in original.], which merely serves from Ms. Bassett's perspective to underscore "the fact" that they were unable to identify via affidavit, photo from her website, or any form of admissible evidence a single, never mind "some," of her works at issue that were published on her website. Defendants are simply "making up" this claim, which they

Moreover, Defendants make that conclusory assertion as to what course of action would have been taken by the Copyright Office without offering by affidavit or otherwise **any** admissible evidence by a current or former Copyright Office employee or other qualified expert witness in support of that conclusion.[8]  Related thereto, they deliberately failed to acknowledge the well-established decisional authority that: "*A certificate of registration from the U.S. Copyright Office raises the presumption of copyright validity and ownership.*"  Unicolors, Inc. v. Urban Outfitters, Inc., 853 F.3d 960, 998 (9th Cir. (CA) 2017).

[**B.**] In Defendants' Part II, Section B, they assert as an "alternative" theory heading that: "*Even if Valid, The Scope of Plaintiff's Copyright Protection is Extremely Limited*".  [MH Memo at 8]. They proceed to question whether every component of Ms. Bassett's separately itemized 53 works identified in those three approved Copyright Certificates were entirely "original" as to her, but that is an evidentiary issue that would **only** arise prospectively in this case **at the damages assessment phase** relative to apportioning Defendants' damages in specific instances to account for the non-original elements of a particular infringement.  In short, the U.S. Copyright Office personnel determined, after a review that included pre-and-post-application communications both with Ms. Bassett and her counsel respectively,[9] that each one of the 53 itemized Works contained

---

shamelessly and unethically, characterized as one of their "Undisputed Facts".

[8]  As stated in the aforesaid Archie MD, Inc. decision: "*The Court is persuaded that, in order to comply with the clear directive of s. 411(b)(1), a copyright infringement claim should not be dismissed on account of inaccurate information that was inadvertently included in the copyright registration, whether or not the inaccurate information is material... The Court therefore holds that there is no dispute that Levine did not state that the animations in the collection were unpublished 'with knowledge that [that information] was inaccurate.' 17 U.S.C. s. 411(b)(1)(A).*"  In the case at bar, Ms. Bassett's identification of the Works in her home as unpublished was not inaccurate.

[9]  A review of each of the three Certificates issued by the Copyright Office state on the second page as follows: "**Correspondence: Yes**" (Bold emphasis in original), intended evidently as an internal acknowledgement that the Office's reviewing personnel had engaged in direct communications with the applicant as part of their review process.

sufficient "originality" on her part to qualify for issuance of an official Certification as submitted.

Since Defendants are unable to rebut the presumption of validity that inures to Ms. Bassett's Copyright Count as a result of her approved Certificates issued to her by the Copyright Office, it is completely unnecessary at this liability stage of the proceeding to parse each of the Works at issue in determining what elements, and in what proportions, each one consists of original versus non-original portions. Besides the glaring failure by Defendants to submit **any** admissable expert testimony in support of this argument as to the purported existence of unprotectible portions of some number of Ms. Bassett's Copyright-protected Works at issue, -- including an identification via expert witness as to which specific works he or she believed that issue to be present, -- there is a prospective damages assessment-related issue as to whether they are now barred from doing so by virtue of their failure to identify any expert witnesses by the deadline, as extended per the Court's September 6, 2019 Order, for them to do so on or before November 15, 2019.

Related thereto, Defendants claim per a titled sub-heading that "*Some of the Works, in Whole or in Part, Are Not Authored or Owned by Plaintiff.*" [MH Memo at 12-13]. The claim that Ms. Bassett **does not own** "[*s/ome of the Works*" is again absolutely erroneous, and Defendants fail to identify which of the 53 Works are being referenced, and on what basis via any admissible evidence. As to those number of the 53 Works that are visibly depicted in the Mile High-owned porn films and Stills circa 2014-15, they were obviously  in her home when Ms. Bassett applied for the Copyright Certificates in 2016, since she had to submit photos of each one with the applications. It is simply mystifying that Defendants would recklessly and falsely assert that she did not own some unspecified number of them.

There is no question, however, that some of the registered Works include subparts that

were not created by Ms. Bassett, underpinning Defendants' claim that she "*herself has conceded that many of these works actually take materials and other elements from previously existing creations.*" [MH Memo at 12]. Apart from disputing Defendants' use of the word "*many*", the only significance is that it places **some** of Ms. Bassett's Copyright-certified items into the category of being "derivative works", -- which again simply has some prospective relevance in an assessment of damages hearing as to how to measure the monetary amounts to be awarded to Ms. Bassett as to Defendants' infringements of those particular Works in each instance. It does **not** provide an avenue for the Mile High-associated Defendants to wholly escape liability for their unauthorized use of Ms. Bassett's Copyright-protected "derivative" Works in their commercial porn films and Stills.

Defendants' conclude this section of their Memo at pg. 13 by stating:

> *Finally, Plaintiff did not even create at least one of the primary items from her house that she is claiming copyright over: the fireplace facade. Plaintiff's father testified at deposition that Plaintiff did not design or create this fireplace. Someone else did. The extent of Plaintiff's role was that "She helped as a [stone] mason's assistant." (SOF #32).*

Apart from appreciating the tacit admission therein that Defendants have zero admissible evidence to support **any** claim that Ms. Bassett did not herself create any of the other "*primary items from her house that she is claiming copyright over*", their specific claim as to the fireplace facade falling into that category is, once more, both factually mistaken and legally specious.

From a factual standpoint, Ms. Bassett's father's testimony to that stated effect would be inadmissable at trial because Defendants' counsel failed to establish that he was either present when the fireplace facade was built, or that he had any other hearsay-admissable basis for his testimony. Defendants' counsel knew, moreover, when they included that reference to Tod Bassett's testimony as their Undisputed Fact #32, that it absolutely varied from Ms. Bassett's

own evidentiarily-admissible averments in Discovery as to the role she played in building that fireplace facade.[10]

From a legal standpoint, it would make absolutely no difference whatsoever in terms of Defendants' liability, **even if** Ms. Bassett had hired her former boyfriend, Eben Armer, to build that fireplace facade, and had played no role herself in its physical creation! The Copyright Act's "Work for Hire" doctrine would apply in that scenario, establishing as a matter of law that Ms. Bassett would own the copyright to that specially-created fireplace facade, -- unless the artisan/artist who built it had retained a written instrument acknowledged by the hirer/owner of the fireplace facade that established that he had retained the copyright to it. As stated in GoPro, Inc. v. 360Heros, Inc., 291 F.Supp.3d 1060, 1069 (N.D. Cal. 2018):

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author... and, unless the parties have expressly agreed otherwise in a written instrument signed by both of them, owns all of the rights comprised in the copyright. 17 U.S.C. s. 201(d).

In the absence of Defendants' producing such an instrument entered into between Ms. Bassett and Mr. Armer as part of their Motion's exhibits, the Act indisputably establishes that she would own the copyright to that fireplace facade, even if he had been its sole builder/creator.

[C.] In Defendants' Section I, Part C, they claim per their titled sub-heading that: "*Any Appearance of These Items is De Minimis as a Matter of Law, and Does Not Amount to a Taking.*" [MH Memo at 14-16]. They proceed to variously misstate key factual matters and controlling law in their ensuing argument.

First, Defendants' counsel fail to acknowledge anywhere in their Memo that both a "de

---

[10]   Depo. of Leah Bassett at pgs. 228-229 ("*Q. And did you create the fireplace? A. i co-authored it. Yes, I took place creating it. Q. Who did you create it with? A... He was a former partner, Eben Armor (phonetic). And I helped him build it.*").   See Affidavit of Eben Armer being filed herewith.

minimis" claim and a "fair use" claim respectively is treated "as a matter of law" as an affirmative

defense, for which the defendant(s) bear the burden of proof.  See Monge v. Maya Magazines,

Inc., 688 F.3d 1164, 1170 (2012).

