# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LEAH BASSETT,
    Plaintiff

       vs.

MONICA JENSEN, d/b/a NICA NOELLE;
JON BLITT, personally and d/b/a MILE
      HIGH MEDIA, d/b/a ICON MALE;
      d/b/a TRANSSENSUAL;
MILE HIGH DISTRIBUTION, INC.;
ET ALS
    Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CIVIL ACTION
No. 18-cv-10576-PBS

## PLAINTIFF'S INTERROGATORY ANSWERS (First Set)

Plaintiff Leah Bassett responds to the "Defendants" First Set of Interrogatories propounded jointly by Defendants Mile High Distribution, Inc., Jon Blitt, and Monica Jensen, with the following supplemental information:

    *#1. Please set forth in detail all mental health diagnoses you received from any and all mental health therapists from January 1, 2013 to the present and identify each therapist who made each diagnosis including, but not limited to, psychiatrists, psychologists, licensed social workers, licensed mental health counselors, guidance counselors, mental health nurse practitioners, psychiatric nurses, or any mental health provider or practitioner of any kind or nature.*

Supplemental Answer #1:

3. Dr. Barbara Krause, MD, who provided me with prescriptions for Lorazepam (Ativan) for anxiety and Escitalopram (Lexapro) for depression, after concluding that I would benefit from the use of those medications.

    *#2. Please set forth in complete detail all mental health prescription medications, including dosage, which you have taken from January 1, 2013, identify the pharmacy or pharmacies providing the medications, identify the health care provider who prescribed the medication, and state the number of times you have taken the medication.*

<u>Supplemental Answer #2:</u>

I am currently taking the following mental health-related prescription medications:

1. Lorazepam (Ativan). Dosage: 0.5MG. Pharmacies: Conroy Apothecary and Leslie's Drug Store. Prescribed by Dr. Krause on July 2, 2019. I have taken this medication 27 times.

2. Escitalopram (Lexapro). Dosage: 5MG. Pharmacy: Leslie's Drug Store. Prescribed by Dr. Krause on July 23, 2019. I have taken this medication 6 times.

*#5. Please identify all artworks, which (sic) a specific description of each, its name (if any) and the location of each of the artworks in the Premises from October 4, 2014 through May 15, 2015 which appear in any Film which you allege the Defendants made at the Premises.*

<u>Supplemental Answer #5:</u>  After reviewing the 16 films which **the Defendants** identified as containing action scenes and/or stills made at my Premises per the Court's Compulsion Order dated January 9, 2019, I **presently** believe that the following artworks appear in the films, the bonus features and/or the DVD cover art. Some of the bonus features on those DVDs did not function, so I was unable to verify what artwork, if any, appears in those sections. It will take additional time to review the 22,000+ photo stills that the Defendants also provided, not only because of the sheer number of photos, but the files were not presented in an organized manner. I can only imagine that this was done on purpose to further upset me during this very stressful process because, reportedly, the files were originally transferred to Mile High Media in organized batches. I also believe that some of the 140+ films the Defendants provided to me per the Court's Compulsion Order dated January 9, 2019, that were **not** identified by them as containing action scenes and/or stills made at my Premises actually **do** contain photo stills made at my Premises. I will provide supplemental documentation to this answer upon completion of viewing those 22,000+ photos and the remaining 125+ films.

My artwork:

1. "Artist's Design Fireplace Façade"
Stone, mortar, lichen, wood, varnish
Approximately 92"x80"x10"
Located in living room



2. "Bathroom 1 Drawing"
Charcoal on Paper
24"x18"
Located in master bathroom



3. "Bathroom 3 Drawing"
Charcoal on Paper
24"x18"
Located in 1st floor bathroom



4. "Bathroom 3 Painting"
Acrylic, varnish on wood
34"x17"
Located in 1st floor bathroom



5. "Bedroom 2 Photo 1"
Photograph
10"x8"
Located in 2nd floor guest bedroom



6. "Bedroom 2 Photo 2"
Photograph
10"x8"
Located in 2nd floor guest bedroom



7. "Handsewn and Designed Slipcover and Pillows"
Fabric, cord, thread
Dimensions variable
Located in kitchen lounge



8. "Handsewn and Designed Slipcover"
Fabric, cord, thread
Dimensions variable
Located in kitchen lounge



9. "Handsewn and Designed Slipcover 2"
Fabric, cord, thread
Dimensions variable
Located in kitchen lounge



10. "Handsewn Pillows"
Fabric, thread
Dimensions variable
Located in living room, 2nd floor guest bedroom, and kids' bedroom



11. "Handsewn Pillow 2"
Fabric, thread
Dimensions variable
Located in master bedroom, 2nd floor guest bedroom



12. "Interior Design Wall Hanging 1"
Paper, ink, foam board
15"x20"
Located in master bedroom



13. "Interior Design Wall Hanging 2"
Paper, ink, foam board
15"x20"
Located in 2nd floor guest bedroom



14. "Interior Design Wall Hanging 3"
Paper, ink, foam board
15"x20"
Located in 2nd floor guest bedroom



15. "Interior Design Wall Hanging 4"
Paper, ink, foam board
15"x20"
Located in kitchen lounge



16. "Interior Design Wall Hanging 5"
Paper, ink, foam board
15"x20"
Located in kitchen lounge



17. "Interior Design Wall Hanging 6"
Paper, ink, foam board
15"x20"
Located in 1st floor guest bedroom



18. "Interior Design Wall Hanging 7"
Paper, ink, foam board
15"x20"
Located in 1st floor guest bedroom



19. "Interior Design Wall Hanging 8"
Paper, ink, foam board
15"x20"
Located in master bedroom



20. "Interior Design Wall Hanging 9"
Paper, ink, foam board
15"x20"
Located in kids' bedroom



21. "Interior Design Wall Hanging 12"
Paper, ink, foam board
15"x20"
Located in kids' bedroom



22. "Livingroom Painting 1"
Acrylic on paper
14"x11"
Located in living room



23. "Livingroom Painting 2"
Acrylic on paper
14"x11"
Located in living room



24. "Livingroom Painting 3"
Acrylic on paper
14"x11"
Located in living room



25. "Livingroom Painting 4"
Acrylic on paper
14"x11"
Located in living room



26. "Livingroom Painting 5"
Acrylic on paper
14"x11"
Located in living room



27. "Stairway Collage 1"
Mixed-media: paper, ink
6"x4"
Located in stairway between 1st and 2nd floor



28. "Stairway Collage 2"
Mixed-media: paper, ink, feather
6"x4"
Located in stairway between 1st and 2nd floor



29. "Stairway Collage 3"
Mixed-media: paper, ink
6"x4"
Located in stairway between 1st and 2nd floor



30. "Stairway Etching 1"
Ink on paper
3"x6"
Located in 2nd floor landing



31. "Stairway Pottery 2"
Ceramic, glaze
Approximately 7"x4"x5"
Located in 2nd floor landing



32. "Stairway Pottery 3"
Ceramic, glaze
Approximately 5"x7"x5"
Located in 2nd floor landing



33. "Table 2 Hand-Painted Top"
Acrylic, varnish on wood
19"x22"x14"
Located in 2nd floor guest bedroom



Other artwork:

34. Andy Barron
Associated Press Photograph
10"x20"
Located in master bedroom



35. Balinese offering box
Wood, acrylic painting
Located in kitchen lounge



36. Balinese painting
Acrylic and ink on Canvas
19"x10"
Located in kitchen lounge



37. Balinese woodcarving 1
Wood
Located above the entry door (exterior)



38. Balinese woodcarving 2
Wood
Located above the entry door (interior)



39. Balinese woodcarving 3
Wood
Located in the living room



40. Buddha hand sculpture
Metal, wood
Located in stairway between 1st and 2nd floor



41. Buddha head statue
Metal, wood
Located in kitchen lounge



42. Buddha statue
concrete
Located on front lawn



43. Emily Drazen
Photograph
8"x8"
Located in living room



44. Eric Gill
"Hula Girl in Green"
Reproduction print
6"x4"
Located in 1st floor bathroom



45. John Kelly
"Healani Hawaii"
Reproduction print
10"x8"
Located in master bedroom



46. John Kelly
"Seated Hula Dancer"
Reproduction print
10"x8"
Located in master bedroom



47. John Tenniel
"Alice in Wonderland"
Reproduction print
Located in kids' bedroom



48. Jonathan Klenner
Photograph
Located in living room



49. Kara Taylor
"Quiet Dignity"
Original oil painting
18"x48"
Located in 1st floor landing



50. Kara Taylor
"Untitled"
Original oil painting
12"x12"
Located in 1st floor guest bedroom



51. Karsten Larsen
Original Acrylic Painting
5 ½"x 9 ½"
Located in stairway between 1st and 2nd floor



52. Marisa Redondo
"Taos Feathers"
Archival Print
10"x8"
Located in kitchen lounge



53. Maxfield Parrish
"The Arabian Nights"
Reproduction print
6"x4"
Located in kitchen lounge



54. Meadow Bassett
Original ceramic sculpture
Located in 2nd floor landing



55. Nicola Dixon
Reproduction print #1
Located in living room



56. Nicola Dixon
Reproduction print #2
Located in living room



57. Ryan Gaffney
Self-portrait
Original conté crayon drawing
24"x48"
Located in master bedroom



58. Shepard Fairey
"Freedom to Lead"
Original screen print
24"x18"
Located in 2nd floor landing



59. Shiva statue #1
Metal, wood
Located in kitchen lounge



60. Shiva statue #2
Metal, wood
Located in 1st floor hallway



61. Ted Mundorff
"Hawaiian Pink Orchid"
Reproduction print
6"x4"
Located in 1st floor bathroom



The undersigned Leah Bassett hereby attests under the pains and penalties of perjury
that all factual representations made in these Interrogatory Answers that fall within my stated
or implied personal knowledge and present recollection are true and recounted in good faith.

Date:   7/29/2019

_Leah Bassett_

Leah Bassett

<u>Certificate of Service</u>

The undersigned John A. Taylor certifies that a copy of these Answers to Interrogatories has been transmitted this stated date by email to all counsel of record ~~ha - ̆~~ representing the so-called Mile High Media Defendants, as well as by ~~first-class or Priority Mail, postage prepaid~~, to be subsequently directed to ~~Stephen Roach~~, Esq. at his Boston Law offices.                                    Natalie  Megaloudis

Date: July 30, 2019

John A. Taylor, Esq.
BBO #493400
18 Central Square
Bristol, NH 03222
(603)530-2160
jataylor317@gmail.com

# EXHIBIT 2

Gmail - Information and other details requested
Case 1:18-cv-01057-PBS Document 98-2   Filed 12/24/19   Page 22 of 59
Page 1 of 11



John Taylor <jataylor317@gmail.com>

___

## Information and other details requested
2 messages

___

**Joshua Spafford** <joshspafford@yahoo.com>
Reply-To: Joshua Spafford <joshspafford@yahoo.com>
To: John Taylor <jataylor317@gmail.com>

Mon, Nov 9, 2015 at 9:39 AM

Hi John, by no means is this complete of course. I'm just sending what I've compiled and accounted for thus far. I hope this conveys my general spirit of cooperation in this.

Most of the questions asked, as I mentioned, is information generally collected by the Production Manager or assigned person and during my stay there it was April Carter aka Diana Devoe. I did my best to answer some questions you have: addresses of the other shoots houses, details of relevance and names of performers there. I want to reiterate that I want to comply with all your requests but being out of the country and without my old US phone some of these things are challenging or impossible. I am regretful and sorry for my participation in this.

This account contains names, details and decisions made in relation to the events in question. It's long, I apologize:

While living in Los Angeles last year I was asked by adult film director Monica Jensen aka Nica Noelle if I would move to the North East Coast to serve as both still photographer and camera man for "Icon Male" a new adult cinema line under the Canadian based adult movie company Mile High Movies, owned I believe by Jon Blitt. I had already worked for Nica in the past, a notoriously polarizing figure in the adult industry. I had worked on and off for a couple years with her and had been "burned" previously so to speak but was hurting financially so I decided to take the gamble. I was cautioned that it might go poorly but in hope of improving my financial status, I agreed. I sold my car in LA and left the apartment I was housing in. I had little to no savings and put most of it in moving east. It was a gamble for which I thought the worst thing that could happen was that I would be fired. In my three or so years I had been fired (and rehired) about 2-3 times by her (while having my character attacked) (and as have many people in her employ). I bring this up as a means of pointing out a very frequent cycle of behavior on Nica's part. You live on a pedestal until either you have done something wrong or, through her own chaotic leadership style, are made to take the blame for her mistakes. This is a well documented pattern by many people over years.