Second, Defendants' counsel also fail to acknowledge anywhere in their Memo that both

of those affirmative defenses are also treated "as a matter of law" as being highly equitable in

their essence, and hence, unavailable to any defendant whose copying of the plaintiff's works at

issue is tainted by "unclean hands" of any of the other recognizable bars to equitable relief.  As

stated in Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985): "*Fair*

*use presupposes 'good faith' and 'fair dealing'.*" (Quoting Time, Inc. v. Bernard Geis Associates,

293 F.Supp. 130, 146 (SDNY 1968)). See Atari Games Corp. v. Nintendo, Inc., 975 F.2d 832,

836-43 (1992)(treating defendant's bad faith in use of an unauthorized copy as a complete bar to

fair use).

In the case at bar, Defendants have failed to advance **any** claim that they exhibited **any**

measure of "*good faith and fair dealing*" towards Ms. Bassett in connection with their collective

decision to shoot commercial porn films and Stills on her residential premises, utilizing her

furnishings and artworks in those films and Stills, and without seeking either her permission or

seeking lawful authority to engage in such business activities from the Town of Aquinnah and/or

the Mass. Secretary of State's Office.  Similarly, they failed to demonstrate **any**

measure of "*good faith and fair dealing*" towards Ms. Bassett upon receipt of her 93A Demand

Letter, in which she advised them that a number of her copyright-protected works appeared to be

featured in those films and Stills that she had seen on various Internet sites, and advised them to

cease and desist all further marketing and displays of her furnishings and artworks in their

commercial porn films and Stills.[11]

Separate and apart from the absolute bar that attaches to the Mile High-associated Defendants by virtue of their unclean hands in even raising a purported de minimis affirmative defense (or a fair use defense), they have shown no credible and/or undisputed factual showing that the appearance of Ms. Bassett's Copyright-certified Works would fall within the definition of a de minimis usage in each and every instance. In fact, they fail to even reference a single one of Ms. Bassett's 53 Copyright-certified Works as it appears in a single one of their 21 porn films at issue in which they claim that its appearance within that film was so trivial and/or unrecognizable as to qualify as de minimis, -- even if they were an innocent infringer versus a willful and unscrupulous set of infringers. Instead, they have simply filed with their Summary Judgment Motion a total of 14 of the 21 porn films at issue in DVD form, and apparently are "inviting" the Court to review all 14 of them on its own for the purpose of making any such assessment!

Defendants also failed to acknowledge once again that the modern day **seminal case** as to the proper parameters of a de minimis affirmative defense is <u>Ringgold v. Black Entertainment Television, Inc.</u>, 126 F.3d 70 (2nd Cir. (NY) 1997).[12] In that case, the recited facts established

---

[11] Her 93A Demand Letter is attached as Exhibit 1(A) of Plaintiff's Verified Complaint. That letter states on pg. 7 that: *"My client further informs me that her furnishings included a number of original and copyrighted works of art, which would prospectively give rise to infringement claims under the U.S. Copyright Act per Title 17 of the U.S. Code, as their 'background' display in your commercial films and/or photo 'stills' without her permission by way of a written release."* It further stated on pg. 9 that any prospective settlement agreement would be conditioned upon the inclusion of *"A clause prohibiting any further dissemination of the films and stills shot on her premises on your or any related entities' part respectively."*

[12] Defendants made no reference whatsoever to the <u>Ringgold</u> decision in their previously-filed Opposition Response to Plaintiff's Motion for Preliminary Injunction in which they advanced the same de minimis argument, while citing two cases therein that had painstakingly applied the <u>Ringgold</u> decision's analysis in the course of finding the particular usage of the copyrighted Works to merit a de minimis finding. Ms. Bassett's Reply Brief **did** identify <u>Ringgold</u> as the seminal case on this issue, as well as a detailed analysis as to why their two cited cases were factually distinguishable

that Faith Ringgold had sold a single artwork, titled "Church Picnic Story Quilt", to the High

Museum of Art in Atlanta, Georgia.[13]   The opinion noted that: "*Although Ringgold has retained*

*all rights in the copyright in 'Church Picnic,' the work itself is owned by the High Museum of*

*Art.. [which] has held a non-exclusive license to reproduce 'Church Picnic' as a poster... and to*

*sell those reproductions... for $20.00 a copy.*"  Id. at 72.   The opinion describes the claimed

infringement by the defendant, a sunsidiary of Home Box Office, Inc. as follows in pertinent part:

> *HBO Independent Productions, a division of HBO, produced "ROC," a television*
> *"sitcom" series concerning a middle-class African-American family living in Baltimore.*
> *Some time prior to 1992, HBO Independent Productions produced an episode of ROC*
> *in which the "Church Picnic" poster, presumably sold by the High Museum, was used*
> *as part of a set decoration... In the episode in question,... the minister of the church*
> *suggests that they give a recital in the newly-remodeled church hall.  A five-minute*
> *scene of the recital concludes the episode.  The 'Church Picnic" poster was used as a*
> *wall-hanging in the church hall....*
>
> *In the scene, at least a portion of the poster is shown a total of nine times.  In some*
> *of those instances, the poster is shown at the center of the screen, although nothing in*
> *the dialogue, action, or camera work particularly calls the viewer's attention to the*
> *poster.  The nine sequences in which a portion of the poster is visible range in duration*
> *from 1.86 to 4.16 seconds.  The aggregate duration of all nine sequences is 26.75 seconds.*

Id. at 72-73.

The opinion proceeds to frame the issue before it from a de minimis standpoint as follows

in pertinent part:

---

from the case at bar.  Notably, Plaintiff's Verified Complaint at pg. 22 also identified Ringgold "[a]*s a leading*
*precedent to this type of infringement*" in the course of setting out her Copyright Infringement Count.  In this instance,
Defendants' counsel evidently felt it necessary to cite to that case in their Memo at pg. 15, but they grossly and
deliberated misstated the **real** bases as to why that defendant failed to prevail on its de minimis defense.

[13]  Like some of Ms. Bassett's works, that "story quilt" as described in the opinion would be deemed for Copyright
purposes as a derivative work due, in part, to its inclusion of many "*multi-colored triangular shapes of fabric.*"  Id. at
72.

*In the pending case, there is no dispute about copying as a factual matter: the "Church Picnic" poster itself, not some poster that was similar in some respects to it, was displayed on the set of defendants' television program. What defendants dispute when they assert that their use of the poster was de minimis is whether the admitted copying occurred to an extent sufficient to constitute actionable copying, i.e., infringement.*

Id. at 75.