**To be clear from the outset: I was not a financial partner in any way with Icon Male, Mile High or Toast Kid inc.** No matter what incident she might cherry pick saying I was some sort of partner in this, all my decisions were driven by the looming proverbial gun to my head that I would be fired and, after spent everything I had left in moving east, this would be devastating. I'm not trying to sound like a victim but I'd like to describe the circumstances surrounding these events. I realize this makes me sound foolish for having taken the job but I was pretty desperate for a move improvement in my life at this point.  To continue:

Mile High and Icon Male are described by Nica, Jon and other employees as the most successful studio in the Mile High collection and "worth millions". **No where is there any paperwork whatsoever saying I had any profit in this.** I was, along with April Carter aka Diana Devoe (a second camera person, and de facto production manager) a daily independent contractor and received no back end profits.  I simply got a day wage or project wage basically on the same rate as my LA colleagues. $500-$600 as a still photographer and $400-$500 as videographer. I'd make about $3.5-5.5$ a month (depending on the amount of work that month and this is even before moving to Ma)based on how many shoot days we did a month. (many days are half days and, as will be described here one would often work on days that weren't paid). What I didn't know is that I would be forced to pay for production costs out of my own pocket: transportation for others (talent and crew) , sometimes food for the talent and crew, and then later as this narrative will describe actual locations (which included rising utilities because of her large packs of talents who could come and go). **Throughout the whole endeavor there was talk from Nica to create "Darling/Noelle" films IF I proved satisfactory in working with her** ( and all the catches that would come with it) but that never manifested. The choice to move back east from LA, to go along with the risk of working with Nica (who is known to be a volatile personality by those who work with her), all these choices were generally attempts at getting out of the financial rut I found myself in after generally failing to get my financial footing back after the 08/09 crash.

Some context: I had been working as photographer and theater maker in NYC (and still do) when after the financial crash in 08. The stress of that time caused me to lose our condo and a divorce resulted (I am still very dear friends with my ex-wife and all my past relationships). I had been shooting fine art nudes and erotica with some respectability in NYC (gallery shows of my work, for example) but after the crash it had been very much a "hand to mouth" existence. I try to make beautiful images with integrity and am generally considered a "romantic" photographer who veers into

graphic work when I have to for money but it's not my preference. My creative and professional partner who had been a popular fine art nude model had been contacted by Nica to make the leap to full fledged adult performer on screen. Nica had a reputation of being one of the few directors who were trying to make sincere adult cinema with narratives and politically correct missions in casting. Nica can also be a charismatic, progressive, creative force and when she wants to be , friendly and very effective at singing your praises. We were fascinated by the premise of working with her not to mention of making more money than we were, which was then pretty tight. The struggle after 08-09 till now has been to break out of the hand to mouth monetary cycle. Thus began an on and off again cycle where I was hired and fired repeatedly (after moving my belongings from NY to LA) with little or no warning and while suffering accusations of things like being: "a grifter". (This was ALL before making amends and moving east) I was a man looking to improve his financial situation, looking for a break from the fall of 08' and trusted her. Despite witnessing volatile, erratic behavior from her towards myself and others, and her polarizing reputation I did think she had "a good side" albeit a very complicated person. I -wanted- to believe in her praise of me and the promises she made for our future, chief of which was a better financial future.

Back to last summer: We first shot a few days in  New Hampshire where the consensus was it was legal to do so. Nica's plan was to find a full time shoot house in New Hampshire. The plan was that after that I would find a house nearby to live in. After shooting the first movie ("Father and Sons") in New Hampshire we flew to Florida to shoot more content in existing studios (who also supplied a large amount of male talent) and to also give Nica an opportunity to find a house for herself and a place to shoot in back in the North East. While in Florida we were joined by her on and off again boyfriend, a former gay adult performer named Logan Larkin, who she had previously said had physically threatened her and others. During the shooting in Florida I housed her second camera man April Carter aka Diana Devoe in my family''s house during the shoot days under Nica's orders. I was ordered also pay for both mine and April's hotel when shooting in places not near my family's house. I did this because I was told I needed to "help the production" until the work flow increased. Nica then went north to find housing. I stayed in Florida catching up with my Mom and family.

I'm not sure when the decision was made to move to Martha's Vineyard (switching it from the initial plan I signed up for which was New Hampshire) instead but Nica made that decision. I had already left Los Angeles, sold my car and left my residence and was waiting in Florida for further direction so at this point there was, for me, no turning back. The prospect was still exciting and hopeful.  I believe she was staying with a long term family friend on Martha's Vineyard Francesca Zern, who also helped take care of Nica's son sometimes. Francesca and her family were friends to Nica. I've met them on a couple occasions. She had lived with Nica in LA and was serving as her production manager but was fired. When I was in MV there seemed to be animosity between the two of them but she had continue to try to help with Nica's teenage son.

Nica sent for me to come to Martha's Vineyard. I flew up there from Florida and stayed with her for a couple weeks while we shot initial content out of her house on 37 Vineyard Meadow Farm ( I -think- this is the address ). It was amiable. Her boyfriend came to live with her. Nica asked us not to talk about the fact that Logan was publicly ( on Twitter where she is very present) since he had previously been violent, she had said. The plan was he would serve as my photo and camera assistant. I then left the Vineyard to visit my girlfriend of the time (who Leah met) in Michigan where she was asking me to meet her parents. I flew back to the Vineyard. The issue at hand was for me to find a place to live. I found a house in the local paper, the Bassett residence. It was large and beautiful but somewhat out of my price range considering impending utilities and plus moving costs. While I would soon be making around 4-5K a month possibly, I had no savings after moving east and had no car. It had already cost me thousands of dollars to ship all my photo gear across the country twice now.  It was also quite far from any open stores (that part of the Vineyard closes down in the winter and I didn't have a car as mentioned). I didn't need a place that big and wanted to be closer to town but my girlfriend wanted a place large enough so that her family could visit. Nica came to take a look and strongly urged me to take the place. Hoping to impress my girlfriend's family and Nica I took it. Nica immediately began pressing me about the possibility of shooting (and possibly housing talent) out of the house. The prospect panicked me deeply: My girlfriend was quite straight laced. She was fine with me working part time in the adult industry but didn't want to be near it. Secondly, I didn't want to do anything illegal, deceive the landlord and add more chaos to my life. The sheer amount of work I was about to take on was already substantial. **Nica stressed that to manifest the vision of shooting east (that was to make quality adult films with narrative (as opposed to normal "porn" films) and an opportunity to shoot them beautifully with the natural landscapes something that appealed to me) I needed to be a "team player" or, in her words, we'd have to "change our situation"  or that "I wasn't the right man for the job": meaning she'd fire me. She ALSO then stressed that she would pay my entire rent and utilities for the duration of our stay in MV and I would never have to pay that. "I promise", she said repeatedly.** After letting my car and residence in LA go, and gambling all my money on a move East I had nowhere else to go.  I didn't know what to do. The perimeters of Nica's plan were still at this point very  vague. Nica told me her boyfriend resented being my assistant, who threatened to beat me and others up. She sent him off the island after an episode in her bedroom. She came out crying, asked me and others for protection, then had a car pick him up.

The perimeters were vague. We had previously been shooting out Nica's house while also housing the talent she'd fly in there **unbeknownst to her house landowners**. She asked to cover the windows to hide shooting. I met that landlady once. The relationship between her and Nica was antagonistic.  My job as I had understood it at the point was to take best photos (generally box covers to sell the movies) and video footage as possible. I thought I would be able to

focus on that and that alone. I was promised an assistant and April Carter aka Diana Devoe would help with everything else. On numerous occasions during the following months April Carter witnessed my predicament: basically I had to "pay to play". (Do Nica's bidding or lose my job).

As I remember it the first filming that was to happen -after- I moved to the Basset residence was to happen late on Saturday or Sunday but the talent, after much scheduling difficulty, were going to arrive via ferry from the mainland. I lived about 45 minutes by car from the ferry. Nica lived about 12 minutes away. I was with my girlfriend when Nica texted me I had to pick up the talent and, much to surprise, house them. I thought that the plan to shoot at my place was still back in negotiation (since she had or was investigating getting a new place, the second house) , but housing a large, young, loud group of of gay, trans, cis and straight adult performers WHILE my gf was there was new development. At the point I still thought I would just "show up for my job"-and do it well )as opposed to being a full time "team player" as if I was PART of the profit of this whole endeavor. After a flurry of texts from Nica she made it clear that if I didn't, we'd "change the situation" and that "maybe things wouldn't work out". This began an ongoing looming gun to my head: basically go along with this or I was out.

I was ordered to pick up the talent and bring them to my house that evening. Nica was going to buy food and drop it off at my house. My girlfriend was mortified. We picked the cast up and brought them to the house. So begun a loud, messy, party where I was viewed essentially as "the host" while talent non stopped partied, cooked bacon and other meats (my gf was a vegan), bathed and treated the house as a party hotel to my horror. They thought it was a production house and I was still trying to figure out the perimeters of this situation. By the first night, my girlfriend and I were fighting about the new reality. **When I saw Nica next I sheepishly expressed to her (Nica) that I didn't think the situation would work I was terrified of being fired which she had already threatened.** My girlfriend left. Nica vacillated between threatening to fire me for not wanting to use my place full time and possibly finding another place which, Nica warned, would leave me with substantial rent and bills. **I was trying to salvage my sanity and my relationship so I said if Nica wanted to find another place she should.** I would rather carry all my bills myself making little profit but at least having sanity and keeping my relationship. Nica was pissed. I was trapped. There was a lot of to and fro.

Nica was proactive with her frustration with me. This started what would become a long autumn and winter of her demanding I be fully "with her" and blurring the lines of having a personal life. I was fine taking the bus to buy my own groceries and when production days were on renting a car (to get to and from work) until I could possibly find a good deal. I couldn't. I couldn't afford a car (and have bad credit) but I -could- afford the pay to day rental of one. Nica insisted I not only have a car but that I have it during the duration of shoot weeks (generally chunks of 5-7 days) **where I HAD to pick up talent and crew and drive them to and fro from my house (this now an hour and a half) at my own expense.** 70% of the car use was me serving as her personal taxi service taking massive amounts of time and money. I rented from the airport taxi service. This resulted in big bills. I have samples. The car rental place would also have copies. I still accrued thousands of dollars of bills on car rental and gas and pulling mental focus from my job. This was a massive undertaking considering I also had a full time job to attend to with no assistant (which is the norm, having an assistant)I frequently was asked to shop for the talent and sometimes pay for their food out of my own pocket. I was promised reimbursement for things like food or equipment (but never for the car which was mostly the production car) but when I asked she acted put out and annoyed. **In addition to driving everyone full time at my own expense from the rental company, I was now hosting and cleaning  for a massive group of rowdy people. I had no stake or profit in any of this beyond my basic salary. I was trapped in the lease and stuck there. I could not afford-literally-to leave.**

After awhile Nica found the another shoot house (**this is now a third house including her place and the Bassett residence**). It was just a minute's drive from her own house. It was a beach house on Great Neck  (Or long Neck?) Way (I think that's what its called). It's the second house I believe on the left as you swerve down that lane. It might be called "Oceanique House" if I'm remembering it correctly.  It was relatively simple and the more posh performers were bristling at staying there so Nica ordered them to stay at my place along with the crew. **During all the filming there was never a single instance when someone from her production didn't stay in the (Basset) house.** April Carter was there almost every time and talent too. If it wasn't a full house it was a good percentage of the talent. Filming was quickly directed to take place at my house again too. I was confused. **I thought we agreed to shoot in the new house near Nica. Once again Nica said I would be let go and that maybe she could "fly me out" from LA to "maybe just shoot stills"** meaning my full time job status ( as Director of Photography ) would be terminated. She had terminated me without warning in the past but this was when I was in LA and had a place to live, a car and I could easily find other work. I had invested my entire life in coming out here. I had invested everything I had in this move East, I had no place in LA, no car and had gambled on this. I was absolutely stuck. **When I saw that shooting had to happen (at her command) at the Bassett place I reminded her that she said I would be fully compensated.** She reminded me that she was looking for a long term team player and perhaps we'd have to change the situation and that it was fine if I wanted to back to LA. Having moved my entire life out there, liquidated my LA life, shipped all my stuff: I COULD NOT GET BACK TO LA and restart.   The lease was till May so my focus changed on being able to weather the toxicity and stress of the situation I found myself in. I just needed to get to May.  If I wasn't shooting (both photos and video in itself a huge job--one days shooting means 2 days of photo processing around the clock.)I was now full time acting as a taxi service at my own cost AND most time consumingly, cleaning the massive mess in the kitchen, bathrooms and laundry the fleets of talent would leave. I cant

stress how much work this was. This would take me at least two days of work alone after each cast left. Nica kept promising to send a maid after each shoot but never did. It was a nightmare. If I could get through till May (when the lease was over) I could either quit with a little savings or find a way out. I became deeply depressed and hopeless. This showed on set and I was chastised.

My girlfriend visited one more time before our break up (we're on good, friendly but non romantic terms now). Someone had started sending her anonymous emails that implied that SHE was now an adult performer. She was very much not. They were taunting and vicious. (She would later tell me she thought it was Nica sending them.) We tried tracking down the instigator to no success. She was fed up by the entire situation. I explained to her I would quit but I needed a few months to save before I could get out. This wasn't a generalization. I literally had no savings left. She left MV and started ignoring me as a means of a break up. I was devastated. I was stuck in this remote, cold house (that I had chosen in part to please her and her family) forced to house and film in a genre I had no love for at threat of termination. The one perk would have been this girlfriend with whom I hoped to develop a meaningful relationship but that was gone. I was lonely, heartbroken, and incredibly depressed.