In determining that the defendants were liable to Ms. Ringgold for copyright infringement, the Court's analysis included the following reasoning and holding:

*In the longest segment, between 4 and 5 seconds, nearly all of the poster, at least 80 percent, is visible. The camera is positioned to the right of about eight members of the audience seated on the left side of the center aisle... The minister stands to the right of the poster, partially obscuring the lower right quadrant, and a member of the audience stand to the left, partially obscuring the lower left quadrant... The very top edge of the poster is not within the camera's "framing" of the scene. Since the camera focuses precisely on the members of the audience, the poster, hung to their left, is not in perfect focus, but it is so close to them that the poster is plainly observable, even though not in perfect focus. An observer can see that what is hung is some form of artwork, depicting a group of African-American adults and children with a pond in the background. The brevity of the segment and the lack of perfect focus preclude identification of the details of the work, but the two-dimensional aspect of the figures and the bold colors are seen in sufficient clarity to suggest a work somewhat in the style of Grandma Moses. Only the painting portion of the poster is observable; the text material and the bordering quilting cannot be discerned.*

*All the other segment are of lesser duration and/or smaller and less distinct portions of the poster. However, their repetitve effect somewhat reinforces the visual effect of the observable four-to-five second segment just described.*

*A helpful analogy in determining whether the purpose and duration of the segments should be regarded as de minimis is the regulation issued by the Librarian of Congress providing for royalties to be paid by public broadcasting entities for the use of published pictorial and visual works. [citations omitted] The Librarian appoints the Register of Copyrights, who serves as the director of the Copyright Office. See 17 U.S.C. s.701. The Librarian's regulation distinguishes between a "featured" and a "background" display, setting a higher royalty rate for the former. Id., s.253.8(b)(1)(i)(A), (B). **Obviously the Librarian has concluded that use of a copyrighted visual work even as "background" in a television program normally requires payment of a license fee.** Moreover, the Librarian has defined a "featured" display as "a full-screen or substantially full-screen display for more than three seconds." Id., s.253.8(b)(2), and a "background" display as "[a]ny display less than full-screen or substantially full-screen for three seconds or less," Id. If defendants' program were to be shown on public television, plaintiff would appear to be entitled to a "background" license fee for a "less than full-screen" display.*

> *From the standpoint of a quantitative assessment of the segments, the principal four-to-five second segment in which almost all of the poster is clearly visible, albeit in less than perfect focus, reinforced by the briefer segments in which smaller portions are visible, all totaling 26 to 27 seconds, are not* de minimis *copying.*

Id. at 76-77 [Emphasis in bold added].

Besides Defendants' utter failure in the case at bar to provide anything close to the detailed analysis that the Ringgold Court deemed appropriate in reviewing those defendants' de minimis affirmative defense, -- while noting that there was no suggestion or finding of "unclean hands" as to how those defendants came to use a poster-sized reproduction that had presumably been purchased from the museum that owned the original artwork (but not the copyright to it), -- they simply assert a series of conclusory factual claims that are, in truth, entirely fallacious as any actual, never mind thorough, review of the films and Stills will readily demonstrate.[14]

[D.] In Defendants' Section I, Part D, their next "fall back" position begins with an

---

[14] Defendants' counsel make the following factual claims in support of their de minimis argument, while failing to reference **any** support for those factual claims in the record via affidavits or deposition testimony from their clients or from any other person who has examined all of the instances of the copying of Ms. Bassett's Copyright-certified Works in the Mile High-owned films and Stills: *"The appearance of some of these items in the background of the adult films at issue are entirely incidental to the films themselves;"* *"These miscellaneous items are the last thing that any casual observer would look at or notice;"* *"Observers are singularly focused on the interactions of the actors, and Plaintiff's items appear as nothing more than generic house furnishings;"* *"This is not a case where the copyrighted materials play some part in the storyline, or receive some special attention or focus in the films;"* *"Often, the items are not even displayed with sufficient detail for the average lay observer to identify the protectable elements within them;"* *"They are featured on the background walls, behind actors, cast off in the side of the picture, and obscured by other items or people;"* *"Because the items have such little importance or value to the actual films, they are affectively* [sic] *unnoticeable and unremarkable;"* *"It does not not matter whether they appear for one second or one hour -- they are unnoticeable to the average lay observer all the same;"* *"They were merely minimally and incidentally captured in the background of the films;"* *"Many of the appearances of the works are partial, obscured, in the background, or out of focus;"* *"When they appear at all, they are usually behind the actors or in some small subset of the screen and off to the side;"* *"appearance of the items in the background have little or no contribution to the essence of the films;"* *"They are not a focal point."* [MH Memo at pgs. 15-23]. Those numerous, highly repetitive sentences, constitute a considerable amount of inadmissible "testimony", in effect, by Defendants' counsel. Far more disturbingly, they constitute a set of affirmative and deliberate factual representations made to the Court that are so demonstrably false from an actual review of the 14+ films and the several thousand individual Stills at issue as to be sanctionable. To only partially illustrate the falsity of those testimonial averments made by Defendants' counsel to the Court a number of "screenshots" from some of the films, as well as a number of the Stills, are being filed herewith along with the respective Affidavits from the two "average lay observers" who assisted in the viewing and copying of those Mile High-owned images.

opening sentence that states: "*Even if the appearance of Plaintiff's household items in the films rises to the level of a 'taking,' she cannot prevail on her copyright infringement claim because any use of her purportedly copyrighted materials was fair use as a matter of law.*" [MH Memo at 16-24]. They proceed to devote 8+ pages to a thoroughly skewed and specious "analysis" of the four factors that predominate **most** of the reported cases in which a fair use affirmative defense have been properly pled.

Two noteworthy, and fatal for the Mile High-associated Defendants, distinctions between "most" cases in which a fair use defense has been raised, and the case at bar are: (1.) That affirmative defense is an equitable one as stated previously in this Response, and **none** of the "supporting" cases cited by Defendants involved a "non-innocent" infringer so tainted by unclean hands. In emphasizing the equitable nature of the fair use affirmative defense, the aforecited Harper & Row Publishers Court observed: "*As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'*" 471 U.S. at 565 (Citing Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (CA2)); and, (2.) That affirmative defense has scant application where the pirated works in question hold the status of being "unpublished" at the time of the defendants' unauthorized copying of them. As stated also by the Harper & Row Publishers Court: "*We conclude that the unpublished nature of a work is '[a] key, though not necessarily determinative, factor' tending to negate a defense of fair use. Senate Report, at 64.*" 471 U.S. at 554.

One other distinguishing factual feature in the case at bar in contrast to **any** of the "supporting" cases cited by Defendants relates to the shear numbers of: (1.) Ms. Bassetts' 53 Copyright-certified Works that appear in Defendants' porn films and Stills; (2.) The 14+ Mile High-owned films in which her Works were displayed without her permission; (3.) The estimated

4,000+ of the 22,000+ Stills owned by Mile High in which her Works were displayed without her permission; and, (4.) The acts undertaken by the Mile High-associated Defendants to foster the release of film clips and Stills to their featured actors, as well as to numerous distributors, for marketing/advertising purposes on their respective Social Media sites and business websites.

Even if one engages in an honest analysis of the four factors that Defendants chose to identify solely, they would still lose, -- and certainly so if one applies that part of the Summary Judgment standard that their counsel deliberately failed to include; to wit, *"The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor."* It is worth noting that the Ringgold Court **also** considered the defendants' fair use defense, -- on which they had prevailed in the lower court, -- and reversed that judgment in their favor on fair use grounds. 126 F.3d at 79-81. The Court reviewed the same four factors cited by the Mile High-associated Defendants, and did not find any of them persuasive in the defendants' favor, -- even though those defendants had no reason to realize that Ms. Ringgold had retained the copyright to the work that she had sold to a museum; even though those defendants had only copied one of Ms. Ringgold's works, rather than numerous of them; and, even though that one work had appeared in the background of a single five minute segment of a serial TV show for a cumulative total of 26 to 27 seconds. Yet, these Defendants would have this Court believe that they have a "winner" in their fair use affirmative defense.

The first factor that Defendants address as stated in Section 107 of the Copyright Act is: *"Tha purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."* Obviously, Defendants cannot check the *"nonprofit educational purposes"* box, and so they instead seek to minimize their placement in the *"commercial nature"* box by asserting that: *"The appearance of these items in the films does not*

*add* any commercial benefit to the films; rather it's incidental to the commercial enterprise." [MH Memo at 19 (Underlined emphasis in original)].  Notably, they cite to zero parts of the record as to any admissable testimony or financial records that even purports to establish that the physical appearance of their porn sets do not "*add any commercial benefit to the films,*" or by extension to the modeling Stills that they use for marketing purposes.