**Nica would openly mock my stress of shooting in my house.** I did not want to do it. She stressed no one would ever know and that Basset house couldn't be identified through the artwork and angles. I disagreed. I begged April/Diana to please do her best to place the furniture and artwork to where they found it. "You look so depressed!", Nica would mock. This statement was loaded with threat of termination meaning "you better put on a happy face" to keep moral up. I'd venture to say that most people working with me would say I keep moral high, happy and positive. I focus on trying to bring artistry and beauty to the product to matter what genre I work in. But I was profoundly depressed, stressed and hopeless. She repeatedly brought up the possibility of starting a new studio "Noelle Darling Films" which would focus on straight or lesbian narratives in which we could focus on acting and beautiful photography including moments of sexuality which is what appealed to me. I would have short runs of harmony with her hoping that this chaos would end. It never did. Every problem that came up. Unhappy performers, scheduling, weather, me-- it was all everyone else's fault but her own. It was in my opinion ridiculous to try to secretly shoot risque cinema in the middle of the winter (or ever) on MV . In regards to "the carrot" of Darling/Noelle films She had brought this up before and I wasn't sure it she was truly serious or not but I began to see the pattern of her invoking it when she could sense my beginning to pull away or leaving the island to decompress or maintain my sanity. She had previously hired me (Back in LA for another studio before this began) to teach talent how to act with my background in theater so this prospect enticed me. She said I could be a co-owner, that it would be ours and I would share the profits (with this intended new venture). But first, she said, we had to get the work flow for Icon Male (and Transsensual the newer brand) even. It was her production company "Toaster Kid" that worked for Jon's Mile High Movies. Mile High has many other adult brands and are extremely successful. Icon Male was by all accounts hugely successful. A friend of mine, a director in LA for -another- Mile High brand told me that Jon was bragging that Icon was the most lucrative brand. Nica bragged that Icon Male was a million dollar studio. (I have those emails from Nica). **But here I was being forced to use my house as a shoot location, hotel, to be an unpaid taxi and production assistant barely breaking even. I had absolutely no stake in any of this. I was shoveling my own money into Nica's production with no stake, interest or payoff other than my own salary which, after the rent, the pricey rental cars, food, and growing utilities I barely broke even.** She was flying talent across country from LA, many of whom were openly critiquing her behavior and lashing out about how poorly it was going as if it was mine and April's fault. It was just me, April and Nica doing everything. Sometimes even April couldn't make it. I acted as both photo, video and crew, maid and taxi service absolutely alone. It was a massive mess. I was fighting off loneliness (it was basically an hour in the snow to any restaurant or store in a tiny empty resort town) and severe depression. My spirit was breaking. I was exhausted and hopeless and was fighting off a nervous breakdown. With all the playing host, cleaning house, driving hours to and fro as an unpaid taxi service (covering all the car rental bills) I barely had time or focus to actually do my real job which was to brand and film Icon (for which the prize being dangled was now "Darling Noelle" films).

During the "Data Transfer" (this is when I move data stored on a hard drive from one drive to be saved to another) my Mac broke down and ruined the data transfer and ERASED the drive on which the data came from. I had already told Nica I didn't think my laptop would suffice for production needs and she had suggested purchasing appropriate computers. It was basically an entire movie ("Bible Buddies", ridiculous I know). I was absolutely terrified and panicked. It sometimes took us about 2 days to film a movie ( I must have filmed maybe 15-20 movies I'm guessing while out there), plus the money it took to fly the talent to the east coast, their talent fees (etc. People have been fired for less. I tried breaching the topic to Nica but she was in the midst of fending off stress from the chaos of unhappy talent, scheduling nightmares and I believe her own daughter she said was in a mental institution. "Fix whatever the problem is". I decided to try to fix it. Nica was in a constant state of breakdown or anger, often would not show up to set (texting, calling or emailing directions) and when she did, the stress was palpably high.

In an effort to both distress from the chaos of what was happening in MV and, at the same time, try to work with someone I had connected to who thought he could retrieve the data off the erased drive I went to LA. Nica very much tracked my activity when I was off (or on) Martha's Vineyard. I was photographing a new model ( I still had my -own- brand of photography as Joshua Darling-I had just been given feature interview in Playboy as an artist they admired greatly) someone who I started dating. Nica was very critical of me being off the island. She told me point blank not to leave. The data that had been erased was being slowly retrieved. I went back to Martha's Vineyard. I had begun brainstorming on how to leave this situation.

Things got vastly worse. Performers complained that they were shooting till 7am sometimes and even sometimes doing these kind of hours on back to back days and other complaints of chaos, bullying from Nica and unprofessionalism. They had to pressure Nica to buy more food for them and, for the people not forced on me to stay in the Basset residence) cold. (Nica's other house was essentially just a beach house). All these complaints were well founded. She was annoyed by having to buy food for them and she complained about it. Amongst them were adult performers Billy Santoro, Seth Santoro, Nick Capra and Jessie Coulter. They were initially trying to respectful in objecting to the way things were being run but she took me (and April I think possibly) and mocked them calling them divas. **Sometime after this Nica informed us that they had called Jon Blitt, the owner of Mile High to threaten with him with  charges and a story to the local MV paper. Nica immediately ordered us to call Jon and tell him they were lying.** Both April and Connor Mcguire (an adult performer who was now serving as crew living and running the second shoot house) did so. I delayed some but Nica pressed me. I told Jon things were fine. It was that or be fired. I believe Nick Capra later made up with Nica. It needs to be remembered that many people (myself included) have been able to let her behavior go because of the need of a new paycheck. Nica shoots alot, so once you're in her stable of on screen talent you can make a considerable amount of money. It is sort of an unspoken (and frequently spoken) joke that if you want to work with Nica you have to "put up with her eccentricities" (and this is being kind). Most sectors of the adult industry are not like this.

All this time Jon Blitt told me he loved my work and that I was instrumental in creating box covers that sold the movies. My photos "classied them up". Nica told me Jon was very happy with the movies I shot completely without April Carter (helping with lighting and filming) or Logan (who had been assisting). Jon said he was interested in flying me to LA to shoot box covers for his other movies too. This is something that excited me. It represented a way out. I went back to LA to work again with the data technician who had been trying to get the data back from the erased drive. I got the drive and delivered it to Nica's editor. It turned out not all the data had been retrieved and that there were holes. I was devastated. By now Nica learned of the extent of the data loss on this particular title. Email, text and phone exchanges between us were testy. She blamed me for the entire chaos of Martha's Vineyard. That I somehow wasn't doing my job. I stressed I couldn't even begin to do my job while doing a million other jobs AND being forced to use my house as a production shoot house at risk and cost fully on me. In essence she sensed my allegiance falling away. She could, I think, sense my resignation to the mess. She began attacking me. At this point all I wanted to do is whatever took to get out. I went back to MV to try to get my stuff and find a way out.

The last two weeks there were intense. Nica was firing me as Director of Photography giving the job I think to April Carter. She said I could stay on as just a still photographer (but that would bring  my income to less than half of what I was making-no where near enough to live). She said she'd take over the Bassett house and film and I could stay there but I wouldn't have a room, the talent would have priority. That was not something I was going to go along with. It was a prison sentence. She still owed me for work done. And if I was fired I wanted to be compensated for having flown my life out there (nothing left to go home to LA to, no car and having to start from scratch). I needed enough to fly out with my gear. This is to say nothing of being promised full rent and utilities and that I "wouldn't pay a dime" if we used my place. **In the entire stay there Nica contributed one check to help cover heating bills that the massive groups were incurring through heat and water usage: one for around $800 and another one for $400 on another heating bill.** Being my basic salary (roughly $4K a month now as many shoots had been canceled) I personally paid for the full time rental car used almost exclusively to taxi her talent(4-5 K I estimate ), and the full time house where she housed and shot in (about 1600 a month with utilities around 12 K). By my estimation almost 16K or more out of my own pocket, against my will, with no profit to me. (This is to say nothing of selling my car to leave LA, letting go of my living situation and the cost of moving) PLUS the cost of the actual move in. In addition to the 16K poured directly into her production and maybe the 10K it cost me to move to LA, **I was realistically 25K in the hole. None of this was of profit to me.** Jon Blitt had no idea. If I was fired I wanted to the at least to be paid for my remaining days shooting there ( which at that point I estimated as 2K) as well as enough to get tickets and ship (maybe 1K) home. **2K was owed for those last few days of work.** I called Jon Blitt and, over the course of days, explained to him what had happened. The entire story. We spent hours and hours on the phone. He was alternately shocked, sympathetic, baffled but then later (after she talked to him, painting a portrait of "my true character" very cold). I told him about all the promises she made of paying me for the house (but then threatened my job when I pushed back). He said he didn't understand why I would agree: I explained to him repeatedly that I had invested everything in moving there. I was an artist that lived paycheck to paycheck. Jon Blitt is a successful businessman and incredibly wealthy. I told him we had to shoot and house out of the place I live. He said he would never do that. He never questioned the truth of my story. I told Jon I needed money owed to me to get out. The money Nica owed me for just the upcoming days work during my transition out and something to get back to LA. I had put in, as I mentioned 25K (by my estimation) into his productions, at no profit (and "at gunpoint", so to speak). I was owed about 3K for the upcoming shoot days. **Jon suggested I could work off money shooting for him in LA and asked me what it would take to move out: I said  8K$ from which I would work $5K off (at his suggestion-this was his idea let me be clear) shooting in LA for his other brands. Jon initially agreed to this and this was his idea.** I have copies of all this dialogue and email. I bring this up because later Nica accused me of extortion. **Despite the fact that after everything was said and done, I was long gone Nica STILL asked me to come back to MV.  After all the names and angles they have for blaming ME for all this  mess AFTER I left MV she still tries to have me come back to work and mend the relationship.** Any angle or framing or destruction of my character they would later (and in most likelihood are now) manufacture is plain deception and opportunistic. **Whatever issue or concern or labels they had with me at this point were already**

**leveled but STILL I WAS ASKED BACK TO MV (from Florida).**  They knew I was a massive resource in the marketing and branding of their product: Jon repeatedly told me this. Even after the problem with the data loss took place Jon said to me basically: "I have no problem with what's happened. I need you to keep making these amazing box covers". I'm digressing:

I waited to hear from Jon for a night or two. He then said he changed his mind and since it was Nica's production company "Toaster Kid", she should pay. She said she would, but then brought it down to 4K of which **3K was owed me for work I had done in those last few days there. This was money owed me for the work on those last few days not anything else.** I didn't care. I just wanted out.

The last few days I was there were to hopefully make a grand or two (as chronicled above) to help get me out. I had the house cleaned by two maids. Nica asked me for the key to get her stuff. We met a few times. She tried to keep me on. **I gave vague answers to maintain some hope on her part that I would stay because I needed the checks they gave me to clear. (On previous occasions her checks didn't clear or she has short changed people. It's** happened to me and I've been in the car when it's happened to talent.) In the midst of all this chaos (I might be getting the timeline muddy on this point) Nica said that a reporter from either the Martha's Vineyard Times (or other local paper) had been given a lead that she was shooting porn there. In a panic she deleted her Twitter and asked the crew and the massive amount of performers to erase "Martha's Vineyard" from their social media. Shoots were canceled (meaning people weren't paid). At some point she thought either the police or the reporter might come so she asked us to evacuate her second shoot house in the middle of a shoot and bring with us camera, gear lights, scripts lights. She was literally having us "run from the law". Our exchanges were hostile on set. She called me names in front of people. We rapidly packed the stuff. She was at a local law office where she had begun work, I believe. I was counting minutes to leave this hellish situation where I was literally being asked to hide from homeowners and police and expected this to be normal and to be a team player in all this. It was sheer chaos.

I left for Florida with a check for a total of about $4K for the work I had done. This was mostly for the work on the last few days.  I gave Jon and Nica all the data.  A few days later  Jon told me that Nica had LOST the data I had given her on a hard drive when I left and I took it upon myself to give it to Jon anyways as a favor to the clean and clear and away for which he expressed gratitude. I didn't need to do this. I just wanted to cut ties with Nica forever. I have the impression she went back to the Bassett residence and shot there after I left because Leah had said the house was a mess (beyond the garbage bags in the basement). **Even after all this she still tried to get me to come back.**

Sometime afterwards I got a random email from her asking to return a $10 light stand she implied I stole. (I had left hundreds of dollars worth of photo gear in her shoot house) or she she would report it stolen or some other petty threat. I was fed up and told Jon to please not have her contact me anymore. She then replied with a toxic email accusing me of being a sociopathic monster and that I moved around so much to commit crimes and that she was going to alert authorities.  Go figure. Around that time I was contacted by Lea and her lawyer John Taylor. My mother's brother had died in the Philippines. My mom flew there to help with the work in trying to keep her house there from being taken by the banks and other family related business. She asked if I would help her. I told her I would. I brought my new girlfriend with me. After a week here, we learned that she was pregnant. We're elated. It's all I care about now.

Based on my experience with Nica she will try to pass blame on everyone but herself. I guarantee she will say I'm a sociopath, a grifter and a dangerous person (something she invoked in an email during the end-despite asking me back to stay on and remedy everything after any of her "issues" with me) and anything else she can use to justify taking advantage of me. I say this because this is literally the exact same thing she has done to a long line of people who have similar stories in the past: this kind of behavior is well documented for YEARS by large, large number of people. This is not an exaggeration. These kinds of things are well documented online, in social media and in blogs.These people (some very articulate and accomplished) are available and willing to attest to her patterns of abuse, passing blame and threatening to throw people under the bus to avoid blame. (She did that to the reporter who was trying to uncover this story in Martha's Vineyard).

I'm sure that she will  cherry pick instances try to make a case that I said I wanted her to shoot at Basset residence but the context here is: I had a gun to my head and after gambling everything I had to get out there was basically was trying to get through to spring without being fired . And this is still a condensed narrative trying to focus on what's relevant.