In rejecting the defendants' similar claim in <u>Ringgold</u> that "*the presence of the poster was 'incidental' to the scene and the defendants did not use the poster to encourage viewers to watch the ROC episode,*" the Court noted that:

> *The defendants have used Ringgold's work for precisely a central purpose for which it was created -- to be decorative... Nothing that the defendants have done with the poster "supplant[s]" the original or "adds something new." The defendants have used the poster to decorate their set to make it more attractive to television viewers precisely as a poster purchaser would use it to decorate a home.*

126 F.3d at 79-80 (quoting from <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 579 (1994). The same analysis applies to the Mile High-associated Defendants' commercial use of Ms. Bassett's numerous Copyright-certified Works. They used them for precisely the same purpose for which they had been created and utilized by Ms. Bassett, and they certainly did not add anything "transformatively" different or new to them.  Indeed, they used them in her very home, -- without either her permission or lawful authority!

The second factor addressed in their Memo is "*the nature of the copyrighted work.*"  Their two-part argument as to why they believe it was "fair" for them to incorporate Ms. Bassett's Copyright-certified Works throughout their 14+ films and estimated 4,000+ Stills is: (1.) A claim that her Works were "minimally" creative, since "*many of the aspects of these works are either functional or derive their creativity from a source other than Plaintiff*"; and, (2.) "*Plaintiff's art has already been previously published, which removes any supposed threat to her right of first*

*publication (no matter how remote).* [MH Memo at 20]. As stated previously in rejoinder, Defendants failed to provide **any** admissible expert witness or other record support for their claims that some of her Copyright-certified Works "failed" to meet the U.S. Copyright Office's requisite standards for creativity; Defendants failed to provide **any** admissible testimony or other record support for their claim that Ms. Bassett does not validly own the copyright to her own fireplace facade; and, Defendants failed to provide **any** admissible testimony or other record support for their claim that some or all of her Copyright-certified Works had been previously "published" be her.

In short, the nature of each of Ms. Bassett's 53 Copyright-certified Works were intended to be decorative, even as to those few that were partially derivitive and/or functional, and that was the sole manner in which Defendants chose to utilize them in their commercial porn films and marketing Stills, -- viz., to be decorative and/or functional.

The third factor addressed in Defendants' Memo is "*the amount and substantiality of the portion used in relation to the copyrighted work as a whole.*" Defendants' counsel purport to testify via their Memo that "[*m*]*any of the appearances of the works are partial, obscured, in the background, or out of focus,*" as supporting their conclusion that "[*t*]*he insignificant qualitative nature of the use of hese items, along with the fact that they are often shown out of focus, obscured, and obstructed, all favor fair use.*" [MH Memo at 21-22]. Again, their Motion provided no admissible testimony or other record support for those conclusory factual claims, and certainly not in any fashion that would extend to **every** instance in which one or more of Ms. Bassett's 53 Copyright-certified Works was deliberately utilized by Mr. Spafford and/or Ms. Jensen at Mile High's behest as a decorative prop in the 14+ porn films and the estimate 4,000+ marketing Stills.

The fourth factor addressed in Defendants' Memo is "*the effect of the use upon the potential market for or value of the copyrighted work.*"  Since all 53 of the Copyright-certified Works have always been, and remain, unpublished, it remains undetermined what the potential market for or value of them individually may be, although it is hard to imagine that many prospective purchasers or licencees would view their previous use as props in graphic, and often predatory-themed, porn films as a "market value enhancement."

The more pertinent consideration is again to be found in the Ringgold decision, where the Court held that: "*The District Court's assessment of the fourth factor in favor of the defendants was legally flawed,*" based on the fact that the lower court had "*relied primarily on the fact that the ROC episode had little likelihood of adversely affecting* [Ringgold's] *poster sales.*"  The Court reasoned in contrast that that "*consideration deserves little weight against a plaintiff alleging appropriation without payment of a customary licensing fee.*"  126 F.3d at 81.  Ms. Bassett similarly asserts via her Copyright Count that she is rightfully entitled to monetary compensation for Defendants' unauthorized commercial use of her Copyright-certified Works in lieu of their willful failure to seek, and secure, her permission to use her protected artworks in their porn films and Stills.[15]  Whether she would have agreed to such use **at any proffered price** is open to question, but it certainly would have required a far heftier sum than the $1,200 monthly rental fee that she had contracted with Mr. Spafford, expressly contingent upon his use of her residential premises as a sole tenant and for strictly non-commercial purposes.

---

[15] As stated in Otto v. Hearst Communications, Inc., 345 F.Supp.3d 412, 437 (S.D.N.Y. 2018), in denying the defendant's fair use defense on an unclean hands basis, the Court noted in pertinent part:  "*In similar cases, willfulness was found when defendants had been informed of their potential infringement and still continued to use the protected work.*" (Citations omitted).  That is certainly and indisputably the case "in spades" with regards to the arrogance displayed by the Mile High-associated Defendants in continuing, unabated, to market and sell the infringing films and Stills after their receipt of the 93A Demand Letter.

[E.] In Part I, Section E of Defendants' Memo, they assert per their titled heading that "*Plaintiff Has No Recoverable Damages.*" [MH Memo at 24-25]. This is another one of their retread claims that is based both on factual misstatements and misstatements of applicable law.

Defendants are correct in asserting that Ms. Bassett had been unable to identify in Discovery any "*actual quantifiable damages*" that she has suffered specifically from Defendants' infringements of her Copyright-certified Works per se. Since she had never sought to sell or license any of those Works before, or subsequent to, their unauthorized appearance in Mile High's porn films and Stills, she has not lost any revenue directly to date thereto. It has become recognized, however, that actual damages may be imputed per the "licensing fee" theory articulated in the aforequoted portion of the <u>Ringgold</u> decision. As stated more directly in <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152, 165 (S.D.N.Y. 2001):

> *If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for. We can see no reason why, as an abstract matter, the statutory term "actual damages" should not cover the owner's failure to obtain the market value of the fee the owner was entitled to charge for such use.*

Defendants are categorically wrong in asserting that Ms. Bassett has knowingly and conclusively "waived" her entitlement to seek from the Mile High-associated Defendants "*any profits of the infringer that are attributable to the infringement*" per Section 504(b) of the Copyright Act. To the contrary, she specifically cited to, and quoted that language in Para. 60 of the Verified Complaint as one of the remedies that she was seeking, and she has never wavered in that view. Related thereto, Defendants are categorically wrong in asserting in that same opening paragraph that "*She has repeatedly stated that she is seeking only statutory damages.*" [MH Memo at 24]. While it is true that Ms. Bassett was under the impression that her entitlement to

the infringers' profits was "statutory" in nature from its inclusion in the Act, they were pointedly and expressly disabused of those very same claims in Ms. Bassett's Reply Brief to their Preliminary Injunction Opposition Memo; and yet their counsel persists in claiming otherwise in their present Motion's filed Statement of Undisputed Facts.

In reality, this entire section of their Memo is superfluous to Defendants' Summary Judgment Motion because it really does not matter from a strictly liability standpoint what measures of monetary damages Ms. Bassett would, or would not, be entitled to seek in the event that Ms. Bassett prevails on the Copyright Count as to their base liability.  As stated in the aforecited <u>On Davis v. The Gap, Inc.</u>, 246 F.3d at 158-59:

> *The existence of damages suffered is not an essential element of a claim for copyright infringement... The owner of a copyright is thus entitled to prevail in a claim for declaratory judgment of infringement without showing entitlement to monetary relief.*  (citing inter alii to <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340 361 (1991).

In short, Ms. Bassett would be entitled at a minimum to seek a permanent injunction against the Mile High-associated Defendants prohibiting any further publications of her Copyright-certified Works, as well as other measures of equitable relief.