**Why would I WANT her to shoot there? I had no gain or profit.** I was  a day laborer. Mile High and Icon were making millions (in her words, I can provide the email). Even my friend who directs for another studio under the Mile High banner assured me when I would commiserate my stress to her that Jon Blitt let Nica keep running this mad house, with a pattern of taking advantage of people, because it was one of the most profitable studios. I said to Jon: "You're letting this behaviour of hers slide because she is a "golden cow"". He had nothing to say back because it's true.

While the timeline may be muddy here and there, the narrative of this is all true. I'd be willing to swear to this, take a lie detector test or did whatever it took to vouch for this. Scores of people were witness to this and a number of them

# EXHIBIT 3



Exhibits:   1-28                    Volume 1, Pages 1-169

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MASSACHUSETTS

Civil Action No. 18-CV-10576-PBS

- - - - - - - - - - - - - - - - - - - - - - - - - -

LEAH BASSETT

         Plaintiff

vs.

MONICA JENSEN, d/b/a NICA NOELLE,

JON BLITT, personally and d/b/a

MILE HIGH MEDIA, d/b/a ICON MALE,

d/b/a TRANSSENSUAL, et al.

         Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF PATRICIA MARIE KEOHANE

Thursday, June 6, 2019, 11:50 a.m.

50 Congress Street, Floor 7

Boston, Massachusetts


- - - - - - - - Reporter:   David A. Arsenault, RPR - - - - - - - -

Farmer Arsenault Brock LLC

Boston, Massachusetts

617.728.4404

26

1  she was in high school there was a teacher who was
2  pursuing her and she did not have any recourse.
3  People were not believing her about it.  She did not
4  want to talk about it with others.  I remember that
5  happened in the second session.
6  Q.  Did you take a history of her in the first
7  session?
8  A.  No.
9  Q.  Why not?
10  A.  My practice is that I want people to leave
11  a session and have a good life, not necessarily for
12  me to get all the information in the first session.
13  So the first session I pretty much encourage people
14  to get a feeling as opposed to just a story, knowing
15  that in the future that I will get more of the
16  story.
17  Q.  Anything else that you can remember from
18  the second session which we marked as Exhibit 5,
19  October 6, 2015?
20  A.  I see in there that I must have continued
21  to want her to get more support than just me.  She
22  did not want to share with others that this happened
23  to her home.  Other than going into the history of
24  what happened in high school, and explaining my

27

1  belief that it would help her think more clearly
2  about this trauma presently to deal with the trauma
3  from the past, so we did touch upon it in that
4  session.
5  Q.  Did you come to a diagnosis?
6  A.  It looks like I still have -- no, I have a
7  different one.
8  Q.  Exhibit 5, you have a diagnosis that says
9  F43.10, right?
10  A.  Yes.
11  Q.  Looking at your phone now, can you tell me
12  what that is -- which is fine with me?
13  A.  Thank you.
14  MR. ROACH:  Let the record reflect she
15  is looking at her phone.
16  Q.  What are you looking at?
17  A.  I'm looking to see the diagnosis.
18  Posttraumatic stress disorder.
19  Q.  So the F43.10 diagnosis is posttraumatic
20  stress --
21  A.  Correct.
22  Q.  So the F43.10 diagnosis is posttraumatic
23  stress disorder.  You just looked at your phone to
24  look at the proper diagnosis with that F43.10; is

28

1  that correct?
2  A.  To make sure I have the proper diagnosis.
3  Q.  What are you looking at on your phone?
4  A.  A website that I have up on my phone.  I
5  think it is drbob.org.  It is the DSM V listing.
6  Q.  Who is drbob.org?
7  A.  What everybody in my supervision group uses
8  as a reference.
9  Q.  Is he a learned professional in the area
10  that writes learned articles regarding diagnosis?
11  A.  Unknown to me.  I don't know.
12  Q.  In making that F43.10 posttraumatic stress
13  disorder, did you in fact diagnose her as having
14  posttraumatic stress disorder on this day?
15  A.  I did.
16  Q.  Did you believe she had it?
17  A.  Yes.
18  Q.  What do you base it on?
19  A.  Intrusive thoughts, inability to sleep,
20  inability to have organized thoughts to be able to
21  get ready for Antigua; shaking, heart palpitations.
22  Q.  Intrusive thoughts, inability to sleep,
23  disorganized thoughts, shaking?
24  A.  Inability to organize her thoughts.

29

1  Q.  Inability to organize thoughts, shaking,
2  palpitations.  I think you said something about
3  heat?
4  A.  No, not that I remember.
5  Q.  Oh, heart.  Heart palpitations?
6  A.  Heart palpitations.
7  Q.  Anything else from that session?
8  A.  Nothing comes to mind.
9  Q.  On Exhibit 5 you put current symptoms
10  severity as severe, correct?
11  A.  Correct.
12  Q.  And below that -- the change in diagnosis
13  you put down as yes.  Do you see that?
14  A.  Yes.
15  Q.  So this was a change in the diagnosis from
16  the first day you saw her in September?
17  A.  Yes.
18  Q.  And that's September 15 that it changed
19  from, the first time?
20  A.  The 29th.
21  Q.  Sorry.  29th.
22  A.  Correct.
23  Q.  You said on the second page, I'll read
24  this:  "Started to ask Leah if this also brings up

Patricia Keohane - Vol. 1 - 6/6/2019

13

46

1  when you were seeing Ms. Bassett; is that correct?
2      A.  To the best of my knowledge.
3      Q.  But the insurance only covered 59 of it,
4  correct?
5      A.  Correct.
6      Q.  Did you ever bill her for the balance?
7      A.  You are not able to.  You can't.
8      Q.  Under Massachusetts rules?
9      A.  Under insurance rules in the United States,
10  you can't bill for anything above the insurance.  It
11  is against the law.
12      Q.  That would include any insurance company,
13  Blue Cross Blue Shield?
14      A.  Correct, yes.
15      Q.  Why didn't you just say to her, listen,
16  let's not meet today and you come back when you're
17  ready to talk about your experience with your house
18  being used for pornography?
19      A.  Because, especially because it was the
20  third session, I'm still building trust, a
21  relationship.  So it is valuable.  It is a valuable
22  session.
23      Q.  Is there anything you learned in this
24  session from her?

47

1      A.  I learned where to push somebody where to
2  back off.  So I learned she needed to back off a
3  little from it.  Yeah.
4      Q.  The next sentence says:  "She started to
5  talk about wanting or not wanting to have kids."
6          Did I read that correctly?
7      A.  Yes.
8      Q.  What did she say about that?
9      A.  So she would say:  "I'm not sure if I want
10  to have children or not.  Maybe a little bit about
11  going to Antigua and her partner had a child.  So
12  that's where the thoughts were coming up.  But he's
13  older.  He's not a little boy.
14      Q.  What's her partner's name, do you remember?
15      A.  Didier.
16      Q.  How old was Didier?
17      A.  No idea.
18      Q.  Did she ever talk to you about any problems
19  or stress she was having about Didier, whether to
20  marry him or anything about the relationship?
21      A.  Within the time frame of seeing her?
22      Q.  Yes.
23      A.  The only thing was that she was sad that
24  she was causing him so much distress because of her

48

1  anxiety from the trauma.
2      Q.  The trauma from the case?
3      A.  The trauma from the case, yes.
4      Q.  Anything else that you can recall from your
5  session with Ms. Bassett on October 14, 2015?
6      A.  No.
7      Q.  When is the next time you saw her?
8      A.  Excuse me.
9          MR. ROACH:  Off the record.
10          (Discussion off the record.)
11      Q.  When is the next time you saw Leah?
12      A.  January 5, 2016.
13      Q.  So you saw Ms. Bassett January 5, 2016.
14  I'll mark as Exhibit 8 your note from that date.  Is
15  that a true and correct copy of that, Exhibit 8?
16      A.  Yes.
17          (Marked, Exhibit 8, Progress notes,
18  1/5/16.)
19      Q.  What happened on January 5, 2016?
20      A.  Leah is now in Antigua at this time and
21  letting me know -- it must have been in the
22  therapy -- it must have been this day that I was
23  trying to help her let go of thoughts so that she
24  could live presently.  She was letting me know that

49

1  it was really difficult for her to let go of
2  thinking about it and her thoughts were intrusive.
3  She was fearful, paranoid.
4          She told me -- I tried to get her to
5  not -- but just researching the pornographic
6  company, researching maybe a woman related to the
7  company.  She was paranoid that people from the
8  Vineyard would find out, paranoid that people in
9  Antigua would find out.  Whether it was this date or
10  later on in that year, telling me that she would be
11  walking down the street thinking she saw somebody
12  from the Vineyard, because there was an overlap
13  because of the sailing community, and she would want
14  to go the other way.
15      Q.  Why would she worry about seeing somebody
16  from the Vineyard?
17      A.  That they would know about it is A.  And B,
18  that she felt bad and uncomfortable that she wasn't
19  letting people know that something so intense and
20  traumatic was going on for her.
21      Q.  This is when she was in Antigua --
22      A.  Yes, yes.
23      Q.  This is when she was in Antigua worried
24  about seeing someone from the Vineyard?

**54**

1   Q.  What was she researching?

2   A.  I know she was researching the company and

3   a particular woman from the company who she was

4   wanting to know what she was about, what she might

5   have been saying about Leah.

6   Q.  When you say the company and a woman, can

7   you tell me who it was she was talking about?

8   A.  Only from looking through the emails from

9   her do I have Monica's name.  At the point when I

10  think this, I'm trying to help her get better.  I

11  don't care what the story is about.  I just want to

12  help this person to get through what they need to

13  get through.

14  Q.  I notice you put down the current symptom

15  severity as moderate?

16  A.  Yes.

17  Q.  You noted there was no change in diagnosis,

18  it was PTSD?

19  A.  Correct, yes.

20  Q.  Was there any other diagnosis that you made

21  at this time other than PTSD?

22  A.  No.

23  Q.  So I see here you put no change in

24  diagnosis?

**55**

1   A.  Yes.

2   Q.  When you said moderate, did that mean that

3   she was getting better?

4   A.  There's a juxtaposition that I have,

5   fearful paranoia, obsessively researching, and yet

6   moderate.  Was she getting better?  There might have

7   been -- yeah, there was some improvement.

8   Q.  I noticed back on October 6, 2015, her

9   symptoms were severe.

10  A.  Yeah.

11  Q.  Is that right?

12  A.  Yeah, yeah.  A so little distance from the

13  house helped her stabilize a little.

14  Q.  Underneath the moderate on Exhibit 8, you

15  have checkmarks under an arrow pointing north --

16  A.  Yes.

17  Q.  -- symptoms.  And an arrow pointing north

18  on function.  Can you tell me what that means?

19  A.  So her symptoms were up via the

20  fearfulness, the paranoia, obsessively researching.

21  Her functioning was also up and better than it was.

22  I think at this time it was she had and her husband

23  were making -- I think they make maps and sell them

24  in Antigua.  She was able to do that.  That's where

**56**

1   the functioning was better.

2   Q.  Was she doing any art in Antigua?

3   A.  I don't know.  I was just thinking was she

4   painting at this point.  I'm not sure.

5   Q.  Did she ever say anything about stopping

6   painting as a result of this event that occurred in

7   her house involving the pornography?

8   A.  I believe so.  All I can be absolutely sure

9   about is that she was stopping selling and having

10  her website up because of fear of -- what would the

11  fear be?  I want to say like invasion from the

12  company or this Monica woman.  I'm not sure what

13  kind of invasion could happen with the website.

14  But I know she was scared to have her

15  Facebook page open, to have her website up.  So I

16  don't know whether or not she was -- I can't answer

17  to the painting or not.  I know she was withdrawing

18  from marketing it.

19  Q.  She was withdrawing from marketing her art

20  because she didn't want to have her website up for

21  fear somebody may invade it?  Did I say that right?

22  A.  Can I put quotes around the invasion?

23  That's not her word.  So that's mine in trying to

24  figure out and recall.  Again, I would be focusing

**57**

1   on the symptoms and helping her with the symptoms.

2   The symptom here would be fear.  That's what I would

3   be focusing on helping her with.

4   Q.  What was she fearful of?

5   A.  She was afraid and so kept her Facebook

6   page down and her website closed.  Smearing, being

7   smeared, yeah.

8   Q.  Did she say anything to you about any

9   particular attack or smearing by this woman Monica

10  or any company, from your memory, before you look at

11  your notes?

12  A.  Yes.

13  Q.  Did she say -- let me ask you this way.

14  Did she give you specific instances of anybody

15  directly smearing her or saying something online

16  about her?

17  A.  I'm not sure.  I'm not sure about her.  But

18  I know it was about, I've heard that this woman is

19  aggressive toward other people who might have stood

20  up to the woman.  So she was afraid that there would

21  be repercussions if she were to stand up to her.

22  Q.  If I get this straight, this other woman

23  was a woman named Monica, correct?