**[F.]**  In Part I, Section F of Defendants' Memo at pg. 26, they assert per their titled heading that "*No Evidence Exists that Jon Blitt, as an Individual, Could Be Liable for Copyright Infringement.*"  Their single paragraph on this supposed issue, bereft of any cited legal authority, is really more significant for the Undisputed Facts that their counsel **fail to disclose** with regards to Mr. Blitt's managerial role as the Chief Executive Officer of Mile High Distribution, Inc. and Mile High Media, Inc. during the years in question, and particularly with regard to the creation of the two "new" <u>Icon Male</u> and <u>Transsensual</u> studios/brands in 2014; his retention of Ms. Jensen to serve as those two Studio's writer/director/producer for all of the porn films and Stills shot on the

Vineyard in 2014-15; and, his active role in serving as the managing liasson and decision maker

between Ms. Jensen and the Mile High entities during that period.

As stated in Bell v. Moawad Group, LLC, 326 F.Supp.3d 918, 930 (2018), in pertinent part:

> *The Ninth Circuit has explained that "a corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he particpates, nothwithstanding that he acted as an agent of the corporation and not on his own behalf."* [Citation omitted] *The court of appeals has noted that cases imposing personal liability on officers "typically involve[ ] instances where the defendant was the 'guiding spirit' behind the wrongful conduct,... or the 'central figure' in the challenged corporate activity."* [Citation omitted] *Courts in this Circuit have applied these principles in copyright cases.* [Citation omitted] *"Where a corporation or similar entity is the alleged infringer, the plaintiff may also hold individual corporate officers, shareholders, and employees personally liable for the corporation's infringements by showing that such individuals are a moving, active conscious force behind the corporation's infringement, regardless of whether they are aware that their acts will result in infringement."* [Citation omitted] *"[I]t is well established that a corporate officer will be liable as a joint tortfeasor with the corporation in a copyright infringement case where the officer was a dominant influence in the corporation, and determined the policies which resulted in infringement."* [Citation omitted] ***"Copyright is a strict liability tort, and thus all individuals who participate in the infringement are jointly and severally liable. As a result, there is no corporate veil."*** [Citation omitted; Emphasis in bold added]

Ms. Bassett's Response to Defendants' Statement of Undisputed Facts, and accompanying

Exhibits, plainly establish that Jon Blitt was a "*central figure in the challenged corporate*

*activity,*" which, of course, is a fact that the Mile High-associated Defendants and their counsel

are well aware.

**[G.]**   In Part I, Section G of Defendants' Memo, they assert per their titled heading that

"*Defendants Are Entitled to Attorneys' Fees.* [MH Memo at 26-27]. Ms. Bassett feels no need to

cite to the Copyright Act's provisions, and pertinate caselaw, as to the rare circumstances in

which it has been a defendant, rather than a plaintiff, in a copyright infringement action who has

been awarded attorney's fees and costs. This is not one of those rare cases.

## IV.  COUNT TEN:  VIOLATION OF CIVIL RICO

Ms. Bassett takes a two-fold position with respect to Defendants' claim that she has not met the requisite quantum of factual proofs to support her Civil RICO Count as a matter of law.  First, she disputes that claim as being factually incorrect, particularly as it applies to the correct Rule 56 standard that all factual inferences are to be drawn in the non-moving party's favor.  Second, she contends that she has been hindered by Defendants in fully developing her civil RICO claim by Defendants' Discovery-related obstructionist conduct to date, and seeks appropriate orders thereto per Rule 56(d).[16]

As the Court is undoubtedly familiar, Section 1962(b) of the RICO Act declares in pertinent part:

> *It shall be unlawful for any person through a pattern of racketeering activity... to acquire or maintain, directly or indirectly, any interest or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.*

As stated in <u>Libertad v. Welch</u>, 53 F.3d 428, 441 (1st Cir. 1995) with respect to the Act's extension to civil actions : "*a party must allege each of the four elements required by the statute: 1) conduct;  2) of an enterprise;  3) through a pattern;  4) of racketeering activity.*"

In the case at bar, the threshhold issue is whether the Mile High-associated Defendants have engaged in one or more "racketeering activities" as defined by the Act's lengthy enumeration in Section 1961(1)(A thru G).  Those enumerated acts include, inter alii: *"dealing in obscene matter"* or *"any act...relating to obscene matter;"* *"any act relating to mail fraud* [or] *wire*

---

[16]   That portion of Rule 56, titled ***When Facts Are Unavailable to the Nonmovant***" states in the interest of justice towards the end of ensuring that litigants be provided ample opportunity to obtain an adjudication of their claims on the merits as follows:
*If a nonmovant shows by affidavit or declaration that, for specified reasons, it canot present facts essential to justify its opposition, the court may: (1) defer considering the* [Rule 56] *motion or deny it;  (2) allow time to obtain affidavits or declarations or to take discovery; or  (3) issue any other appropriate order.*

*fraud;" "any act... relating to retaliating against a witness, victim or an informant;"* and/or, *"any act... relating to criminal infringement of a copyright."*

The Mile High-associated Defendants are professional and commercial pornographers. They have established a pattern of conducting their porn activities, individually and/or in conjunction with the actors, crew and others whom they hire, via the use of alias pseudonums, shell corporations, or multi-layered incorporated and unincorporated entities. They lease private citizens homes within the U.S. under false pretenses so that they can create their porn products in those "shoot locales" in secrecy from the homeowners, and without obtaining any necessary municipal land use/zoning permits for that commercial activity. They create their porn in various States within the U.S., while marketing and selling their porn products throughout the U.S. via mail or via the Internet, and they do so deliberately without securing the required "doing business" certificates required under State law. They largely "specialize" in creating predatory-themed porn, that often features youthful-looking actors who are portrayed in their plots and marketing materials as probable minors, -- while refusing to confirm in Discovery those actors' real names and ages. They exhibit no concern whatsoever about including Copyright-protected Works in their porn films and Stills without seeking, or paying for, the rightful owner's permission. When a Copyright owner, such as Ms. Bassett, demands that they cease marketing and selling the infringing films and Stills shot on her premises without her permission or lawful authority, they refused to do so. Nonetheless, Defendants would have the Court believe that **none** of those business practices and acts fall within the scope of conduct which is prohibited, and which provide grounds for civil liability to an injured individual, under the RIC

"After confirming that Mile High does not shoot **any** of their commercial porn in Canada (*"There hasn't been anything shot in Canada in over ten years."* J. Blitt Depo. at 17 ), and that

approximately 90% of it has been shot in the U.S. versus 10% in Europe during that span  (T.

Blitt Depo. at 43-44), Ted Blitt responded to a series of "business practices- oriented" questions as

follows:

> Q.  Do you take any steps to ensure that the producers such as Monica Jensen has secured the location owner's permission?

> A.  We never did.  We never had a problem. (Depo. at 49)

> Q.  Do you take any procedures, or do you have any procedures in place to ensure that your
>
> producers have obtained artwork releases from the location owners?

> A.  No.  (Depo. at 49-50)

> Q.  Do you have any procedures in place to ensure that your producers have secured all required city or town permits?

> A.  No.  (Depo. at 50)

> Q.  And has Mile High Distribution ever secured any certificates for permission to do business in any state in the United States?

> A.  No.

> Q.  And I take it the same would be true for Mile High Media?

> A.  True.  (Depo. at 51)

> Q.  Do you have any procedures in place to require your producers to carry insurance to cover any damages that they've created on somebody's property?

> A.  No.

> Q.  And the same would be true if any actor was injured during a film, your position is that's the producer's problem

> A. Absolutely.  (Depo. at 52)

> Q.  And do you have a standard contract you use with your producers?