24  A.  Yes.

Patricia Keohane - Vol. 1 - 6/6/2019

17

**62**

1  Q. When is the next time you saw Ms. Bassett,
2  either saw her or talked to her by phone?
3  A. What is the date?
4  Q. Exhibit 8 is January 5, 2016. I see the
5  next note either January 14 or 19, 2016.
6  A. 19.
7  Q. So the next time you saw her was January
8  19, 2016?
9  A. Correct.
10  (Marked, Exhibit 9, Progress notes
11  1/19/16.)
12  Q. What happened on that day?
13  A. This is more of a conversation about how
14  she is not -- I still think it is posting the art.
15  I'm not sure about doing art, doing painting. Not
16  having any official media posts, so not posting on
17  Facebook; and that Island, Vineyarders will be
18  coming and the fear that people will know about it.
19  Q. To Antigua?
20  A. Yeah. That the Vineyarders will be coming
21  to Antigua.
22  Q. This is like the same thing you talked
23  about in the earlier session, correct?
24  A. That's where I said earlier it all melds

**63**

1  together.
2  Q. And the diagnosis was still posttraumatic
3  stress disorder?
4  A. Correct.
5  Q. For each time you diagnosed her with
6  posttraumatic stress disorder, did you look it up to
7  check the criteria anywhere?
8  A. No.
9  Q. Can you tell me, I notice that the current
10  symptomology, severity, change in diagnosis form on
11  the front page is blank. Any reason for that?
12  A. Just my lack of good note-taking.
13  Q. On the back, intervention techniques used,
14  that is blank?
15  A. Yes.
16  Q. Why is that?
17  A. I'm not good at note-taking.
18  Q. On the reverse side under Notes it says:
19  "Wondering about acute stress reaction diagnosis but
20  leave at posttraumatic stress disorder symptoms,
21  point to posttraumatic stress disorder."
22  Did I read that correctly?
23  A. Yes.
24  Q. What does that mean?

**64**

1  A. The only difference is the emphasis. Just
2  that I said to myself leave it at PTSD. The comment
3  is because the symptoms point to PTSD as opposed to
4  acute stress.
5  Q. I can read it. Why did you write this?
6  What does it mean?
7  A. Thinking out loud to myself and the note, I
8  must have wondered is this acute stress disorder or
9  is this PTSD? Then I said to myself leave it at
10  PTSD.
11  Q. You weren't sure which it was.
12  A. Right.
13  Q. Did you look up under the drbob.org or in
14  the DSM IV manual what it was?
15  A. Yes. I looked at DSM probably V at this
16  point. I want it on the record that I only use
17  Dr. Bob to come up with the numbers. I don't
18  remember the numbers. I don't use him in my quick
19  look to come up with the diagnosis. I look at the
20  DSM and my experience, and then get the number from
21  Dr. Bob.
22  Q. Do you have a copy of DSM in your office?
23  A. I have IV and V.
24  Q. So you decided to leave it at PTSD.

**65**

1  A. Yes.
2  Q. What does acute stress reaction, what is
3  that about?
4  A. PTSD is a more longstanding reaction.
5  Acute is the reaction is happening right as the
6  trauma occurred. So Vietnam vets where PTSD came
7  from, came home from Vietnam and had symptoms for a
8  very long time. Acute is that you are having the
9  recreation right after the trauma.
10  Q. But it is fair to say that the trauma that
11  you say that she experienced was now some distance
12  away, correct?
13  A. Distant from the location of the trauma,
14  yes.
15  Q. So that's why you left it at PTSD?
16  A. It is why I wondered about it. Because she
17  was still having symptoms but she was removed from
18  the location.
19  Q. Emotionally or physically?
20  A. She was physically removed but not
21  emotionally.
22  Q. Can you tell me what you talked about on
23  January 19, 2016 in Exhibit 9?
24  A. Yes. Mixing up 1/9 and 1/5.

70

1    A. Yeah. I do remember her speaking about how
2 the diagnosis has aged her. I don't know if she
3 said or my imagination went to that her hair had
4 become grayer. I remember her saying that it has
5 aged her.
6    Q. You said how the diagnosis has aged her.
7 Was it the trauma or diagnosis?
8    A. I'm thinking diagnosis because you just
9 said diagnosis, but the trauma of what occurred in
10 her house.
11    Q. But did she ever say to you that she had
12 been physically attacked or threatened physically?
13    A. Not physically, no. Also thinking about
14 having a child. And then there was the virus that
15 was happening down there, that they were
16 discouraging women from getting pregnant.
17    Q. Was that the Zika virus?
18    A. Yes.
19    Q. Was that another phone interview?
20    A. Yes.
21    Q. You did not put anything in this form
22 progress, current symptoms, risk assessment or
23 intervention techniques, correct?
24    A. Correct.

71

1    Q. Is that for the same reasons you talked
2 about earlier?
3    A. Exactly, yes.
4    Q. Can you tell me what else she talked about?
5 I see more notes. What do those notes say?
6    A. To me I imagine the session because I know
7 we did have a session or part of a session where I
8 was happy that she was feeling some anger because
9 that can help people come out of depression and help
10 people to take action to take care of themselves. I
11 noticed in my notes that she got angry; instead of
12 fearful and withdrawn, she was more angry.
13    Q. So she was getting better?
14    A. Since she was continuing to have intrusive
15 thoughts and still depressed, better in my thinking
16 but not in her actions in life. So emotionally I
17 was imagining good, she is getting stronger. So
18 back to that empowerment.
19    Q. So she was improving?
20    A. I can't say that, Steve, because of the
21 other notes that are with it.
22    Q. What do those notes talk about?
23    A. Still depression, still intrusive thoughts;
24 and that she feels like the trauma has aged her.

72

1    Q. Did you come to the conclusion that the
2 experience that she had with the pornography in her
3 house is what caused the PTSD? Is that your
4 opinion?
5    A. Yes.
6    Q. It is based on what you have told us so far
7 today?
8    A. What's based on?
9    Q. On what you told us about today.
10    A. What's based on?
11    Q. Your diagnosis.
12    A. Correct, yes.
13    Q. Anything else that you can tell us about
14 the March 15 session with her, 2016?
15    A. Whether it is here or elsewhere, I remember
16 thinking at some point that what happened at her
17 house, like maybe it just kind of gets to me, this
18 really changed the trajectory of this woman's life.
19    Q. Is that what you thought?
20    A. That's what I -- whether it was throughout
21 this or at this moment, that's what I thought, yes,
22 yeah, yeah.
23    Q. What do you mean change the trajectory --
24    A. So part of it --

73

1    Q. -- of her life?
2    A. So part of it, this has aged me, and the
3 children, was not just the virus that was happening
4 down there, but it was also that this event that
5 happened had caused her so much stress that she
6 couldn't imagine having a child right now and this
7 is when she was thinking of having a child.
8    Q. Did the Zika virus enter into the picture
9 of the decision of her not having a child?
10    A. As she was thinking, she was like "And of
11 course I couldn't anyway because the virus is in the
12 area."
13    Q. Did she ever say to you that she didn't
14 worry about Zika virus anymore? Was there ever a
15 point where she said that was no longer in the
16 picture in terms of her feelings?
17    A. No. The next session is so much later.
18 But no.
19    Q. The next session appears to be March 29,
20 2016; is that correct?
21    A. Correct.
22        (Marked, Exhibit 12, Progress notes,
23 3/29/16.)
24    Q. Is that a true copy, Exhibit 12?

106

1  publicity of the lawsuit caused her stress?
2      A. Yes.
3      Q. When?
4      A. I bet you it is in the emails that I think
5  we would have to go through as well. I think it is
6  in the emails. We did not have a session.
7      Q. That's in Exhibit 2?
8      A. Correct.
9      Q. We'll get to those later. Let me ask you
10  about this session on October 18, 2018, Exhibit 16.
11      Now it appears that she went from doing
12  well two years earlier on July 5, 2016 to, you have
13  down here under Progress, deterioration. Is that a
14  fair statement?
15      A. Mm-hmm.
16      Q. Is that a yes?
17      A. Yes, yes.
18      Q. You have changed the diagnosis from
19  posttraumatic stress disorder to acute stress
20  disorder?
21      A. Correct.
22      Q. I think you explained the difference
23  earlier, that posttraumatic stress disorder is after
24  the trauma has occurred, this is some period later.

107

1  Acute stress is that it is happening right at the
2  moment, correct?
3      A. Yes.
4      Q. Other than the timing of each, are the
5  symptoms the same, posttraumatic stress disorder
6  versus acute distress disorder?
7      A. Similar.
8      Q. How would they be different?
9      A. I would have to look at the DSM.
10      Q. You can't tell me off the top of your head.
11      A. Off the top of my head, no.
12      Q. Can you read what's in your notes and tell
13  me what you discussed on October 18, 2018.
14      A. Leah was on Martha's Vineyard, MV, and came
15  in for appointment. She was just at the depo for
16  the whole day and she is distressed all over again
17  due to her house which she loves, being invaded, and
18  she felt like she was being invaded by these people.
19  So the actual questioning, she felt like she was
20  being invaded by the people who questioned her.
21      Q. The lawyers?
22      A. Yes.
23      Q. Like myself or my co-counsel?
24      A. Yes, yeah.

108

1      Q. Did she say how the lawyers who represent
2  the company and Monica were invading her?
3      A. In the moment of the deposition?
4      Q. Yes.
5      A. "Invade" is probably my word. She did.
6      Q. So she told you that she filed a lawsuit
7  against the company and Monica but yet felt invaded
8  even though she knew that she was going to have to
9  testify and people were going to ask her questions?
10      A. Correct.
11      Q. Does that sound rational to you?
12      A. Very.
13      Q. Even though she's the one that started it?
14      A. Yes. To me, again, I checked off
15  empowerment. So in order to get over it, she needs
16  to do this. Sometimes when we need to do something,
17  we need to go through hell or difficult situations
18  in order to get what we want. So she did know this
19  was going to happen. That doesn't necessarily mean
20  it is going to be easy or not going to retraumatize.
21      Q. She knew she was going to be retraumatized
22  once she filed a lawsuit?
23      A. She knew it was going to be hard. I'm
24  using the clinical word "retraumatize."

109

1      Q. You are using the clinical word?
2      A. "Retraumatize." She knew it was going to
3  be hard.
4      Q. Is it fair to say she caused her own
5  retraumatization by filing the lawsuit?
6      A. No.
7      Q. Why not?
8      A. Because it is mincing words or something.
9  I just want to make sure we are clear. Is she the
10  cause of the acute stress disorder by filing and
11  then being questioned?
12      Q. That's my question.
13      A. Is there something where you don't answer?
14      Q. You can't ask --
15      A. I can't?
16      Q. No.
17      A. He's not my counsel.
18      Q. You have to my question with yes or no,
19  would probably work.
20      A. So if a child is abused and they have to be
21  questioned --
22      Q. This isn't about a child being abused.
23  This is a person's home that she said was misused.
24  She found out about it. She had PTSD. She was

122

1    A. Yes.
2    Q. It wasn't until October, about five or six
3  months later that you changed it to acute stress
4  disorder?
5    A. Right.
6    Q. That's from the deposition?
7    A. We are swinging back around this. Yeah,
8  yeah, from the deposition, yeah. I'm comfortable
9  with saying yes.
10   Q. Anything else you talked about with her in
11 this session?
12   A. Can you remind me which one this is?
13   Q. Exhibit 17.
14   A. No.
15   Q. What is the chart on the back of Exhibit
16 17?
17   A. It is a piece of scrap paper that must have
18 been in the printer.
19   Q. Nothing to do with this?
20   A. Absolutely nothing.
21   Q. When is the next time you saw her after
22 October 18, 2018?
23   A. I have not seen her.
24   Q. Do you know why not?

123

1    A. No.
2    Q. Have you checked in with her?
3    A. Sometimes I do. I have not.
4    Q. Do you have any views as to why she has not
5  called you or checked in with you since October
6  of 2018?
7    A. Maybe her worst fear happened on that day
8  of the questioning. Everything came out and the
9  anxiety had quelled.
10   Q. Do you know this or giving just your
11 opinion?
12   A. Just my opinion.
13   Q. What is that based on, the fact that you
14 haven't heard from her?
15   A. Yes. And a clinical opinion when people
16 get it out, it's not as powerful. She got it out in
17 the most stressful way anybody could. Faced the
18 demon, so to speak.
19   Q. In March you had Intervention as solution
20 focused therapy. Exhibit 17. Do you see that?
21   A. Yes.
22   Q. What's that, what was that?
23   A. The medication and the book.
24   Q. You changed it in the next session, the

124

1  last time you saw her, to: Cognitive therapy,
2  client empowerment, trauma counseling.
3    A. Yes.
4    Q. So why did you move it from solution
5  focused therapy to cognitive therapy, client
6  empowerment and trauma counseling?
7    A. It always changes session to session with
8  anybody. Maybe one diagnosis I'm geared toward a
9  particular style. Cognitive is used often for many
10 problems.
11   Q. I noticed that in the current symptoms
12 after she filed a lawsuit and you saw her on March
13 28, 2018, the progress was deterioration, correct?
14   A. Right.
15   Q. The severity was severe?
16   A. Yes.
17   Q. So she went from doing well on July 5, 2016
18 where you didn't check off anything other than she's
19 doing well, to deterioration, severe symptoms.
20   A. Mm-hmm.
21   Q. Correct?
22   A. Mm-hmm.
23   Q. Is that a yes?
24   A. Yes, yes. Due to reliving the trauma due

125

1  to the questioning.
2    Q. We talked about client empowerment I think
3  already. This was October 18, 2018. What was the
4  trauma counseling? What was that intervention?
5    A. Regarding the questioning and what might I
6  have done as trauma counseling?
7    Q. Let's go back to Exhibit 16. One of the
8  interventions is trauma counseling?
9    A. Mm-hmm.
10   Q. Is that a yes?
11   A. Yes.
12      (Discussion off the record.)
13   Q. Back on Exhibit 16, you have one of the
14 interventions is trauma counseling. Do you see
15 that?
16   A. Yes.
17   Q. What is that?
18   A. If somebody is sitting in my office and
19 starts to hyperventilate, starts to re-experience
20 the trauma of say the questioning, I'm going to help
21 them come down. I'm going to help them ground,
22 connect to their breathing. That is what I did in
23 that session. So she could then either tell me more
24 or discharge more about it, but that's what I would