*A. No.* (Depo. at 52)[17]

The significance of those testimonial admissions, both from a RICO standpoint as well as from a

93A standpoint, is that it provides evidence of a deliberate intent to encourage and incentivize

their Producers, such as Ms. Jensen, to ignore their legal obligations to secure permission from

their shoot locale owners, or required artwork Copyright releases, or required permits at the

municipal and State level.  Obviously, it is significantly cheaper economically for the Mile High-

associated Defendants in the creation of their porn products to deliberately avoid securing any or

all of those permissions and permits.[18]

Similarly, Defendants have raised the spectre that they also choose to skirt their income

tax reporting requirements at the State and federal level, both as to themselves as well as to those

actors and crew who choose, or are willing, to be paid "under the table", stemming from their

refusal to date to produce any of their Discovery-requested tax reporting information for the years

in which they were creating commercial porn under the Icon Male and Transsensual

studio/brands, -- combined with their refusal to date to provide the so-called Section 2257

information as to the legal names and addresses for the actors who were present on Ms. Bassett's

---

[17] Jon Blitt, who attended his father's deposition that same day, reconfirmed, *inter alii*:  (1.) That there were "*no procedures in place by Mile High Distribution to ensure that a shoot location owner's permission has been secured?*", circa 2014-15, answering: "*Yes, I believe that's correct*"; (2.) That there were "*no procedures to ensure that artwork releases had been secured from the location owner, is that correct?*", answering: "*I don't believe so.*"; (3.) When asked "*were there procedures in place to ensure that the producer had secured all the necessary city or town permits?*", answering: "*Not to my knowledge.*"; (4.) When asked "*were there procedures in place to secure certificates of doing business in the states where the films were being created?*", answered: "*Not to my knowledge.*"; and, (5.) When asked "*do you agree with your father's testimony this morning that Mile High Distribution does not file copyright registrations for the films and stills that it acquires?*", answered: "*Correct. We do not.*"  (Depo. at 15-17).
Those referenced Deposition pages were filed as an Exhibit with that prior Motion [Doc.#62].

[18] Related to the Mile High-associated Defendants' seeming disregard for staying within the bounds of the law with respect to their creation of commercial pornography, the Court, sua sponte, raised the question during the last Hearing on October 16, 2019 from her review of some of the photos submitted with Ms. Bassett's filed Affidavit as to whether the porn created by Defendants on her residence and elsewhere would constitute "Obscenity" in violation of the law.

premises for Defendants' commercial purposes in 2014-15.[19]

Defendants' counsel cites the Kelly v. L.L. Cool J for the proposition that "*conduct that does not support a civil action for infringement cannot constitute criminal [infringement]."* [MH Memo at 29]. The corollary conclusion to be drawn is that they cannot prevail in "knocking out" Ms. Bassett's civil Rico claim via Summary Judgment if they are unable to do so as to her Copyright Infringement claim, especially where those claimed Infringements alone constitute far, far more than the requisite "two predicate acts" committed by Defendants against Ms. Bassett's proprietary property interests in her Copyright-certified Works in every year that they have continued to market and sell those infringing films and Stills in interstate commerce.

In further bolstering her entitlement to proceed at trial on the Civil RICO Count for a full examination of its merits, Ms. Bassett seeks per Rule 56(d) that Defendants be directed to comply with all prior Discovery Requests propounded to them per Rules 33 and 34 sought substantive information and records pertaining to: (1.) All other shoot locales in the U.S. that they have utilized from 2014-onward for their porn films; (2.) All of the actors and crew who participated in the porn films and Stills shot on Ms. Bassett's residence; (3.) All tax reporting information filed by Defendants with respect to their own earnings attributable to their porn activities from 2014-onward, as well as all tax reporting information created by them with respect to the actors and crew whom they hired for the porn films and Stills shot on Ms. Bassett's residence; and, (4.) All Mile High-affiliated entities, as well as all third-party entitites, utilized by Defendants to market and sell the porn films and Stills shot on Ms. Bassett's residence.

---

[19] As referenced in Plaintiff's Motion for Preliminary Injunction at pgs. 18-19, along with Ms. Jensen's attached Deposition excerpts, she testified that she does not keep those Section 2257 documents, despite the Act's requirement that she do so for a minimum of five years, nor was she able to independently produce any information in Discovery as to the actors and crew from her business records as to their legal identities, addresses, and/or tax reporting forms issued to them by her. Plaintiff's Preliminary Injunction Motion at 18-19 [Doc.# 62].

### V.  The Breach of Contract Count

Defendants' counsel devote less than half a page in their Memo in claiming that their clients can not be held liable as a matter of law on Ms. Bassett's Breach of Contract Count per the simplistic claims that: "*Nowhere on the lease do the signatures or names of the Mile High, Jon Blitt, or Monica Jensen appear... [and] There are no facts to support a theory that Spafford acted under the authority or at the behest of the Defendants, sufficient to hold them liable under a breach of contract claim.*" [MH Memo at 34-35].

It is a ridiculous assertion in relation to the factual circumstances surrounding the use of Ms. Bassetts' premises by Mile High's hired studio head/Producer both as a shoot locale for the Mile High-owned porn films and Stills, as well as a rotating hotel for the 30+ porn actors and crew who were hired to participate in those porn films and Stills.  If they prefer to characterize Ms. Jensen and the actors and crew whom she brought onto Ms. Bassett's home as unlawful trespassers, or if the Court chooses to make such a Finding as an admission against interest, -- that would be entirely acceptable.  Such a characterization would seemingly fit the circumstances by their theory in relation to Ms. Jensen's conduct in entering the house for the purpose of dropping off two more actors/models on March 16, 2015, -- **after** Mr. Spafford had permanently vacated the house and relinquished his tenancy as confirmed by his anticipatory breach email. Ms. Jensen and the unidentified strangers were evidently no longer "invitees" at that time, and they certainly were not lawful assignees/sublessees.  Labeling them as trespassers seems appropriate.

### VI.  The Trespass Count

Defendants' counsel devote two full pages in their Memo in claiming that: "*When Spafford invited Jensen (and others) into Plaintiff's house, she became a lawful visitor,*" which precluded liability for trespass per their quoted sentence from the <u>Amaral</u> case that "*A trespass is an*

*invasion of the plaintiff's interest in the exclusive possession of his land, as by an entry upon it.*"
[MH Memo at 36-37]. Applying that authoritative legal definition of "a trespass" to the preceding
section, Ms. Bassett had reacquired "exclusive possession" of her property from Mr. Spafford
when he renounced his tenancy.

Apart from the more pedantic issue as to whether Mr. Spafford had "lawful authority" to
invite Ms. Jensen (and others) into the home for the sole purpose of shooting unlawful
commercial porn thereon, -- and whether that "invitation" extended beyond his anticipatory
breach renouncement of his own occupancy/tenancy, -- the bigger issue pertinent to the Trespass
Count as clearly stated in that Count's para. 48 of the Verified Complaint was "*the unauthorized
and forcible entry into her padlocked bedroom closet.*" As set forth in Ms. Bassett's Cross-
Motion for Summary Judgment Memorandum, incorporated herein by reference, she did not
discover until her review of the "Behind the Scenes" special feature in one of the porn films that
the criminal break in to her padlocked master bedroom closet had occurred **during** the filming of
one of their porn scenes under Ms. Jensen's direction. Besides the outrageous conduct of forcing
entry into the locked closet where Ms. Bassett kept her personal photos, journals, jewelry, etc., in
the first place during the course of shooting a porn film in her house, no attempt was made to
repair the broken lock, or to alert Ms. Bassett as to their decision to permanently disable all of her
hard-wired smoke detectors, at any time over the ensuing weeks as the Mile High-associated
Defendants continued to house actors and crew in her house in an evidently unsupervised manner
as revealed by the two "strangers" who Ms. Jensen simply deposited there on March 16, 2015, and
left.[20]

---

[20] From a statute of limitations standpoint, Defendants' affirmative attempt to fraudulently conceal the true

## VII.  The Negligence Count

Defendants' counsel devotes less than a page in their Memo in claiming that their clients bear no liability for any portion of the $15,000+ in physical damages and cleaning costs that resulted from the condition of her house as a result of its unauthorized use as a shoot locale and rotating hotel for the 30+ actors and crew at the direction of Ms. Jensen and for the commercial benefit of the Mile High-associated Defendants.