EXHIBIT 4

EileenKohlhepp

                                                          1

1            UNITED STATES DISTRICT COURT
2              DISTRICT OF MASSACHUSETTS
3
4    LEAH BASSETT,                    )
                                      )
5            PLAINTIFF,               )
                                      )
6      VS.                            )  CASE NO.
                                      )  1:18-CV-10576-PBS
7    MONICA JENSEN, d/b/a NICA        )
     NOELLE; JON BLITT, in his        )
8    Personal capacity & d/b/a        )
     MILE HIGH MEDIA, ICON MALE, and  )
9    TRANSSENSUAL; MILE HIGH          )
     DISTRIBUTION, INC.; JOSHUA       )
10   SPAFFORD, d/b/a JOSHUA DARLING;  )
     APRIL CARTER d/b/a DIANA DEVOE;  )
11   TLA ENTERTAINMENT GROUP, d/b/a   )
     TLA GAY and TLA DISTRIBUTION;    )
12   and GAMMA ENTM'T, d/b/a          )
     CHARGEPAY B.V., WILLIAM GRAY     )
13   d/b/a BILLY SANTORO, and FIORE   )
     J. BARBINI, d/b/a HUGH HUNTER,   )
14                                    )
             DEFENDANTS.              )
15   _____ )
16
17          DEPOSITION OF EILEEN KOHLHEPP
18            TUESDAY, MARCH 12, 2019
19
20
21   REPORTED BY
22   MARONDA POWELL,
23   C.S.R. 13862
24   JOB NO:  3258501
25   PAGES 1 - 134
♠

                                                          2

1    DEPOSITION OF EILEEN KOHLHEPP, TAKEN ON BEHALF OF THE
2    DEFENDANT, COMMENCING AT 10:19 A.M., TUESDAY, MARCH 12,
3    2019, AT 1801 CENTURY PARK EAST, SUITE 1430, LOS
4    ANGELES, CALIFORNIA, BEFORE MARONDA POWELL, C.S.R. NO.
5    13862, PURSUANT TO NOTICE.
6
7    APPEARANCES OF COUNSEL:
8
9    FOR DEFENDANTS:

EileenKohlhepp

```
 7    sensational because that's what the Daily Mail is --
 8    yeah.  My first response was "Holy fucking shit."
 9         Q    And what was so disturbing?
10         A    It was a violation.
11         Q    Of?
12         A    It was a violation of -- there were pictures
13    in the Daily Mail of soiled laundry, of scenes from the
14    pornography.  And it was, very clearly, rooms in the
15    house that I had slept in, and I knew really well.  So
16    it was like, oh, wow.  That's crazy.
17         Q    It was crazy that people were having
18    intercourse in the house?
19         A    No.  It was crazy that people were filming in
20    the house when there was no commercial filming allowed
21    in the house.
22         Q    That's what was disturbing --
23         A    Yes.
24         Q    -- that people were filming inside the house?
25         A    As somebody -- as somebody who, like in the
```

28

```
 1    past, like has sublet my apartment, I would fully expect
 2    that people, who I'm renting my house to, might have sex
 3    in it.  And there's a part of you that just has to not
 4    think about that.
 5         Q    Sure.
 6         A    But, if someone is coming into your home and
 7    photographing stuff and filming things without your
 8    permission when you've expressly said, in your lease, no
 9    commercial -- for -- not for commericial use, and then
10    someone comes into your home and violates it by doing
11    something without a permit and without permission, yeah.
12    That's a little upsetting and disturbing.
13         Q    So it wasn't the sex that was occurring in
14    that house that was disturbing, it was the fact that it
15    was videotaped?
16         A    Correct.
17         Q    Okay.  And it has nothing to do with the fact
18    that was it homosexual or transsexual intercourse?
19         A    Not at all.  No.
20         Q    So when you received the link from Belinda,
21    you contacted Leah Bassett?
22         A    Yes.
23         Q    Can you tell me what you guys discussed?
24         A    It would have been whatever was in the
25    WhatsApp text that you guys have.
```

29

EileenKohlhepp

1    Q    And you mentioned that you often spoke to Leah
2  on the phone.
3         Can you tell me what you discussed on the
4  phone that isn't reflected in text messages?
5    A    It would have been -- whatever is in the text
6  messages, if you can pull them up.  You can see we
7  planned on a talk, but she was so incredibly upset that
8  she couldn't even talk on the phone.  So we didn't talk
9  for a while.  It took almost a week before she was able
10 to talk.  She was really upset.
11        I've known her for almost 25 years.  I've
12 never seen her so -- I never heard her so upset.  And I
13 think in reading over the texts, she's talking about how
14 she's having -- it feels like she's having a panic
15 attack, that she's having to take Xanax.  That's not the
16 Leah Bassett I've known for years to be that upset.  All
17 of this became so public.  She felt so exposed and
18 violated.
19   Q    So when was this exactly when you had this
20 conversation?
21   A    It would have been in the week after it became
22 public.
23   Q    So is it true that Leah became upset and her
24 emotional distress, if any, occurred after the publicity
25 of the lawsuit?

30

1    A    I think she was upset before, but she wasn't
2  telling everybody because it was so -- I think it was
3  very upsetting to her.  But because she's so private,
4  she wasn't going to share it with everybody.  So she was
5  keeping it together and keeping it between her and her
6  husband and her parents.  She kept the circle very small
7  of people who knew about it.  When it became public, she
8  felt very exposed to judgment and very exposed to -- it
9  was embarrassing.
10   Q    So did the publicity cause a significant
11 amount of her being upset?
12   A    I think it elevated it, but I wasn't sitting
13 there next to her.  It's like I couldn't see her on a
14 day-to-day basis so I couldn't tell you exactly how much
15 it was affecting her.  Other than when we did speak, she
16 was -- she was noticeably more upset and freaked out
17 than I've ever seen her in our whole friendship.
18   Q    So you mentioned that you had gone to visit
19 her in Antigua and you went to her wedding?
20   A    Uh-huh.
21   Q    And you mentioned she seemed well there, and

Page 17

EileenKohlhepp

22    she seemed happy.
23        A    She seemed happy at her wedding.  Yes.
24        Q    And during that week, you visited her in
25    Antigua?

31

1         A    Yes.
2         Q    And she seemed well?
3         A    I mean she seemed as well as somebody who's
4     not telling her best friends what's going on and that
5     she's embroiled in a lawsuit.
6         Q    But she wasn't noticeably upset or distressed?
7         A    She wasn't noticeably upset or distressed.
8         Q    And she was, when you spoke to her, following
9     the publicity of the lawsuit that she filed?
10        A    Yes.  Because she actually felt like she could
11    talk to me and tell me what was going on.  And she
12    apologized to me for not having told me earlier.  She
13    was just so embarrassed and humiliated and didn't know
14    how to speak to me about it.
15        Q    What else did you and Leah speak about
16    regarding the lawsuit?
17        A    Not much.  I mean, my role, as her friend, is
18    basically help support her through this because it's
19    been really upsetting.  And sometimes she's like, I just
20    can't talk about -- I don't want to talk about it.  I
21    want to talk about what's going on with you.  I want to
22    talk about what's going on in the rest of the world so I
23    cannot think about this.
24            The only other thing we talked about regarding
25    the lawsuit is when I had a private investigator show up

32

1     at my house at 10:00 o'clock on Sunday morning and
2     surprise me and try to walk into my home.  And then I
3     had to send her away and tell her to call me back later.
4             So I did text Leah on WhatsApp and sent the
5     private investigator's card.  When she asked me to be a
6     character witness for her -- this is also in the
7     WhatsApp messages -- I said, I would love to.  Since I'm
8     in Los Angeles, will I have the legal team?  Will I have
9     people coming to my house?  Will I have people coming
10    after me?  Will I be deposed?  And I think she and her
11    lawyer both thought those things weren't going to
12    happen.
13            So there's been a lot of apologies on her side
14    saying, I'm sorry that someone is coming to your home
15    and stalking you.  I'm sorry that someone is coming and

Page 18

EileenKohlhepp

16  delivering you subpoenas.  I'm sorry you're having to
17  take a half day from your work and go down to a part of
18  town you would never go to so that you can talk about my
19  case.
20      Q    And, again, I apologize if the service of the
21  subpoena was uncomfortable for you.  And I understand
22  that you're not happy being here today.  And you have to
23  take some time off work.
24      A    Yeah.
25      Q    But Leah Bassett identified you as a witness

33

1   with potential knowledge.  And so that's why you're here
2   today.
3       A    I understand that.
4       Q    Okay.  So when the investigator showed up at
5   your house, what did you guys speak about?
6       A    She said she was there to talk to me about
7   things regarding the Leah Bassett case.  I asked her why
8   she didn't call me ahead of time.  And she said she was
9   flustered.  And then I asked her for her card.  My
10  husband told her to get the hell out of our house.  And
11  I said give me your card, and we'll plan to talk later.
12  We'll set a time when we can talk later.  And that's
13  when I sent a picture of the card and a text to Leah and
14  said, I've just had a private investigator show up at my
15  house.  How do I deal with this?  And she reached out to
16  her lawyer and got back to me and said her lawyers
17  said -- I didn't speak to John -- she texted me and said
18  that I could either speak to her, if I wanted to, or
19  not.  Either way, it was up to me.
20      Q    Did he say anything else?
21      A    No.  That's it.
22      Q    Did Leah tell you anything else?
23      A    By the way, her name is Leah.
24      Q    Sorry.
25      A    You're saying her name wrong.

34

1       Q    Did Leah tell you anything else?
2       A    No.  She just said it was up to me whether or
3   not I wanted to talk to the private investigator.
4       Q    Did she ask you to speak to the private
5   investigator or ask you to not speak to the private
6   investigator?
7       A    No.  She said it was up to me.
8       Q    And other than that, did you have any other
9   conversations with Leah?

Page 19

EileenKohlhepp

10      A      No.
11      Q      What about John Taylor?
12      A      I didn't talk to John Taylor.
13      Q      You did not talk to John Taylor --
14      A      The first time I talked to John Taylor is
15  after I received the subpoena.
16      Q      Okay.  Did you speak to anyone else about the
17  subpoena that you received?
18      A      My husband because he was there.
19      Q      Okay.  What did you speak about?
20      A      I said, "Holy fucking shit.  I got a
21  subpoena."  I literally walked back into the house and
22  said, great.  And he was super pissed.
23      Q      Did you speak to anyone else?
24      A      No -- oh.  I talked to my boss about it
25  because I told him I have to be here for this

                                                        35

1  deposition.
2      Q      Did you speak to anyone else?
3      A      I told my sister.
4      Q      What's your sister's name?
5      A      Kelly.
6      Q      And what did you and Kelly discuss?
7      A      I said I got deposed and have to go and sit in
8  a lawyer's office on Tuesday morning.
9      Q      Anything else?
10      A      No.  That's it.
11      Q      What about Brenda, did you tell Brenda that
12  you received a subpoena?
13      A      Are you talking about Belinda?
14      Q      Do you not have a friend named "Brenda"?
15      A      No.  It's Belinda.
16              Who's Brenda?
17      Q      I'm just asking.  If you don't have a friend
18  named Brenda, that's fine.
19      A      I don't have a friend named Brenda.
20      Q      Okay.  Did you speak to Belinda about the
21  subpoena that you received?
22      A      Yes.
23      Q      What did you discuss?
24      A      I said I got a subpoena.  And I have to go sit
25  in a deposition on Tuesday.  And she said, holy shit.

                                                        36

1  We curse a lot.
2      Q      These are really excited conversations.
3              Anything else?

                        Page 20

EileenKohlhepp

4     A    That's it.
5     Q    Did you speak about the lawsuit?
6     A    No.
7     Q    And after the private investigator visited
8  you, did you speak to Belinda about that incident?
9     A    No.  I didn't speak to Belinda about that.
10    Q    You did not?
11    A    No.  She was out of the country.
12    Q    You did not text her?
13    A    No.  Like, I don't text Belinda every time
14 something happens.
15    Q    What about Vanessa Thomas?
16    A    No.  I definitely do not talk to her.
17    Q    You did not contact her after you got the
18 subpoena?
19    A    No.  I'm not friends with Vanessa.
20    Q    And what about Leah's husband, do you speak to
21 him?
22    A    I don't speak to him directly.  I'm not on
23 Facebook.  So I don't talk to him directly, and I don't
24 text with him directly.
25    Q    Okay.  Have you ever provided a written

                                                    37

1  statement to Leah or John Taylor --
2     A    No.
3     Q    -- regarding this lawsuit?
4     A    No.  I have not.
5     Q    Did you agree to testify at trial regarding
6  this lawsuit?
7     A    I haven't received anything regarding that.
8     Q    Did you agree with them that you would?
9     A    I haven't been asked by them that I would.
10    Q    Okay.  Did Leah tell you why she filed this
11 lawsuit?
12    A    No.
13    Q    You never asked her?
14    A    Well, I kind of assumed that the reason why
15 she filed this lawsuit -- this is my own assumption --
16 is to basically make back the money that -- the money
17 that she needed to replace all of the stuff in the house
18 that was destroyed.  And I don't know -- I can't really
19 speak to why she decided to do this.
20    Q    Because she never told you?
21    A    No.
22    Q    You never discussed that with her?
23    A    We didn't discuss it.  I never said, why you
24 are filing this lawsuit?  And she never answered that

EileenKohlhepp

25   question.