Besides Defendants' continuing refusal to accept **any** legal responsibility for those damages done to her home, -- as evidenced particularly by their 93A Response Letter in relation to the 93A Count and its four-year statute of limitations, -- they claim to be entitled to Summary Judgment on the Negligence Count on the basis of its three-year statute of limitations.  That claim is speciously premised on the allegedly "undisputed fact" that Ms. Bassett's mother and stepmother respectively had forwarded a number of photos of the house's condition on March 20, 2015, which purportedly put her "on notice" as to the damages more than three years before her initiation of this lawsuit on March 26, 2018.

The first problem with their analysis is that Massachusetts applies a "discovery rule" analysis for negligence actions, particularly where the responsible parties have engaged in any acts of fraudulent concealment.  On March 20, 2015, Ms. Bassett had not yet discovered that most, if not all, of those physical damages, including the break in to her master bedroom closet, had occurred as a result of Defendants' use of her residence as a commercial porn shoot locale and a rotating

---

circumstances as to why that closet was broken into would serve to fix the accrual date to when she discovered those actual and unlawful circumstances.

hotel for 30+ actors and crew thereto.  Moreover, she had no reason at that time to know that **anyone** other than her anticipatory-breaching tenant might bear joint and several liability for those damages, separate and apart from Mr. Spafford's own liability per the damages clause in the Lease.

The second problem with their analysis is that those photos forwarded to her on March 20, and included as Exhibits to Defendants' Motion, were directed almost exclusively in demonstrating the extensive and shocking state of disarray in the house.  Most of the actual, and pricier, physical damages were not shown in those photos, nor discovered by Ms. Bassett until her return to her residence in May 2015.  That fact is evidenced by the difference in the itemized damages statements and respective dollar amounts that she sent to Mr. Spafford, dated March 22, 2015 and July 21, 2015 respectively.[21]

### VIII.  The Chapter 93A Count

Rather remarkably, Defendants' counsel devotes less than two pages in their Memo in claiming that their clients bear no liability to Ms. Bassett per her claim that their conduct was in violation of that Act to her actionable detriment.  [MH Memo at 38-39].  They assert two equally specious arguments thereto.

Their first argument is that Ms. Bassett is barred from proceeding against their clients pursuant to Section 9 due to the simplistic claim that: "*Section 9, which protects consumers not businesses, does not provide the Plaintiff a claim because, insofar as the facts of this case are concerned, she was not a consumer.*"  They appear to profess ignorance of that long-standing line of cases, dating back decades, which has held that the owner-occupant of a one-to-three family

---

[21]  Those two damages statements were included as exhibits to the 93A Demand Letter sent to Mr. Spafford and the Mile High-associated Defendants in October 2015, and are attached as part of Exhibit 1 of the Verified Complaint.

home who periodically rents out portions of that home, and who does not own any other off-site rental properties, is **not** deemed to be in "*a trade or business*" as a professional landord for 93A purposes.  See, e.g., Billings v. Wilson, 397 Mass. 614, 616 (1986)("*The relationship between the landlord and tenant here was of a private nature, and in no way concerned a trade or business... the commerial activity of the landlord is at a low level, and his motivation -- that of mitigating the economic burden of supporting his home -- is of a personal rather than a business nature.*"); Young v. Patukonis, 24 Mass.App.Ct. 907, 910 (1987)("*Young, as an owner-occupant of a three-family building, whose primary objective is personal, is not subject to G. L. c. 93A.*").

The fact that Defendants would assert such an argument in relation to a person who rents out her home to a "lone tenant" for $1,200 per month during an extended Winter period while she was pursuing a romantic relationship abroad with her non-U.S. citizen boyfriend (now her husband) and his school-aged son, while leaving all of her household furnishings and artworks, along with most of her other personal possessions, in the home, -- speaks volumes as to the character of the Mile High-associated Defendants.  Moreover, it appears to have conveniently escaped their attention in connection with the Section 9 part of their analysis that Ms. Bassett **had** no business relationship with them relative to the rental in question, and knew nothing about their tortious conduct in the use of her home until after her tenant's departure.

Even more paradoxically, Defendants do then base their Section 11 analysis on that very argument, stating: "*Section 11 of Chapter 93A, which applies to business-to-business transactions, also does not apply.  Defendants had no relationship with Plaintiff; they sold her nothing, and they provided no services.*"  The question presented is whether the Court would be inclined, and rightfully so, to treat that foregoing admission against interest as a Finding that the Mile High-associated Defendants had no color of right, express or implied, to create their

commercial porn films and Stills in her residence and to incorporate her Copyright-protected

Works in those porn films and Stills, -- constituting as a matter of law the necessary pattern of

racketeering activity and predicate acts to render them liable on the Civil RICO Count?

Ms. Bassett has submitted a lengthy section on her entitlement to Summary Judgment on the

93A Count in the Cross-Motion's Memorandum being filed this same day, and incorporates its

factual recitations and legal analysis herein by reference.

## IX.  The Civil Conspiracy Count

Defendants' counsel devotes one full page in their Memo in asserting that their clients have

committed no conduct adverse to Ms. Bassett in any manner that would meet the legal standard

for a Civil Conspiracy claim. [MH Memo at 40].  Thus, they claim in entirely conclusory fashion:

"*There are no facts to establish that any of the Defendants 'specifically advised' Spafford or*

*anyone else 'to commit conduct constituting a particular tort' under the 'substantial assistance*

*theory.' Nor is there any evidence that Defendants were 'unaware* [sic] *of whether the tort was*

*accomplished,' there is no civil liability.*"  So basically, Defendants are claiming that they were

"unaware" either contemporaneously, or after-the-fact ,upon receipt of the 93A Demand Letter,

that the Joint Director of Photography and Still Photographer whom they had hired circa 2014-15

in connection with the Mile High-owned Icon Male and Transsensual porn films and Stills, was

shooting those 14+ films and those thousands of Stills on Ms. Bassett's premises without **any**

knowledge that there was neither any permission from the landlord to do so, extending to her

Copyright-protected Works as well, nor any lawful authority to do so!  Considering that the

conspiracy-related conduct continued well after Mr. Spafford vacated her house, and well past

Defendants' receipt of the 93A Demand Letter and their ensuing refusal to cease marketing and

selling the porn films and Stills shot on her residence, it is a frivolous argument.

Ms. Bassett has submitted a section as to her entitlement to Summary Judgment on this Count in her Cross-Motion's Memorandum, and incorporates its factual recitations and legal analysis herein by reference.

## X.  The Civil Fraud Count

Defendants' counsel devotes less than a full page in their Memo in asserting that their clients have committed no actions that would sustain their liability on Ms. Bassett's Fraud Count, asserting in their usual conclusory fashion that: "*Without any interaction between the parties, and certainly no representations made by Defendants that Plaintiff relied on, Plaintiff's fraud claim fails.*" [MH Memo at 41].  Besides the indisputable fact that Ms. Bassett **did** rely upon false representations made by Defendants' Joint Director of Photography and Still Photographer as to the manner in which her residence was to be used per the Lease and was being used during his residency there, -- who was clearly acting as an employee or agent of the Mile High-associated Defendants in making those false representations to her, -- Defendants appear to believe that if someone commits unlawful acts against another person's property interests, -- without actually communicating with that person directly, -- then they are insulated from liability if those unlawful acts would constitute fraud if there had been direct communications between them.  In the case at bar, it was not Mr. Spafford who ended up owning all of those Copyright-infringing films and Stills, but rather it was the Mile High-associated Defendants who had hired him and who were the intended owners at all times.