38

1       Q    Indirectly, did she discuss her motivations
2   for filing this lawsuit?
3       A    No.  She did not.
4       Q    Did you ever encourage her to file the
5   lawsuit?
6       A    No.
7       Q    You did not?
8       A    No.
9       Q    Did Leah tell you she's trying to get rich off
10  of this lawsuit?
11      A    No.
12      Q    No?
13      A    No.  I didn't know about the lawsuit until
14  after the lawsuit was filed.
15      Q    And after the lawsuit was filed, did you have
16  any conversations with her regarding her motivations for
17  filing the lawsuit?
18      A    No.  I did not.
19      Q    Did you ever talk to her about the damages
20  that she's seeking?
21      A    No.  I definitely did not talk to her about
22  the damages.
23      Q    You didn't talk the money that she could make
24  from filing this lawsuit?
25      A    No.  I did not.

39

1       Q    No?
2       A    No.
3       Q    And are you aware that Leah had her deposition
4   taken a couple of months ago?
5       A    I am aware of that.
6       Q    Did you have any conversations with her
7   regarding her deposition?
8       A    No.  I did not.
9       Q    You didn't speak to her before she had her
10  deposition taken?
11      A    I spoke to her before.  I didn't speak to her
12  about it afterwards.
13      Q    You didn't speak to her after her deposition
14  was taken?
15      A    No.  I did not.
16      Q    Okay.  And can you describe to me what your
17  relationship is with Leah?
18      A    Leah and I met at RISD in 1995, and we've been

Page 22

EileenKohlhepp

19  friends ever since.  She and I have just been really
20  good friends for the last -- almost 25 years now.  We've
21  traveled together.  We've lived in different cities,
22  and, you know, it's hard when you have one of your best
23  friends and she lives on the other side of the world.
24      Q    Right.  I can imagine.
25      A    But she and I -- we've done a lot together,

40

1  you know.
2      Q    Putting in a lot of effort to stay in touch.
3      A    Yeah.
4      Q    And when is the last time you saw Leah?
5      A    The last time I physically saw her was at her
6  wedding in December of 2017.
7      Q    Did Leah tell you she was emotionally
8  distressed  as a result of this lawsuit?
9      A    I think as a result of everything.
10     Q    And what is everything?
11     A    Just everything she's been going through up
12 until when it became public.  And then once it became
13 public, it got elevated.
14     Q    And what did she tell you about her emotional
15 distress?
16     A    That she was having to see a therapist for the
17 first time; that she was having to take Xanax
18 occasionally; that she felt, at times, like she was
19 having panic attacks; that -- for as long -- like since
20 I met her in the '90s, she's been pretty unflappable.
21 She was always very, like, calm and cool and like --
22 when we would be traveling internationally, she would
23 be, like, the relaxed one.  And I've noticed a
24 difference in her anxiety level, and it's not her
25 usual -- usual way of being.

41

1      Q    And you've noticed this?
2      A    Over the phone.
3      Q    Since when?
4      A    Since the lawsuit became public.
5      Q    And what else did she tell you about her
6  emotional distress?
7      A    Everything I just told you.
8      Q    Anything else?
9      A    No.  That's it.
10     Q    Did you communicate that you would be able to
11 testify regarding her emotional distress to her or to
12 her attorney?

Page 23

EileenKohlhepp

13      A      I haven't been asked to do that.
14      Q      Did you communicate that you would be able to,
15  if you were asked?
16      A      I don't know how to answer that question
17  because I haven't been directly asked that.  I was asked
18  if I would be able a character witness.
19      Q      Okay.
20      A      That's the only thing directly I've been
21  asked.
22      Q      Do you know what a character witness is?
23      A      No.
24      Q      You do not?
25      A      I assuming it's somebody who can speak to

42

1  someone's character.  But if there's a more technical
2  legal term then --
3      Q      So did you ask John Taylor what a character
4  witness was when he mentioned that you would be one
5  potentially?
6      A      John didn't mention to me that I would be a
7  character witness.  Leah asked me via text on WhatsApp
8  if I would be a character witness.
9      Q      And you did not ask her what that was?
10      A      I assumed it would be someone who would be
11  speaking to her character.
12      Q      Okay.  And you mentioned Leah had never
13  visited a therapist prior to visiting one due to the
14  lawsuit?
15      A      Not that she had told me.  I thought this was
16  the first time that she was seeing a therapist.
17      Q      Did she mention how often she visited the
18  therapist?
19      A      No.
20      Q      You didn't ask?
21      A      I didn't ask how many times a week are you
22  going to a therapist.
23      Q      And you mentioned she was taking Xanax.
24      A      She said that she was taking Xanax.  She
25  texted it to me when we were chatting on the WhatsApp

43

1  app.
2      Q      And do you know if that was prescribed by a
3  doctor?
4      A      I have no idea.  I'm assuming it was, but I
5  can't speak to that.
6      Q      Right.  And so when Leah would speak to you

Page 24

EileenKohlhepp

```
 7   about her emotional distress, did she tell you what was
 8   causing it?
 9        A    She said the lawsuit, the fact that there was
10   publicity about this, the fact that she would have to --
11   I believe I actually made a joke about this, that she
12   was very distressed about going back to
13   Martha's Vineyard because Martha's Vineyard is a very
14   small place.  And she grew up there.  And everyone knows
15   her.  And you get out of your car, and you walk into the
16   supermarket, and you know 25 people in the supermarket.
17   And everyone has read about this case.  And they're all
18   coming up to talk to her about how she feels about it.
19   And I said, wow, it must be really fun talking about
20   porn in the aisles of Cronig's Supermarket.  Because
21   everyone is like, how are you doing?  What's going on
22   with that?  And she can't talk to anybody about it.  And
23   she's stressed out every time someone says something to
24   her.
25             So she was really not looking forward to going
```
⬆

                                                              44
```
 1   back home once this was public, and people knew about it
 2   because she was going to have to deal with people asking
 3   her questions that she didn't want to answer, and she
 4   didn't want to talk about it.
 5        Q    So it was the publicity and the community's
 6   knowledge of the lawsuit that was giving her anxiety?
 7        A    I think that was giving her some anxiety, yes.
 8   I can't say that it was everything, but it gave her some
 9   anxiety, yes.
10        Q    Was there anything else that she expressed to
11   you that was causing her anxiety as you mentioned?
12        A    I can't -- I don't know.
13        Q    Did she ever say that the anxiety that she was
14   experiencing was caused by the idea that people are
15   having sex in her house?
16        A    No.  She didn't.
17        Q    Did she ever mention that the anxiety that she
18   was experiencing was caused by the fact that homosexual
19   or transsexuals were inside of her house?
20        A    No.
21        Q    Did she ever mention that her anxiety was
22   caused by the fact that people were videotaping things
23   in her house?
24        A    She didn't mention to me why exactly she was
25   feeling anxiety.  I -- she just told me that this whole
```
⬆

                                                              45

EileenKohlhepp

1  situation was causing her anxiety.
2      Q    But she did mention that specifically a lot of
3  her anxiety -- a lot of the anxiety she was experiencing
4  was due to the fact that it became public --
5      A    No.
6      Q    -- and that people at the market, for example,
7  would approach her?
8      A    No.  I mentioned that.
9      Q    You mentioned that.
10     A    I mentioned that in the text.
11     Q    So she didn't express that that was a cause of
12 her anxiety?
13     A    I think she had anxiety -- from what I
14 gathered, she had anxiety before it became public, and
15 then she had more anxiety after it became public.  I
16 think the feeling of violation of someone doing
17 something in your home that you didn't know about and
18 becoming aware of it, and that caused her a tremendous
19 amount of anxiety, then that becoming public, and
20 everyone knowing about it caused even more anxiety and
21 more hurt.  So I think there were levels of it.  I think
22 she's very good at hiding her anxiety when she was
23 initially going through it when she first found out what
24 was going on.  And she wasn't telling people.  So she's
25 very good at putting on a happy face when she needs to.

46

1          But when it got worse, everyone knew.  So she
2  didn't have to have a facade.  She was able to just be,
3  like, I'm really upset, and let people know that she was
4  upset.  I don't know.  How would you feel if the same
5  thing happened in your home?
6      Q    But to be clear:  She wasn't upset that people
7  were having sex inside of her house?
8      A    I can't speak to that.  I can't speak to
9  exactly why she was feeling the way she was feeling.
10     Q    Okay.  Do you know why Leah is suing for
11 defamation?
12     A    I read the amendment, but I didn't memorize it
13 before I came here.
14     Q    I want to know what Leah explained to you
15 about -- if anything, about her defamation?
16     A    Leah didn't explain to me anything about her
17 defamation.
18     Q    So you never spoke to Leah about why she
19 amended the complaint to add a defamation cause of
20 action?
21     A    No.  It was after I read it, after John sent

Page 26

EileenKohlhepp

22   it to me is when I learned the details.
23        Q    And did you speak to John about the defamation
24   cause of action?
25        A    No.  I just told him I read it.  He said, was

                                                              47

1    it clear?  I said, yes.  It was clear.
2         Q    Okay.  Did you ever talk to Leah about her
3    copyrights?
4         A    I talked to her about it via text and asked
5    her if she had copyrighted her work, and she said she
6    did.
7         Q    What else did you guys discuss?
8         A    Do you want me to pull up the text?
9         Q    No.  Thank you.
10             Do you remember?
11        A    No.  It was just that.  She said she had
12   copyrighted it.
13        Q    Did you ever speak to her on the phone about
14   her copyrights?
15        A    I spoke to her on the phone initially about
16   that in that first week.  And she said, yes.  She's
17   like, I did that.  That's taken care of.
18        Q    Did she tell you why she filed for copyright?
19        A    No.
20        Q    She did not?
21        A    No.  We didn't talk about that.
22        Q    Do you know why she hadn't filed for copyright
23   protection prior to this incident?
24        A    I do not.
25        Q    Did she ever tell you or insinuate that she

                                                              48

1    filed for copyright in order to get more money from my
2    clients through this lawsuit?
3         A    She did not.
4         Q    Okay.  Did you guys ever discuss monetary
5    damages associated with copyright filings?
6         A    We did not.
7         Q    You tell her to file for copyright protection?
8         A    No.
9         Q    You did not tell her?
10        A    I did not tell.
11        Q    So what did you guys discuss?
12        A    I asked her, is your artwork copyrighted?
13   Have you copyrighted your work?  And she said, yes, I
14   have.
15        Q    Okay.  Do you know what Leah's primary source

                                Page 27

EileenKohlhepp

16   of income is?
17        A     She works as an artist, and she also uses her
18   house as a rental property occasionally.
19        Q     And does she make money off of her art?
20        A     She does make money off of her art.
21        Q     And do you know which source is her primary
22   source of income?
23        A     I'm not sure because I don't know her
24   finances.
25        Q     You don't know.

                                                          49

1               Do you know whether -- and you mentioned to
2    her, correct, that this lawsuit didn't affect her
3    rentals?
4         A     Could you repeat that?  I mentioned to her?
5         Q     Yes.
6         A     When did I mention that to her?
7         Q     Let's take a look at the text messages.
8         MS. ESSAKHAR:  I'd like to introduce -- off
9    the record for a second.
10              (Recess taken.)
11        MS. ESSAKHAR:  I'd like to introduce this as
12   Exhibit 1, please.
13              (Whereupon Defendant Exhibit 1 was marked
14               for identification by the Court
15               Reporter.)
16   BY MS. ESSAKHAR:
17        Q     These are text messages that were produced by
18   Plaintiff Leah Bassett between Leah and Deponent
19   Eileen --
20        A     Eileen.
21        Q     Okay.  So starting -- I would like to go
22   through some of these text messages with you.
23              On page one, is this the text message you
24   mentioned before where you contacted Leah Bassett about
25   seeing the Daily Mail article?

                                                          50

1         A     Yes.
2         Q     Okay.  At this point, did you know that Leah
3    had filed a lawsuit?
4         A     Well, it said she filed the lawsuit in the
5    Daily Mail article, yes.
6         Q     And that's the first time you learned about
7    it?
8         A     That's the first time I learned about the
9    lawsuit.