Much of the factual bases in support of the Fraud Count are recited in Ms. Bassett's arguments in her Cross-Motion Memorandum as to her entitlement to Summary Judgment on the 93A, Civil Conspiracy, and Copyright Infringement Counts.

## XI.  The Infliction of Emotional and Mental Distress Count

Defendants' counsel devotes slightly more than a page in their Memo in asserting that their clients bear no liability to Ms. Bassett for any cognizable emotional distress that she may have suffered as a result of her discovery of the extensive and protracted use of her personal residence by the Mile High-associated Defendants for shooting those 14+ porn films and thousands of Stills for their commercial purposes and financial gain.  Their conclusory analysis comes down to the claim that: "*Here, the worst that can be said is that Jensen filmed at Plaintiff's house without checking to determine if Plaintiff would agree.  Jensen did not know the Plaintiff and did not even speak to her until after some filming was done and Spafford skipped out on the rent; at which point Jensen offered to pay the balance of the lease.*" [MH Memo at 42].

Defendants also make the scurrilously false claim that: "*Nowhere in her Complaint does Plaintiff even allege the manifestation of physical harm by 'objective symptomology.'  Nor has she established any facts for it.*" [Id. at 41].  Defendants' counsel deliberately fail to make any reference in their argument to the dual facts: (1.) That Ms. Bassett had retained the services of a mental health therapist during the Summer of 2015 to assist her in coping with the post-porn discovery emotional distress that she was experiencing as stated in her Verified Complaint, and, (2.) That they had the opportunity in Discovery to depose that therapist and to review all of her session notes and correspondence with her patient during the years of treatment spanning 2015 - onward.  Likewise, they omitted to mention that said therapist had diagnosed Ms. Bassett as suffering from both an anxiety disorder as well as from PTSD as a causal result of Ms. Bassett's reaction and observed symptomology by her therapist stemming from the discovery of the porn activities conducted on her personal residence.

Ms. Bassett notes that she is seeking judgment in her favor as to Defendants' liability on this

Count as well, and incorporates by reference the factual recitations and legal analysis advanced in her Summary Judgment Memorandum.

## XII.  The Interference with Advantageous Business Relations Count

Defendants' counsel devotes a little less than a full page in their Memo in their assertion that their clients bear no liability to Ms. Bassett on this Count. [MH Memo at 42-43].  This Count was asserted by Ms. Bassett primarily due to her anticipation/fear that "going public" with the lawsuit would adversely and materially affect both the market value of her home, as well as any future periodic rentals of her home, as a result of its "public association with porn".  As Defendants correctly note, she has chosen to refrain from retaining any expert witness for the purpose of evaluating what impact the litigation-related publicity may have had on her home's market value. It is a painful subject for her, and she would rather not know at this time.

She does, however, maintain that she lost a relatively small amount of rental income due to Mr. Spafford's  breach of the Lease, and that both his 93A Response Letter in November 2015 and his Affidavit, dated October 14, 2019, assert that it was Ms. Jensen's continuing acts of coercion in insisting that he make Ms. Bassett's home available to her and Mile High for the porn shoots and housing purposes, coupled with her repeated threats to fire him if he did not do so, that caused him to escape the Vineyard and abandon the Lease.[22]  Defendants' presumably disagree with his factual account on that score, which leaves neither side entitled to Summary Judgment as to that issue.

Ms. Bassett has also maintained in her Discovery responses that she **would** have continued to seek Winter rentals in the following years due to her post-2013 lifestyle change of spending those

---

[22] See Mr. Spafford's aforesided 93A Response Letter, and his previously-filed Affidavit.

months abroad with her now husband and his school-aged child, **but for** her anxiety/PTSD-related fear of renting her home out to virtual "strangers" again for such an extended period of time while she was so distantly removed from her home geographically.  She contends that Defendants are jointly and severally liable, along with Mr. Spafford theoretically, for that loss of rental income over the ensuing Winter periods since 2015.

## XIII.  The Defamation Count

Defendants' counsel devotes a bit less than a full page in their Memo in asserting that their clients bear no liability on that Count. [MH Memo at 43-44].  Their argument centers on the fact that Ms. Jensen's Social Media post, dated March 29, 2018, -- three days after the lawsuit was filed, -- about having to deal with "*Fighting homophobic and transphobic bullshit*" did not specifically mention either the lawsuit or Ms. Bassett by name, and so she did not defame her. Ms. Bassett contends that is a triable issue in which a jury could, and rather clearly would, conclude otherwise based on the circumstantial evidence.

Besides the timing of Ms. Jensen's post relative to the lawsuit, a pre-existing pattern of threatening to smear Ms. Bassett as homophobic and transphobic if she dared take legal action against the Mile High-associated Defendants was already established via their counsel's pre-lawsuit communications.[23]  Even more damning, Ms. Jensen's post was followed on the following day by Mr. Gray's far more outrageous and specific Social Media blog post, -- which included a screenshot of those portions of Defendants' 93A Response Letter in which they accused Ms. Bassett of being homophobic and transphobic; which did identify her by name in claiming that her lawsuit was solely motivated by her status as "*a vicious homophobe and transphobe;*" and

---

[23] See Exhibit 4 of Plaintiff's Verified Complaint.

which threatened retaliatory adverse consequences against anyone within the porn community who chose to support and/or cooperate with Ms. Bassett in the lawsuit.  Notably as well, Mr. Gray had been hired earlier that month by Ms. Jensen to be the Production Manager for the Mile High-owned Icon Male studio/brand for which Ms. Jensen was **still** their studio head/Producer.  That same day Mr. Barbini elected to "share" those posts on his Social Media site, while noting that he also was a porn actor whom Ms. Jensen had repeatedly hired in her capacity as Mile High's studio head/Producer.

Defendants may continue to assert that all of those interconnections between Ms. Jensen, Mr. Gray, Mr. Barbini, and Mile High are entirely coincidental, and did not amount to a concerted and planned attempt both to smear Ms. Bassett's reputation in retaliation for going forward with the lawsuit, and to threaten and intimidate prospective witnesses with first-hand knowledge of the Vineyard activities on Ms. Bassett's premises from coming forward, -- but, that presents as a triable issue.

## XV.  Conclusion

Ms. Bassett maintains that Defendants have failed to establish their entitlement to Summary Judgment as to any of her asserted Counts, while raising serious issues as to their counsel's candor under the Rules of Professional Responsibility in the process.  She requests that their Motion for Summary Judgment be denied as to each Count, while also requesting that the Court enter appropriate Orders per Rule 56(d) with respect to the Civil RICO Count.

LEAH BASSETT

By her attorney,

Date:  December 23, 2019

John A. Taylor, Esq.
BBO# 493400
18 Central Square
Bristol, NH  03222
(603) 530-2160
jataylor317@gmail.com

## Certificate of Service

The undersigned John A. Taylor, Esq. hereby certifies that a copy of this responsive pleading, along with its accompanying Affidavit (with Exhibits), will be transmitted on the above-stated date, electronically to the registered counsel of record as identified on the Notice of Electronic Filing, as well as to those attorneys known to be representing named Co-Defendants in this matter who have not yet filed their respective Appearance.

John A. Taylor, Esq.

-40-