                        Page 28

EileenKohlhepp

```
10      Q    Okay.  And do you see at the end of your
11  second text message, it reads, "I hope you sue the shit
12  out of these assholes."
13      A    Yes.
14      Q    What do you mean by that?
15      A    It meant I hope you sue the shit out of these
16  assholes.
17      Q    Who are "these assholes"?
18      A    Whoever did this to her house.
19      Q    And who did that?
20      A    I don't know.
21      Q    You didn't discuss with her who she is suing
22  in the lawsuit?
23      A    Since this was the first -- whatever I read in
24  the Daily Mail was -- whoever was named in the Daily
25  Mail article was probably who I was saying were "these
```
⬆

51
```
1   assholes."
2       Q    Were you encouraging her to file this lawsuit?
3       A    The lawsuit was already filed.
4       Q    To pursue the lawsuit?
5       A    I don't know how to answer that question.  If
6   the lawsuit was already filed and it was already out
7   there, me saying, I hope you sue them -- sue the shit
8   out of them means go for it.
9       Q    So you were encouraging her to pursue the
10  lawsuit?
11      A    It was already filed.  So yeah.
12      Q    That's why I'm using the term "pursue" as
13  opposed to "file."
14      A    Well -- yes.  I guess I was.  I was telling
15  her she should pursue the lawsuit based on the fact that
16  it was already filed, and that I saw the extent of the
17  damage that was in the Daily Mail article with pictures
18  of damage to her home.
19      Q    If you had spoken to her about -- if you had
20  spoke to her prior to her filing the lawsuit, would you
21  encourage her to file a lawsuit?
22      A    I don't know because I haven't spoken to her
23  about this before she had filed the lawsuit.
24      Q    Do you think she made a mistake by filing the
25  lawsuit?
```
⬆

52
```
1       A    I can't speak to that.
2       Q    And you said in the Daily Mail article, you
3   saw the extent of the damage.
```

Page 29

EileenKohlhepp

4          Can you run me through what you saw that
5    was --
6          A    I would have to pull up the Daily Mail article
7    to remember from almost two years -- a year and a half
8    ago.  When did this come out? -- March -- so yes -- a
9    little over a year and a half ago.  I would have to pull
10   up the article.  But I saw that there was -- there were
11   pictures of just ripped sheets and stains on things.
12   And I know that house, and I know how clean she keeps it
13   so to see things messed was kind of disturbing.
14         Q    So you believe she should have sued someone
15   over some stains and ripped sheets in federal court?
16         A    I'm not going to answer that.
17         Q    You previously mentioned that your motivation
18   for saying "I hope you sue the shit out of these
19   assholes" was the extent of the damages you saw in an
20   article, and then you proceeded to say that the damages
21   you saw were the ripped sheets and some stains.
22         A    There was also other stuff described in the
23   article of things that had happened that weren't in
24   photographs.  Not all the information was in -- not all
25   of the photographs -- probably not all of the evidence

53

1    was in the article.  There were only a few pictures.
2    But there were other things described, and it sounded
3    pretty horrific.
4          Q    Like what, for example?
5          A    I don't remember.  I don't remember.
6          Q    So you don't have any understanding of what
7    went on in the house that encouraged Leah Bassett to
8    file and pursue this lawsuit?
9          A    At this point, at the time that I sent this,
10   it was whatever was in the Daily Mail article that I
11   reacted to, and it sounded pretty horrific.
12         Q    Do you remember what that was?
13         A    No.  I do not.
14         Q    As you sit here now, do you know what occurred
15   in the house that encouraged you -- or encouraged
16   Leah Bassett to pursue this lawsuit?  What horrific
17   things had occurred?
18         A    From what I remember briefly was that there
19   were semen stains all over her furniture, and things
20   that had not been cleaned up.  Stains that could not --
21   they could not get out.
22         If I come home to my house and there was a
23   ring on the coffee table because someone didn't put a
24   coaster down, I would have been annoyed.  But if I had

EileenKohlhepp

25  come home to my house and there were stains everywhere
🔺

54

1   from people having sex and then squirting semen all over
2   furniture, I would probably be pretty upset and not
3   cleaning up properly.  They had not cleaned it up
4   properly.
5        Q    So you would be upset about the sex or the not
6   cleaning or both?
7        A    The not cleaning part.
8        Q    So you wouldn't be upset about people having
9   sex in your house if you were renting out your house?
10       A    I would only be upset about people having sex
11  in my house if they were filming it, and they didn't
12  have a permit or permission to film it, and they did not
13  clean up after themselves afterwards.
14       Q    Okay.  You would be upset about the filming
15  and the cleaning portion?
16       A    Me, personally I would be upset about someone
17  filming without permission or a permit in my home and
18  then not cleaning up after themselves and leaving it
19  filthy and leaving it there for me to clean up and find.
20  Yes.
21       Q    And, say, someone was filming another person
22  cooking pasta, for example, would that also upset you?
23       A    That would upset me if it was then used for
24  commercial use or if it was sold as a stock photograph
25  or if it was somebody filming a commercial or someone
🔺

55

1   filming a YouTube show in my home, and I expressly said
2   that they couldn't film something in my home.
3        Q    Do you know if Leah is also frustrated by the
4   filming and the cleanup only?
5        A    No.  I do not know if that was the only thing
6   that is upsetting her.
7        Q    And as her best friend, you've never discussed
8   what was upsetting her specifically?
9        A    Like I said, she's pretty private, and this
10  has all been upsetting, and I think she's not being
11  completely forthcoming with every detail of why this is
12  upsetting because she is in a lawsuit.
13       Q    Did you ever talk to her about how much it
14  would cost for her to clean up whatever mess was left in
15  her house?
16       A    No.
17       Q    Did you ever talk to her about how much she is
18  seeking in damages in this lawsuit?

Page 31

EileenKohlhepp

```
19      A    No.
20      Q    If you look back at the exhibit, the first
21 page, Leah's text at the end reads "And now I totally
22 regret filing the complaint.  It has ruined my life."
23           Can you tell me what she meant by that or what
24 you believe she meant by that?
25      A    I can't speculate.
```

56

```
1       Q    Please don't speculate.
2       A    I can't speculate.
3       Q    Did you ever talk to her about this statement?
4       A    When we talked, she said that just the public
5 scrutiny was much more than she expected.
6       Q    And she mentioned that she regrets filing the
7 lawsuit?
8       A    I guess she regrets -- she said it there.  She
9 didn't say it when we spoke.
10      Q    So you never spoke to her about --
11      A    I didn't speak to her about this direct text.
12      Q    Did you ever speak to her about her regretting
13 the lawsuit?
14      A    No.  She's -- all she said was she didn't
15 expect it to be so public, and so out there.
16      Q    And that was causing her a lot of distress?
17      A    That was the one of the things that was
18 causing her distress.
19      Q    Do you know if she spoke to anyone else about
20 regretting the filing of the lawsuit?
21      A    I don't know if she did or not.
22      Q    If you go to the next page, Leah says, "No one
23 is ever going to look at me or her house the same
24 again."
25           Do you know why she feels that way?  Did she
```

57

```
1 explain to you why she feels that way?
2       A    Because when everyone looks at her, they're
3 going to say, you're the lady who had porn shot in your
4 house who filed a lawsuit, and now everyone knows that
5 there was porn shot in her house.
6       Q    So she's embarrassed because porn was shot in
7 her house?
8       A    She's embarrassed because people are now aware
9 that she is filing a lawsuit for the damages done to her
10 property while porn was shot in her house.
11      Q    So she's embarrassed by the fact that she
12 filed a lawsuit regarding damages --
```

13     A     I think she's embarrassed by the fact that
14 it's public knowledge.
15     Q     What is public knowledge?
16     A     That this lawsuit is public knowledge and what
17 happened in her home was public knowledge.
18     Q     So she's upset about what happened in her
19 house?
20     A     I think she's upset about what happened in her
21 house.
22     Q     And what happened in her house that is
23 upsetting her?
24     A     The fact that people came into her home and
25 used it as a film shoot without her permission and

58

1 without permits and didn't do their due diligence in
2 cleaning up.
3     Q     Did she ever mention that she was upset that
4 people were having sex in her house?
5     A     No.
6     Q     But she did mention that she was upset that
7 they didn't clean up after themselves?
8     A     She was upset by the fact that they were
9 filming in her house when they didn't have commercial --
10 the house was not zoned for it.  They didn't have the
11 right to shoot anything commercial in her home.  They
12 didn't have permits.  And they also didn't clean up.
13 If --
14     Q     So -- please go ahead.
15     A     -- if I want to film something, if I want to
16 go do a live action shoot somewhere, I need to get
17 permits.  I need to pay location fees.  I need to make
18 sure the owner of the house knows we're shooting in
19 their house.
20          In this situation, she was completely unaware
21 that there were people who were using her home for
22 commercial use.  And not only did they
23 use it, but then they ruined her personal property.
24 They filmed all over her house, every inch of it.  And
25 it's recognizable.  So anyone who's watching those films

59

1 who knows her house can say, "That's that.  That's that.
2 That's that.  That that's.  That's that house.  Those
3 are her things."
4     Q     So she would have been just as upset as if
5 someone filmed a cooking show, for example?
6     A     I think so.  Probably.

EileenKohlhepp

25  made public record or will it be made available only to

86

1   your lawyer?  Will the defendants and their attorneys
2   have access to it?  I ask because we live in L.A., and
3   these assholes work in the porn industry which is based
4   in the Valley?  Of all of your character witnesses, I
5   most likely live closest to them, and I want to know
6   what I would be getting into."
7       Q    Okay.  Let's go back to page 17, ending in
8   Bates 1073, Leah says, "I have to send a list to the
9   other lawyers in the lawsuit regarding the porn rental
10  in my house."
11          Is there any reason she identified it as a
12  "porn rental" as opposed to a commercial rental?
13      A    I don't know --
14      Q    You don't know?
15      A    -- why she worded it the way she worded it.
16      Q    Because you stated before it was not your
17  understanding that she was upset that there was porn
18  shot in her house?
19      A    I think she was upset that there was something
20  being shot in her house that wasn't -- didn't have
21  permission to be shot.
22      Q    But not necessarily because it was porn?
23      A    I don't know.
24      Q    You don't know?
25      A    I don't know.  I think porn rental is a

87

1   descriptor of what happened.
2       Q    Leah continues to say, "I need to provide them
3   with people who can vouch for me about certain elements
4   of the lawsuit including my emotional distress".
5           And so Leah, here, is identifying you as
6   someone that would be able to testify regarding her
7   emotional distress.
8       A    Yes.
9       Q    Can you tell me everything that she's told you
10  or why she believes that you would be able to testify
11  regarding her emotional distress?
12      A    Because I'm one of her best friends and I'm
13  one of the people she's told that she's been seeing a
14  therapist and Xanax which are in the other text
15  messages.  Because I've known her for 25 years.  And I
16  can tell a difference between how she's feeling now as
17  opposed to how she was feeling five years ago.  Her
18  comfort level has changed.  Her trust level has changed.

EileenKohlhepp

19  Her anxiety has gone up.  You know, it's --
20      Q      You know this because?
21      A      In speaking to her and in text message -- in
22  my correspondence with her and in talking to her.
23      Q      Have you witnessed any of these symptoms?
24      A      Yes.  When I speak to her, I can tell.  She
25  gets like really nervous and talks quick, and she seems

88

1  more anxious than she was before.
2      Q      But you don't have an understanding of what's
3  causing this emotional distress?
4      A      I have an understanding that it's dealing with
5  the aspects of this case and what happened to her and
6  how she views the world.
7      Q      What do you mean by "how she views the world"?
8      A      I don't think there's the level of trust that
9  she once had in people to do the right thing.
10      Q      So it's your understanding that the breech of
11  a rental agreement has caused her distrust in humanity?
12      A      Partially, yes.
13      Q      And that my clients should pay for her
14  distrust in humanity?
15      A      I believe they should.
16      Q      On what basis?
17      A      If something happens to you that causes you so
18  much trauma that you can't ever view the world the same
19  way again, that you wouldn't have viewed it that way had
20  this thing not happened, then yes.
21      Q      So someone videotaping something in her home
22  has caused her to distrust humanity and, therefore, my
23  clients have to pay her money for that?
24      A      Your clients were the people who violated her
25  home.

89

1      Q      The lease agreement?
2      A      Yes.
3      Q      And how did they violate the agreement?
4      A      They shot stuff without a permit, and they
5  shot things -- they weren't even on the lease, from my
6  understanding.  Who was the person that was on the
7  lease?
8      Q      This is a one-way deposition.  I get to ask
9  the questions.
10      A      From the complaint that I read, the person who
11  was on the lease was someone named Josh.  Your clients
12  weren't on the lease.  Why were your clients in the

EileenKohlhepp

10      A     There's many different ways to think about
11  destroyed.
12      Q     I'm just trying to understand.  I want to make
13  sure we're on the same page when understanding what you
14  meant by "destroyed her home."
15      A     Yes.
16      Q     Her house was still standing.  Some of her
17  property was damaged; is that correct?
18      A     Some property was destroyed and needed to be
19  thrown out.
20      Q     Do you know which property that was?
21      A     All the stuff that I just said to you.  I
22  don't know like exact specifics, but that's what she
23  told me.
24      Q     So some of her property was destroyed, not the
25  home or the house?

99

1      A     The house was not destroyed.  Her home and her
2  concept of home was destroyed.
3      Q     Do you know if Leah has gone back to the
4  house?
5      A     Yes.  She's gone back to the house.
6      Q     Does she stay there from time to time now?
7      A     Occasionally, yes.
8      Q     And has she ever mentioned anything about it
9  no longer feeling like a home?
10      A     I know she's mentioned it was difficult to be
11  there at times.
12      Q     Because?
13      A     Because it felt like the home had been
14  violated.
15      Q     It had been violated because?
16      A     Leah built that house from the ground up.  She
17  worked with her father and her uncle to build it.  Every
18  tiny detail in that house was planned by her.  Every
19  decision.  That house is her.  To come home and -- to
20  come into a place that you've put so much of yourself
21  into and your heart and to see that someone has had no
22  respect for it and has treated it like trash, and taken
23  things that you have put your soul into and your time
24  into and your love into, and they just didn't care.  And
25  they destroyed objects and furniture and rugs.  Those

100

1  are things.  But when you've put that -- so much of
2  yourself into the whole, it's heartbreaking.  And
3  there's no respect given.  And it's hard to trust people

Page 56