UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
LEAH BASSETT,
   Plaintiff

  vs.

           CIVIL ACTION
           No. 18-cv-10576-PBS

MONICA JENSEN, d/b/a NICA NOELLE;
JON BLITT, personally and d/b/a MILE
 HIGH MEDIA, d/b/a ICON MALE;
 d/b/a TRANSSENSUAL;
MILE HIGH DISTRIBUTION, INC.;
ET ALS.
    Defendants
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER
## CROSS-MOTION FOR SUMMARY JUDGMENT

### I. Opening Statement

Plaintiff Leah Bassett submits this Memorandum, and accompanying Exhibits referenced herein, in support of her Cross-Motion for Summary Judgment being filed by even date per the revised Scheduling Order deadlines announced by the Court during the Motion Hearing held on October 16, 2019 as between Ms. Bassett and the so-called Mile High-associated Co-Defendants (hereinafter "the Defendants", unless specified as between Monica Jensen, Jon Blitt, and or the corporate Mile High entities).

Unlike the Defendants' pending Summary Judgment Motion in which they allege their entitlement per F.R.C.P., Rule 56 to dismissal of all eleven of the Counts stated in Ms. Bassett's Verified Complaint, as Amended, Ms. Bassett deems it to be more productive to focus on what strikes her as the more significant and factually clearcut Counts in her bid to establish the

Defendants' joint and several liability on those Counts via Summary Judgment. Consequently, her Memorandum is directed solely to the Complaint's asserted Count Four (Violation of Chapter 93A); Count Five (Civil Conspiracy); Count Seven (Infliction of Emotional and Mental Distress); and, Count Nine (Copyright Infringement). She does not waive any of the other Counts, but simply believes that those specified four are the Counts to which her entitlement to Summary Judgment as to Defendants' liability therefor are the clearest per the stringent standard of review set forth in Rule 56.

## II. The Legal Standard of Review

The Court is undoubtedly highly familiar with the standard of review to be applied in weighing the merits of a Summary Judgment Motion. Judge Gorton summarized that standard as follows in the IvyMedia case previously cited by the Defendants:

> The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.
>
> If the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

IvyMedia v. iLIKEBUS, Inc., 252 F.Supp.3d 34, 37 (D. Mass. 2017).

## III.  The 93A Count

### (1.)  The Defendants' commission of multiple acts or practices in violation of the Massachusetts Consumer Protection Act

The Court is also undoubtedly highly familiar with the provisions of Massachusetts' Consumer Protection Act, codified at Mass. Gen. Laws, Chapter 93A.   As a widely-accepted general proposition, the Massachusetts Supreme Judical Court noted in Herman v. Admit One Ticket Agency LLC, 454 Mass. 611, 615-16 (2009):

> The purpose of c. 93A is "to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace" by "impos[ing] liability on persons seeking to profit from unfair practices." Poznik v. Massachusetts Med. Professional Ins. Ass'n, 417 Mass. 48, 53 (1994).  A party alleging a violation of G.L. c. 93A, s. 9(1), must establish (1) that the defendant has committed a violation of G.L. c. 93A, s. 2; (2) injury; and (3) a causal connection between the injury suffered and the defendant's unfair or deceptive method, act, or practice. [Footnote omitted, quoting Section 9(1)].  General Laws c. 93A, s. 2(a), proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce...."  The unfairness of an act or practice is determined from all the circumstances. [A string of three further citations omitted].

This Court has reiterated that:

> A claim under ch. 93A  need not be premised on a violation of an independent common law or statutory duty, so long as the complained of conduct is "within at least the penumbra of some common-law, statutory or other established concept of unfairness...[or] is immoral, unethical, oppressive, or unscrupulous."

American Tel. & Tel. Co. v. IMR Capital Corp., 888 F.Supp. 221, 256 (D. Mass. 1995)(citing Massachusetts Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc., 403 Mass. at 729).

Applying those two quoted passages to the case at bar, it seems indisputable to conclude that most reasonable people of ordinary sensibilities would have a gut reaction of shock and

condemnation with regard to a set of professional pornographers adopting a business practice of renting private residences for the express purpose of shooting scores of graphic sex scenes/films and Stills without the home owners' knowledge or permission in order to market, sell, and distribute those films and Stills broadly within the U.S. and internationally for their commercial profit.  That is precisely what the Mile High-associated Defendants did with respect to their unauthorized use of Leah Bassett's residential, single-family home in Aquinnah on Martha's Vineyard.  Besides constituting commercially-motivated conduct generally that falls within the definition of  "*unfairness*", their conduct was also "*immoral, unethical, oppressive, or unscrupulous*" by any common understanding. Beyond the basic and indisputable fact that the Mile High-owned and marketed porn films and Stills at issue were created on Ms. Bassett's personal residence without her contemporaneous knowledge or permission, Defendants' conduct included a considerable number of "aggravating features" to be included in the fact-finder's calculus that "(*t*)*he determination of unfairness of an act or practice is to be determined from all of the circumstances,*" highlighted by the following such circumstances.

(A.)  The absence of "privity" in hiding behind Mr. Spafford.

None of the Mile High-associated Defendants engaged in **any** direct contact or communications with Ms. Bassett, either during her pre-Lease contacts and negotiations with Joshua Spafford or during his purported sole tenancy in her home.  Rather they waited until **after** he surprised ~~both Ms. Bassett and his Mile High-associated employers~~ by notifying Ms. Bassett of his having vacated the premises via his "anticipatory breach" email on March 15, 2015.[1]  Ms. Jensen proceeded to inform both Ms. Bassett's mother, and subsequently Ms. Bassett directly, in

---

[1]  That email is attached as Exhibit 1(C) of Plaintiff's Verified Complaint.

purported explanation as to why she had the key to the house and why she had dropped off two "strangers" there with suitcases on March 16, that she had "taken over" the Lease per an alleged sublet agreement between her and Mr. Spafford. Mr. Spafford's previously-filed Affidavit tells a somewhat different story, supported by his March 15 email's failure to make reference to any such continuing understanding/agreement between him and his former employers.[2] Clause 11 of the Lease expressly prohibited any such sublet without Ms. Bassett's prior written consent.[3]

Regardless of the internal agreement between Mr. Spafford and his employers, which appear to have some disputed elements between them respectively, it is indisputable that Mr. Spafford had been hired by Ms. Jensen to serve as her Joint Director of Photography as well as the Still Photographer, for all of the Icon Male and the Transsensual studio line porn films, owned by Mile High. The only disputable question appears to be at what point in time did he become the "cover agent" in the utilization of Ms. Bassett's home for their commercial porn purposes. That absence of any "direct" contact, however, between Ms. Bassett and Jensen/Mile High served as the basis for Defendants' oft-asserted position that **they** bear no liability to her due to the alleged "lack of privity", stated in their 93A Response Letter as follows: "(*I*)*t is clear that Mr. Spafford is the only potential party liable to your client... Any claims that Ms. Bassett attempts to assert against my clients for violations of a Lease Agreement that they never executed nor* (sic) *parties to, necessarily fail for lack of privity of contract.*"[4] Thus, they claimed that **their** former Photographer for all of the porn film scenes and Stills shot on Ms. Bassett's premises in the course

---

[2] That Affidavit was previously filed as part of Doc.# 62.

[3] The Lease is attached as Exhibit 1(B) of Plaintiff's Verified Complaint, and its Clause 11 reads: "*NO ASSIGNMENT: Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.*"

[4] That 93A Response Letter, dated November 17, 2015, is attached as Exhibit 3 of Plaintiff's Verified Complaint.

of his employment at a managerial level was the only person against whom she could seek legal recourse.

Unfortunately for them, it was determined **decades ago** that "traditional" contract-law concepts, such as privity, do not pose a bar to a 93A-based action. The SJC noted in <u>Maillet v. ATF-Davidson Co.</u>, 407 Mass. 185, 191 (1990): "*Nor has a lack of privity between plaintiff and defendant previously barred recovery under c. 93A, s.9.*" (Citing, e.g., <u>Burnham v. Mark IV Homes, Inc.</u>, 387 Mass. 575 (1982).

(B.) <u>The Lease's prohibitions against any commercial uses, or any undisclosed occupants.</u>

As stated in Para. 12 of Plaintiff's Verified Complaint: "*A review of the written Lease clearly reveals that no commercial uses of her residence, nor any undisclosed occupants other than Mr. Spafford, were permitted. (See Exhibit 1, pages 5-7, for a summary of the sundry Lease provisions that were subsequently breached).*" Defendants' position has been that they were not familiar with those restrictions because none of them, and Ms. Jensen as the Vineyard-based studio head/Producer in particular, had ever read the Lease during the months that they were housing actors and crew in Ms. Bassett's home, and shooting their porn film scenes and Stills there. The Court will perhaps recall the colloquy with Defendants' counsel to that effect during our initial Hearing on July 17, 2018 in which the Court correctly noted: "*But you are still subject to whatever restrictions are in the lease. In other words, you are not -- if the tenant can't use it for commercial purposes, somebody he invites on can't use it for commercial purposes.*"[5] On that basis alone the Mile High-associated Defendants are severally and jointly liable on Ms.

---

[5]  See Transcript, filed as Doc.#40 at pg. 20.  Defendants' counsel had prompted that reply by asserting that his clients had never actually read the Lease to the best of his knowledge.

Bassett's Breach of Contract Count.[6]

(C.) <u>The prohibition against commercial uses in Aquinnah's land use Ordinance.</u>

As stated in Para. 26 of the Verified Complaint, Defendants' use of her home for commercial pornography was not only in violation of the Lease, "*but also in violation of Aquinnah's zoning by-laws that would have required Mile High to successfully secure per a noticed public hearing a Special Permit in order to conduct commercial activities of a temporary, but repeated, nature on premises, such as Ms. Bassett's, located in a strictly "Residential District".*[7] In response to that particular "problem" with their conduct, Defendants elected to claim that it has never been their collective business practice to ever look into whether there might be a zoning or other municipal regulation, requiring a permit or other compliance issues, for **any** of their "shoot house" locales in Massachusetts or elsewhere in the U.S.![8]

(D.) <u>The failure to secure a "doing business" certificate in Massachusetts.</u>

Along those same lines, the Defendants expressed complete ignorance as to their requirement to secure a "doing business" certificate from the Massachusetts Secretary of State's Office per Mass. Gen. Laws, Chapter 156D for the porn films and Stills created on Ms. Bassett's residence, and elsewhere in other shoot house locales in Massachusetts in their respective

---

[6] It remains noteworthy that Defendants never sought to assert a Third-Party Complaint against Mr. Spafford for indemnification, etc., if they sincerely believe that **he** bears primary responsibility for **their** creation of commercial porn on Ms. Bassett's premises in violation of the Lease. Not only did Defendants elect not to do so, they also deliberately elected not to seek any Discovery from him per an apparent decision that it would be best to blame him in his absence.

[7] See Ms. Bassett's Affidavit filed herewith.

[8] See Part IV of Plaintiff's Opposition Response to Defendants' Motion for Summary Judgment for these quoted portions therein of Ted Blitt's and Jon Blitt's respective Deposition testimony.

Discovery responses.[9]  The twofold problem for the Defendants is, first, that violation of a local ordinance, or of a state law or regulation, may in appropriate circumstances be deemed to constitute a *per se* violation in a 93A action.   The case at bar presents a prime instance for determining via Summary Judgment that the Defendants have committed two such *per se* violations, rendering them liable on what presents as a cumulative basis to Ms. Bassett on that Count.  They also **help** make the case for Defendants' liability via Summary Judgment on the Conspiracy Count, while buttressing their eventual liability at trial on the Fraud and RICO Counts respectively.[10]

---

[9] M.G.L., c. 156D, s. 15.01 et seq., provides in pertinent part as follows: "*A foreign corporation that transacts business or has a usual place of business in the commonwealth shall deliver the certificate required by section 15.03 to the secretary of state for filing.*"  For purposes of that statute, a foreign corporation is defined as one that is incorporated in another State or country.  Section 15.03 of that statute requires that the applicant seeking permission to "conduct business within Massachusetts" provide a specified list under oath of rather detailed information about its corporate identity, including, inter alia, "*the name* [and address in the commonwealth] *of its registered agent;*" a "*description of the activities to be conducted by the foreign corporation in the commonwealth;*" "*the names and usual business addresses of its current directors and officers:*" and, "*a certificate of existence, or a document of similar import, duly authenticated by the secretary of state or other official having custody of corporate records in the state or country under whose law it is incorporated.*"  Upon review, approval, and payment of the required annual fee, "*the certificate shall be filed by the secretary of state and the foreign corporation shall be considered to be registered to do business in the commonwealth.*"  (Bold emphasis added).

In the case at bar, Ms. Jensen was not only conducting those commercial porn activities in Massachusetts over an extensive period of months/years on Mile High's behalf under the adopted pseudonym of Nica Noelle, but also in the name of a California-incorporated entity known as Toaster Kid, Inc..  See __ (her Interro Answer, and Josh's Aff.)  Mile High, in turn, identifies the owner of the porn films and Stills created in Massachusetts at its direction by its Studio(s) head/Producer, Ms. Jensen, as Mile High Distribution, Inc., which is a Canadian corporation.  Besides its use of third-party distributors, such as former Co-Defendant TLA Entertainment, Inc., it has a subsidiary entity known as Mile High Media, Inc., which is a Delaware corporation.  Theodore (Ted) Blitt is the titular President of both of those 'Mile High' corporations, and he testified that the subsidiary company's "*function to do business with people in the States. It's an American corporation.*"  (Depo. at 29).

The conclusion to be reached is that **all three** of Defendants' foreign corporations that were being utilized in the creation of the porn films and Stills in Massachusetts and/or in the subsequent marketing and sales of them to Massachusetts citizens were required to comply with that statutory requirement of securing a certificate authorizing them to do buisness in the Commonwealth.

A comparable statute exists reportedly in 47 other States, while New Hampshire's version is nearly identical to Massachusetts' statute, and found at NH RSA Title 293A, Section15.01 et seq..  It is indisputable that the Mile High-associated Defendants have also created a considerable number of their Icon Male and Transsensual studio/brand films in New Hampshire, both prior to and subsequent to the numerous ones created in Massachusetts.

[10]  Besides facing prospective liability at the governmental level for various fines and tax-related sanctions for failing to secure the required "doing business" registration certificate, Section 15.02(a) of that Act states that: "*A foreign*

Second, the Defendants' claims of ignorance as to those violations are not only ineffective in their quest to avoid liability on a *per se* basis, but provides further support for an additional finding from a prospective damages-related determination that their unfair and deceptive conduct was "wilful or knowing" as defined by the Act.  Both Section 9 and Section 11 allow the award of multiple damages for "*wilful*" or "*knowing*" violations of Section 2.  (Quote Judge Keeton's analysis of the distinction between those two terms in the Computer Systems case, 571 F.Supp. 1365 -- with wilful consisting of a reckless disregard for the truth or obligation as "nevertheless proof of a culpable state of mind")

    (E.)  The duration and extent of the unauthorized and unlawful commercial uses.

The Defendants' objectionable use of Ms. Bassett's residence was neither of an isolated nature nor of minor, or *de minimis*, significance.  Rather, they shot in secrecy from Ms. Bassett and local officials over a period of  5+months at least 14 feature-length porn films there, encompassing many separate, and often predatory-themed, graphic sex scenes.  They housed over a period of 5+ months over 30 of their hired actors and crew there for varying lengths of days at a time as to each of those undisclosed occupants/trespassers. They produced in Discovery a total of 23,000+ Stills that were shot by Mr. Spafford during his months of employment for the Icon Male

---

*corporation transacting business in the commonwealth without delivering to the secretary of state for filing the certificate required by Section 15.03 shall not maintain a proceeding in any court in the commonwealth until the certificate is delivered and filed."*  That prohibition would appear to extend to any Cross-Complaints against Mr. Spafford; any late-filed Counterclaims against Ms. Bassett; as well as to any Affirmative Defenses asserted against Ms. Bassett.

and Transsensual studio lines, the vast majority of which were shot on Ms. Bassett's residence. Besides the Spafford-created, and Mile High-owned, Stills, they permitted the actors to take their own photos during their occupancy in Ms. Bassett's residence so that they could post them, as well as the "official" Stills provided to them, on their individual Social Media sites as part of the marketing strategy for promoting both themselves and the Mile High films they were appearing in.

 (F.)  The use of other "shoot houses" without owner, or governmental, permission.

 During that same period of time in 2014-15 when Ms. Jensen had established Martha's Vineyard as the home base for creating the Icon Male and the Transsensual porn films and Stills, she was also utilizing two other private residences in West Tisbury that she had rented under false pretenses as shoot locales.  She did not secure the permission of those two other sets of homeowners for shooting commercial porn on their respective premises, nor did she seek or secure permission from the Town of West Tisbury per its land use Ordinance.

 (G.)  Complaints lodged by Mr. Spafford and several actors with Jon Blitt were ignored.

 Both Mr. Spafford, and some of the actors, came to develop issues of genuine concern over the specific instructions for maintaining secrecy of their porn-related activities on the Vineyard, as well as the living conditions in one or more of the shoot locales where they were being housed, and sent letters of complaint to Ms. Jensen's handler/boss at Mile High, Jon Blitt. Mr. Blitt chose to take no remedial action with respect to those first-person complaints, but rather continued to endorse Ms. Jensen's on-going conduct in shooting the porn films and Stills on the Vineyard in secrecy.

 At least two of the actors also brought their concerns and complaints to the then editor of the Martha's Vineyard Times, who was prohibited by the paper's owner from publishing a story

about the commercial porn being shot in secrecy.

(H.) <u>All of the smoke detectors were disabled due to their high intensity lighting.</u>

Mr. Spafford's March 15, 2015 email makes reference to his disabling all of the "carbon monoxide alarms" in the house, including the one in her padlocked bedroom closet, due allegedly to "[*T*]*he batteries were dying it seems.*"[11]   Ms. Bassett discovered many months later in the course of viewing the "*Behind the Scenes*" special feature sections of one of the films; viz. <u>School Boy Fantasies 2</u>, that all of her hard-wired, combination smoke and carbon monoxide alarms were actually triggered during one of the sex scenes being filmed in one of her bedrooms.   Mr. Spafford's voice is heard exclaiming that all of the carbon monoxide alarms were "*going off everywhere*", while a woman's voice, presumably Ms. Jensen's. is heard stating: "*He found the last fucking smoke alarm!*"[12]   Mr. Spafford has subsequently confirmed that his disabling of those alarms was not due to "dying batteries", but rather to the high intensity lighting that they were using during their filming, and that he was then instructed by Ms. Jensen to keep the alarms disengaged to avoid having them "interrupt" another one or more of her film scenes.

It is a violation of the Massachusetts Housing Code's attendant regulations propounded by the Attorney General's Office for either a landlord or a tenant to **deliberately** disengage required smoke/carbon monoxide detectors without proper cause, -- due obviously to the attendant serious

---

[11] See Exhibit 1(c) attached to Plaintiff's Verified Complaint. The pertinent passage of his email reads:  "*Lastly, a few nights ago nearly every single carbon monoxide alarm in the house went off almost at once in the middle of the night. The batteries were dying it seems.  It took a long hunt to find them all.  One of them was in your closet* [sic, probably meant "bedroom"] *inside the master closet.  I feel bad for having had to open that door and it was a last resort as I couldn't trace where the very loud noise was coming from.  I hadn't had a chance to replace the many batteries so I collected all of alarms and put them in a bag along with the dead batteries by the door.  I hadn't had a chance to write you about this in the stress of the past few days.  It was 3 in the morning otherwise I would have gone to your families house to fix this.  I didn't know what else to do.*"

[12] That film is included among the DVDs that Defendants filed in its entirety with their Summary Judgment Motion.

risk of fire-related personal injury and/or property damage.[13]  Under those circumstances, it was

also a per se violation of Chapter 93A.  Compounding that unsafe conduct by Mr. Spafford at his

employer's directive, Ms. Bassett has always been extremely upset by the fact that he/they

physically broke the padlock that secured her master bedroom's closet in which she kept her

personal photos, journals, jewelry, etc., for the sole purpose of "not interfering" with one of the

Defendants' porn shoots.[14]

(I.) Ms. Jensen's continued use of the house after Mr. Spafford's departure.

As stated in Para.s 15, 16, 17, & 18 of the Verified Complaint:

*15.  On March 16, 2015, Barbara Bassett walked over to the residence, and found two "strangers" unpacking their suitcases with bags of groceries on the kitchen counter. Demanding to know what they were doing there, she was told that they were guests of Ms. Jensen. Mrs. Bassett did not know whom they were referring to, but did agree at the strangers' request to speak with Ms. Jensen in lieu of immediately calling the Aquinnah police. One of the strangers called Ms. Jensen, and she drove back to Skye Lane and met with Barbara Bassett.*

*16.  During their face-to-face conversation, Ms. Jensen stated that she was Mr. Spafford's former employer, and that he had unexpectedly ended his employment as a photographer; that she had a prior arrangement with Mr. Spafford whereby she would assume responsibility for the leased premises for the remainder of its term, and had been given the entryway key as proof of that understanding; and, that the two strangers were professional models who would be staying there while she shot advertising-related stock photography.*

*Ms. Jensen did not utilize her porn pseudonym of Nica Noelle in her introduction to Barbara Bassett, nor did she disclose the true nature of the commercial use(s) for which she had been using Ms. Bassett's residence during the preceding weeks and months.*

---

[13]  Besides the applicability of that State law, Clause 35 of the signed Lease also specifies in pertinent part that: "*No person shall tamper with fire protection devices, including smoke and CO detectors.*" Ms. Bassett had also informed Mr. Spafford that her father, who lived in an abutting property on the same private road, was a general contractor who had largely built her house, and that he should be contacted in the event of any property-related issues. Common sense would dictate that the Defendants could simply have turned off their high intensity film lights, and perhaps opened a window or two for a few minutes, and the alarms would have ceased sounding on their own accord, but it was evidently more important to film director Jensen to keep filming then, as well as in future scenes without that interruption as the reason for keeping them disengaged.

[14]  Clause 35 of the Lease also specifies in pertinent part:  "*The Landlord reserves the right to the exclusive use of locked storage areas in the closets, basement and attic for storage of her personal property.*"  That padlocked closet remained broken and accessible to anyone in the house at the time of Mr. Spafford's departure from the premises, as made evident in Mr. Spafford's March 15 email.

*17. After confirming that Ms. Jensen had not spoken directly to Ms. Bassett about this "continued" use of the premises in the aftermath of Mrs. Bassett's awareness of the preceding day's email from Mr. Spafford, Barbara Bassett directed that Ms. Jensen remove the two strangers and relinquish the entryway key until she had obtained her daughter's express permission for the claimed sublet continuation. Ms. Jensen complied with those directives, and had no further contact with Barbara Bassett.*

*18. Ms. Jensen and Ms. (Leah) Bassett did subsequently speak by phone, and Ms. Jensen related substantially the same story as part of her bid to formerly take over the Lease.[15] Per Ms. Bassett's direct inquiry, Ms. Jensen assured her that none of the intended "advertising-related photography" would take place on her premises. Nonetheless, Ms. Bassett decided that Ms. Jensen's stated association was **not** a positive recommendation in view of the condition-related reports that she had received from her parents, and so, she refused to agree to the de facto sublet that Mr. Spafford reportedly had entered into with Ms. Jensen and, hence, refused to advise her mother to return the entryway key to Ms. Jensen.*

Just as it was unfair and deceptive for Mr. Spafford to fail to inform Ms. Bassett as to what improper and unlawful uses were, in fact, being made of her residence during his months in occupancy, either contemporaneously or in his March 15 "anticipatory breach" email, it was similarly and equally unfair and deceptive on Ms. Jensen's part to fail to make any such disclosures in **her** aforedescribed conversations with Mrs. Bassett and Ms. Bassett. Rather, she claimed to each of them that she had actually "sublet" the premises from Mr. Spafford, and was intending to use Ms. Bassett's home for housing her "models" for the duration of the Lease. Her deliberate failure to inform them as to what uses she had been making of the home during the preceding months, as well as her evident intention to continue to use it for commercial porn purposes, constitutes a classic instance of 93A-violative deceit and misrepresentation. (cite caselaw) It also **helps** make the case for Defendant's liability via Summary Judgment on the Conspiracy and Fraud Counts.

---

[15] A footnote at that juncture reads: "*In addition, Ms. Jensen affirmatively represented that she had personally 'pre-paid' $2,333 to Mr. Spafford as the intended March rent and utilities, as well as $1,500 towards the February rent and utilities, and that she had also agreed with him to pay the rent and utilities for the balance of the Lease term.*"

(J.)  Ms. Jensen's offer to pay $4,000 on "Mr. Spafford's behalf".

While still completely unaware of the true manner in which Mr. Spafford and the Mile High-associated Defendants had been using her home, Ms. Bassett sent an email to Mr. Spafford on March 22, 2015 as her first communication with him in response to his anticipatory breach email.[16]  Her purpose, in part, was to confirm his March 15 email's stated expectation that "*I'll assume you'll take the deposit I made as some cushion against this unforeseen event*" (purporting to refer to his claim therein that "*I have been let go from my job, my long term singular source of income without warning.*").  Besides acknowledging that she was holding $2,400 in escrow as his last month's rent and security deposit, her email itemized $7,033 in lost rent and other costs that she would be incurring as a direct result of his breach, -- while leaving the issue of any reimbursement for the physical damages as yet to be determined upon her return to her home ["*TBD Damages (either I or my representative will make an assessment).*"].  Her email states in pertinent part:  "*I am willing to accept a lesser amount* [after "*Subtracting $2400 held in escrow*"].  *$4000 would cover the unpaid rent, utilities and cleaning.*"

While unbeknownst to Ms. Bassett at the time, Mr. Spafford then engaged in an email exchange with Ms. Jensen and Jon Blitt in which he basically threatened to "blow the whistle" on them to Ms. Bassett, unless they forwarded to him the $4,000 sum that she was demanding. Instead of doing so, Ms. Jensen initiated a text exchange with Ms. Bassett on March 27, 2015 in which she stated in pertinent part that she and her unnamed "*partner*" had learned of the $4,000 demand from Mr. Spafford, and were willing to pay it on his behalf.  Their stated "generosity", however, was stated to be expressly contingent upon her providing them with a "*release*" of any

---

[16]  That email is attached as Exhibit 1(D) of Plaintiff's Verified Complaint.

further claims or sums.[17]

There can be no genuine dispute that Defendants' attempt to secure a General Release of Claims from Ms. Bassett in return for $4,000 to be paid by them, purportedly on Mr. Spafford's behalf, at a time when they had reason to believe from Mr. Spafford's email to them that she was still unaware of **any** of the unauthorized porn-related activities that they had been conducting in her home over the preceding months constituted an unfair and deceptive act within the parameters of Chapter 93A. That conduct also **helps** make the case for their liability via Summary Judgment on the Conspiracy Count (as well as the Fraud Count at trial).

Ms. Bassett did not "accept" that unconscionable settlement offer from the Defendants, because she happened to make an initial discovery of the porn activities in her home on the preceding day, March 26!

(K.) Ms. Bassett's revised itemization to reflect the physical damages to her home

While that initial March 22, 2015 email to Mr. Spafford had not itemized any of the physical damages to her premises, besides an estimated $200 for the broken closet door/lock, Ms. Bassett discovered upon her ensuing return to her home that the physical damages were far more extensive than revealed in the series of photos that her mother and her stepmother respectively had forwarded to her on March 20, -- which had been directed more to the shocking state of disarray that they had observed in her home's interior.[18] That led her to send a revised "damages"

---

[17] See Ms. Bassett's Affidavit filed herewith. It is to be noted that Mr. Spafford's triggering email was directed to both Ms. Jensen and Jon Blitt, leading to a presumption that her ensuing reference to the unnamed "partner" who had told her to condition the $4,000 proffer on a signed Release was also Jon Blitt.

[18] For whatever reason, Defendants' attached those exchanges between Ms. Bassett and Barbara Bassett and Lee Taylor, dated March 20, 2015, along with the photos that they had forwarded to her, as part of their Summary Judgment Motion's Exhibits F, G, H, I, J, K, L, M, N, O, & Q. See Doc.# 89.

letter to Mr. Spafford, dated July 21, 2015, in which she increased the $6,964 subtotal from her March 22 email to an amended net figure of $15,609 as itemized therein.[19] It made no reference to the unauthorized and unlawful use of her residence for commercial porn purposes, since Ms. Bassett and her attorney were still engaged in the process of trying to ascertain its underlying circumstances and extent, combined with Ms. Bassett's concerns about "going public" in any fashion with her disturbing discovery of the commercial porn-related usage of her home.

Nonetheless, it had become apparent that most of the other physical damages committed on her premises were attributable to the unauthorized use of her home as a rotating hotel for 30+ porn actors and other crewmembers, besides Mr. Spafford, who evidently did not care as to some of them about respecting the home of a "porn shoot locale" owner. The fact that the Mile High-associated Defendants allowed those physical damages to occur by some number of the actors and crew hired to participate in the porn films and Stills constitutes an unfair and deceptive practice for which they are vicariously liable, -- particularly where Ms. Jensen was in charge of determining where the actors she hired to appear in the Mile High porn films and Stills were to stay while on the Vineyard.

(L.) <u>Ms. Bassett's service of the 93A Demand Letter</u>

A detailed 14-page letter, replete with a packet of identified exhibits, dated October 6, 2015 and described in its opening paragraph as "*a so-called 'demand letter' pursuant to Section 9 of the Massachusetts Consumer Protection Act. See Mass. Gen. Laws, Chapter 93A; Cassano v. Gogos, 20 Mass.App.Ct. 348, 350-52 (1985)*" was transmitted by mail to the following addressees respectively: (1.) "*Joshua Spafford, aka Joshua Darling*"; (2.) "*Monica Jensen, aka Nica Noelle*";

---

[19] That revised "damages" letter is attached as Exhibit 1(E) of Plaintiff's Verified Complaint.

and, (3.) "*Jon Blitt, d/b/a Mile High Media/Distribution*". The contents of that letter speaks for itself.[20] As stated in <u>Heller v. Silverbranch Construction Corp.</u>, 376 Mass. 621, 627 (1978):

> *Under G. L. c. 93A, s. 9(3), a demand letter describing the specific unfair practices claimed and listing the damages suffered is a prerequisite to suit and must be alleged and proved.* [citation omitted]. *Any person receiving a demand letter may make a written offer of settlement within thirty days, thereby limiting his damages to the relief tendered, if the court finds the tender to have been reasonable. The Hellers sent such a demand for relief. However, Silverbranch made no offer of settlement. In such circumstances, c. 93A, s. 9(3), authorizes the judge to award up to three, but not less than two, times the amount of actual damages if he finds a wilful or knowing violation of c. 93A, s. 2, or that the refusal to grant relief on demand was made in bad faith with knowledge or reason to know that the practice complained of violated s. 2....*
>
> *General Laws c. 93A, s. 9(4), directs the trial judge in a s. 9 action to award reasonable attorney's fees and costs to the plaintiff if the judge finds in the plaintiff's favor.*

The Defendants made no offer of settlement in their Response Letter, dated November 17, 2015, and the plain conclusion to be reached is that their refusal to accede to **any** of Ms. Bassett's demands "*was made in bad faith with knowledge that the practice[s] complained of violated s. 2.*"

Mr. Spafford replied separately via a lengthy, apologetic, and highly-detailed letter.[21] In sharp contrast to the Mile High-associated Defendants, Mr. Spafford expressed genuine remorse for his acknowledged role in the commercial porn-related misconduct that had occurred on Ms. Bassett's residence, and attempted as best he could do to substantively respond to the Demand Letter's Informational Queries therein.

### (M.) The Defendants' Response to the Demand Letter examined more closely

Apart from the Defendants' disclaimer on privity-related grounds of **any** liability, their

---

[20] That Demand Letter, along with its attachments, is attached as Exhibit 1(A-E) of Plaintiff's Verified Complaint.

[21] Mr. Spafford's Response Letter is attached as Exhibit 2 of Taylor's Affidavit filed herewith.
..

Response Letter charged that Ms. Bassett's stated objections to the unauthorized and unlawful use of her home for the creation of commercial gay and transsexual porn "*are based on her disdain and personal animus toward the homosexual and transsexual community,*" while "*expressly reserv[ing] all rights, remedies and lawful courses of action by my clients against Ms. Bassett.*" [22]

Notably, their Response Letter: (1.) Refused to offer any monetary amount for Ms. Bassett's lost rents per Mr. Spafford's premature departure; the physical damages to her home; the quantum meruit value of their use of her home as an unauthorized hotel for the 30+ actors and other crew who Ms. Jensen had directed to stay there; and/or, the quantum meruit value of their use of her home, including her personal furnishings and artworks, as an unauthorized "shoot locale" for their commercial porn films and Stills;

(2.) Refused to comply with her demand that they immediately cease and desist marketing and displaying those films and Stills that had been shot on her residence, even though her Demand Letter had expressly noted that much of the artwork in her home had been created by her and was subject to copyright protection; and,

(3.) Refused to provide substantive responses to the 13 numbered "Informational Demands".

Apart from the failure to offer any monetary compensation whatsoever, and thereby eliminating any ensuing factual inquiry as to whether they had tendered a "reasonable settlement offer", Defendants' additional refusals to cease marketing/displaying the films and Stills at issue,

---

[22] Again, that Response Letter is attached as Exhibit 4 of Plaintiff's Verified Complaint. It is noteworthy that named Co-defendant William Gray, d/b/a Billy Santoro, chose to include a screenshot of that portion of Defendants' 93A Response Letter in the blog post that he placed on Social Media on March 29, 2018 as the sole purported support of his claim that Ms. Bassett's motivation for filing the lawsuit against his "blameless" employers was because she was "*a vicious homophobe and transphobe.*" As stated in Plaintiff's First Amendment to Complaint, Mr. Gray had been hired by Ms. Jensen earlier that month to be the Production Manager of Mile High's Icon Male studio/brand.

as well as to provide Ms. Bassett with substantive answers to **any** of her Informational Demands

constitute unfair and deceptive acts or practices.[23]   Moreover, Defendants' conduct in that regard

~~helps~~ to establish their liability via Summary Judgment as to Ms. Bassett's Copyright

Infringement Count, especially in establishing that Defendants' conduct in **continuing** to market

and sell those porn films and Stills that included images of her copyright-protected works was

"willful and knowing" as defined in the Copyright Act.

> (N.) <u>Mile High's endorsement of Ms. Jensen's Vineyard-related conduct</u>

Defendants' Response Letter's opening sentence reads:  *"Please be advised this firm and*

*the undersigned represent Monica Jensen ("Ms. Jensen") and Mile High Media Distribution*

*("Mile High").*   One particularly notable factual feature of this case is that the two corporate Mile

High entities (Mile High Distribution, Inc., which owns the films and Stills shot on Ms. Bassett's

premises, and Mile High Media, Inc., which markets them within the U.S.); as well as their

principal management officers, Jonathan ("Jon") Blitt and Theodore ("Ted") Blitt, have never

sought to criticize or otherwise distance themselves from the "business methods" used by Ms.

Jensen in her conduct as the studio head/Producer whom they had hired to create the <u>Icon Male</u>

and the <u>Transsensual</u> porn films and Stills on Ms. Bassett's residence and elsewhere between

---

[23]   As stated in <u>International Fidelity Ins. Co. v. Wilson</u>, 387 Mass. 841-57: *The promotion of reasonable settlement offers is a prime goal of c. 93A, s.s. 9 & 11. While the procedures set out in the two sections differ, they both aim at "achieving the same objectives of facilitating settlement and fixing damages." Both sections are designed to make it "unprofitable" for a defendant to ignore meritorious claims. That a wilful violator can limit his liability by making a reasonable settlement offer demonstrates the critical importance of the settlement process. <u>Indeed, the conduct proscribed by the statute is as much the failure to make a reasonable settlement offer as it is the substantive violation of c. 93A.</u> Multiple damages are "the appropriate punishment" for forcing plaintiffs to litigate clearly valid claims. The imposition of independent liability against multiple defendants will promote settlements. Limiting the plaintiff to a single award of multiple damages would dilute the incentive to settle. Restricting a plaintiff to a single award of multiple damages would seriously compromise the goals of punishment and deterrence in cases where several defendants have participated through their own individual acts in a single wrong.* (Citations omitted) (Underlined emphasis added).

2014-2018.[24]

Those Deposition admissions by Jon and Ted Blitt respectively evidence a knowing and reckless disregard for their so-called "Producers'" compliance with all legal requirements at the municipal, state, and federal level as to the commercial porn products that Mile High has hired them to create on Mile High's behalf, as well as a knowing and reckless disregard for their Producers' recognition of the legal rights of the homeowners' on whose property respectively the Mile High porn products are shot/created, including whether there may be copyright-protected works being incorporated into the Mile High porn products. That knowing and reckless disregard is evidently premised in part on a profit-driven recognition that it is less expensive to shoot their porn products on unsuspecting homeowners' properties under the false pretenses of a "solo occupant" residential tenancy, and without the fuss and expense of complying with municipal and/or state permitting requirements for their commercial activity. It is also apparently premised in part on a cold-hearted calculation that most homeowners will be unwilling to seek any legal recourse against Mile High, even if a particular homeowner happens to discover the true manner in which her residence was used. Rather than taking umbrage with the manner in which Ms. Jensen was creating their porn products on the Vineyard generally, and on Ms. Bassett's residence particularly, Mile High chose to continue her employment as one of their studio heads/Producers for the next several years after their receipt of the 93A Demand Letter. That conduct on both Mile High's part and Ms. Jensen's part, separately and jointly, is inescapably in violation of the 93A Act. It also **helps** make the case for Defendants' liability via Summary Judgment on the

---

[24] See their Deposition testimony excerpts filed as exhibits with Plaintiff's Motion for Preliminary Injunction [Doc.# 62].

Conspiracy Count.

    (O.)  Defendants' 93A liability may be both independent to, and in conjunction with, Ms. Bassett's Fraud Count

The decisional law interpreting the Massachusetts Consumer Protection Act has consistently held that a 93A action can lead to separate and/or concurrent liability for unfair or deceptive acts or practices that are factually related to the more traditional actions for breach of contract, negligence, conspiracy, fraud, emotional distress, defamation, etc.. While a prevailing plaintiff cannot receive "double damages" from a single defendant if she prevails on both a Fraud Count and a 93A Violation Count arising from the same set of facts as to that defendant, she can be awarded double or treble damages, plus attorneys' fees and costs, if that fraud-based conduct is found to have met the "wilfulness" element per the 93A Act.

As stated in Grand Pacific Finance Corp. v. Brauer, 783 N.E.2d 849, 862 (Mass.App.Ct. 2003), in pertinent part:

> *The dismissal of the common-law claims of fraud as to all defendants and the common-law conversion claim as to Decnos is not inconsistent with the imposition of liability under G. L. c. 93A. Rather, the differences in result are attributable to different elements of proof and to the more expansive reach of G. L. c. 93A. This act, which sounds in terms of fraudulent and deceptive trade practice, is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights. The relief available under c. 93A is sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action. It mak[es] conduct unlawful which was not unlawful under the common law or any prior statute. Thus, a cause of action under c. 93A is not dependent on traditional tort or contract law concepts for its definition. [A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims."* Kattar v. Demoulas, *433 Mass. 1, 12-13, 739 N.E.2d 246 (2000) (citations and internal quotations omitted).*

Consequently, it is likely that Ms. Bassett may elect to waive her Fraud Count if Defendants' are

determined to be liable via Summary Judgment on stated grounds, inter alii, that include some or all of the same elements as a Fraud Count.

## IV.  The Conspiracy Count

Proceeding from the preceding analysis of the Mile High-associated Defendants' liability on the 93A Count, it is a matter of common sense to conclude that Defendants were engaged in a conspiracy to shoot commercial porn under a guise of secrecy in Ms. Bassett's private home without her knowledge and permission, and without lawful authority from the Town of Aquinnah or the Massachusetts' Secretary of State's Office.  A layman's definition of "**conspiracy**" as found in Webster's New World Dictionary (Second College Edition, 1970) reads in pertinent part "*1. a planning or acting together secretly, esp. for an unlawful or harmful purpose.*"  Of course, the "legal" definition of actionable terms is not always as straightforward and simple as their more "ordinary" meaning, but in this instance the legal definition is simply much wordier and more expansive than the ordinary definition.

As summarized in Taylor v. American Chemistry Council, 576 F.3d 16,  34-35,  (1st Cir. [MA] 2009):

> *Massachusetts recognizes two types of civil conspiracy, so-called "true conspiracy" and conspiracy based on section 876 of the Restatement (Second) of Torts.  The second type of conspiracy, based on section 876 of the Restatement, is a form of vicarious liability for the tortious conduct of others.  Because it is vicarious liability, this type of civil conspiracy requires an underlying tort.  The conspiracy consists in agreeing to, or assisting in, the underlying tort. Massachusetts courts have recognized two theories of liability under section 876: (1) "concert of action," and (2) "substantial assistance" or "aiding and abetting."*[25]  [Citations omitted]

---

[25]  A similar, but somewhat more expansive, definition was provided in Metropolitan Property and Cas. v. Boston Regional, 550 F.Supp.2d 199, 202-03 (D. Mass. 2008), reading in pertinent part: "*In Massachusetts, there are two distinct forms of conspiracy.  The first, commonly referred to as "true conspiracy", "occurs when the conspirators, acting in unison, exercise 'a peculiar power of coercion' over the plaintiff that they would not have had if they acted alone."... The second form of conspiracy recognized in Massachusetts is the tort-based civil conspiracy "more akin to a theory of common law joint liability in tort."  For liability to attach with respect to the second form of conspiracy*

Ms. Bassett's argument with respect to the existence of a "true conspiracy" as defined in the aforequoted Metropolitan Property case is supported by the unquestionable level of misrepresentation, deceit, and/or fraud that was at the heart of the joint decision to shoot those commercial porn films and Stills on her residence without her knowledge, permission, or lawful authority.  That deceitful conduct began with Mr. Spafford's decision in his capacity as the Joint Director of Photography and Still Photographer for the Mile High-owned Icon Male and Transsensual porn films and Stills being shot on the Vineyard to permit his employer, Ms. Jensen/Toaster Kid, Inc., in her capacity as the Mile High-hired Studio head/Producer for those porn films and Stills, both to start housing the actors and other crew in Ms. Bassett's home, and to start shooting the porn films and Stills in her home.  There is no question that those activities were brought to the attention of Jon Blitt specifically in his managerial capacity as Mile High's point man for the Icon Male and Transsensual studio/brands, because some of the notably scant number of emails to and from him during Ms. Jensen's porn shooting activities on the Vineyard were produced in discovery.

Mr. Spafford deceitfully kept those porn shooting activities, including the intentional use of her Copyright-protected Works as background props in the films and Stills, a secret from Ms. Bassett, even though he was in regular contact with her via email in relation to his monthly

---

*there must be an agreement between two or more people to do a wrongful act and proof of some tortious act in furtherance of the agreement... that evidence may be circumstantial... Moreover, a person may be held responsible for the entire conspiracy although that person had a comparatively small part in it and even if the person joined the conspiracy after it was well underway."* [Citations omitted]

payments of the rent and utility charges, as well as other periodic communications between them. Ms. Jensen also deceitfully kept those porn shooting activities a secret from Ms. Bassett in the direct communications between them wherein Ms. Jensen claimed that she had "already" sub-let the premises from Mr. Bassett circa mid-February 2015, and intended/wished to continue to do so for the duration of the Lease.  There is no question, moreover, that Ms. Bassett would never knowingly consent to the use of her personal residence for those commercial porn purposes, based not only upon her inclusion of that prohibition against **any** commercial uses, but on her knowledge that any commercial uses of an extended films-creation nature would be in violation of her town's zoning ordinance in the absence of a Special Permit.

The second type of conspiracy, based on Section 876 of the Restatement and characterized in the aforequoted Metropolitan Property case as "*more akin to a theory of common law joint liability in tort*," would also apply to the factual circumstances of this case in establishing liability. Besides encompassing the main characters in this macabre plot, -- Mr. Spafford, d/b/a Joshua Darling; Ms. Jensen, d/b/a Nica Noelle, d/b/a Toaster Kid, Inc.; Jon Blitt, d/b/a Mile High Media and/or Mile High Distribution, Inc.; and, Mile High Distribution, Inc., -- it would also extend prospectively to most, if not all, of the other crew and porn actors who were brought onto Ms. Bassett's residence for the specific and sole purpose of participating in the porn shoots per the aforequoted language in the Metropolitan Property case.[26]

---

[26] It remains notable with respect to the other crew and the porn actors that each of them was operating under a porn pseudonym, both in how they are listed on the credits of the individual Icon Male or Transsensual films in which they participated, as well as on their individual Social Media sites on which they posted the Stills provided to them by the Mile High-associated Defendants and otherwise advertised their participation in those films.

Equally notable is Defendants' obstructionist and continuing refusal to disclose the real names and last known addresses for the vast majority of the other crew and actors who were brought onto Ms. Bassett's residence, -- starting with their refusal to do so, as demanded, in the 93A Demand Letter, and continuing through Discovery to date in the lawsuit.

Ms. Bassett maintains that she is entitled to Summary Judgment as to Defendants' liability on either or both of the two recognized causes of Civil Conspiracy under Massachusetts law per her Verified Complaint's Count Five.

## V.  The Infliction of Emotional and Mental Distress Count

While Ms. Bassett's Emotional and Mental Distress Count qualifies as an independent cause of action at common law, it is also encompassed by her 93A Count.  Consequently, she will cite the legal standard summarized by Chief Judge Saris in Brown v. Bank of America, Nat., Ass'n, 67 F.Supp.3d 508, 514-15 (D.Mass. 2014) as follows:

> The Court recognizes that Chapter 93A permits recovery for "a personal injury loss such as emotional distress, even if the consumer lost no money or property." To establish emotional distress damages under Chapter 93A, however, a plaintiff must establish: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of the conduct; (2) that the conduct was "extreme and outrageous"; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe." [Citations omitted]

As to that first factor, there is no dispute that Defendants **intended** to shoot their graphic porn films and Stills on Ms. Bassett's personal residence over an extended period of months without her knowledge or permission, and that they also **intended** to incorporate the physical features of her home as well as her personal furnishings and copyright-protected works into those graphic porn films and Stills.  The fact that they chose to do so in secrecy from her, as well as in violation of the Lease form that she used, and in violation of municipal and State law, supports a conclusion that they "*knew or should have known that emotional distress was the likely result of the conduct*" if it were discovered by Ms. Bassett.

As to the second factor, there is no cognizable basis for Defendants to credibly characterize their conduct as regards Ms. Bassett as being anything but "*extreme and outrageous.*"  They secretly housed other crew and porn actors on her residence over a course of

months, while shooting at least 14 films there, along with many thousands of Stills, which they proceeded to market and sell across the Internet, directly and via numerous third-party distributors, to an extraordinary extent. They permitted their crew and porn actors to take "selfies" within her home, and to post them on their individual Social Media sites, separate and apart from the film clips and Stills that Defendants forwarded to them for the marketing purpose of having them posted on their individual Social Media sites. They defiantly refused to take any steps to cease marketing and selling the films and Stills when Ms. Bassett demanded that they do so in her 93A Demand Letter, opting instead to smear her in their Response Letter as homophobic and transphobic and repeatedly threatening to sue her if she pursued legal action against them. They continue to engage in repeated attempts to "victim shame" Ms. Bassett as a deliberate litigation strategy even after the initiation of the lawsuit.

As to the third factor, there is again no cognizable basis for credibly disputing "*that the actions of the defendant were the cause of the plaintiff's distress.*" It was the discovery of **their** commercial porn-related conduct on her personal residence that caused Ms. Bassett to seek professional mental health therapy/services, as well as to be prescibed anti-anxiety medications at various times since that porn-related discovery of Defendants' conduct, for the first time in her adult life.

As to the fourth factor, there is again no cognizable basis for credibly disputing "*that the emotional distress sustained by the plaintiff was "severe."* Ms. Bassett's own testimonial descriptions on the record as to the physical symptoms that she has experienced since that discovery of Defendants' conduct, and its debilitating effects on her; coupled with the deposition

testimony of her therapist;[27] coupled with the deposition testimony of one of the close friends listed in Ms. Bassett's Rule 26 Statement;[28] are sufficient to establish that the emotional distress suffered by Ms. Bassett has been severe.

Ms. Bassett maintains that she is entitled to Summary Judgment as to Defendants' liability for Infliction of Emotional and Mental Distress pursuant both to her common law Count Seven, as well as to its extension as an additional basis of liability to her 93A Count Three.

## VI.  The Copyright Infringement Count

Defendants' liability on Ms. Bassett's Copyright Infringement Count is really quite straightforward and simple, notwithstanding the lengthy and obstreperous arguments advanced by their counsel in their own Summary Judgment Memorandum, -- much of which was really directed to the measure of damages that would be applicable upon an initial finding of liability. While Ms. Bassett strongly disagrees with Defendants' analysis of those damages-related measures and factors, they are not at issue for present purposes.  Defendants' liability is the present issue.

The starting point from a liability standpoint is a recognition that Copyright Infringement as applied on the U.S. Copyright Act's civil action side is a strict liability offense. See Hetcher, The Immorality of Strict Liability in Copyright, Marq. Intell. Prop. L. Rev., Vol. 17:1 (2013), at pg. 1(" *From the Supreme Court on down, it does not even appear to be questioned that copyright infringement applies a strict liability standard.*"). The affirmative defenses available to someone who is found to have copied another person's copyright-protected work(s) without her permission

---

[27] See Deposition testimony of Patricia Keohane filed herewith.

[28] See Deposition testimony of Eileen Kolhepp filed herewith.

are quite limited, especially with respect to someone who has engaged in the copying for commercial purposes and in a manner that was "*willful or knowing*" as defined by the Act and its interpretive caselaw.[29]  In those cases in which the infringement was done in a non-willful/knowing manner, and which do not fall under either the "fair use" affirmative defense or the less common "de minimis" affirmative defense as either innocent or exempted altogether, the prescribed measures of damages per Section 504 of the Act are based in common sense and do not include a punitive element as to the otherwise "innocent" infringer.[30]

As stated in the aforecited Sony Corp. decision rendered by Justice Stevens:

> *The Copyright Act provides the owner of a copyright with a potent arsenal of remedies against an infringer of his work, including an injunction to restrain the infringer from violating his rights, the impoundment and destruction of all reproductions of his work made in violation of his rights, a recovery of his actual damages and any additional profits realized by the infringer or a recovery of statutory damages and attorneys fees. Id. s.s. 502-505.*
> 464 U.S. at 435.

As stated by Justice Ginsberg in Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014) in pertinent part;

> *The registration mechanism, we further note, reduces the need for extrinsic evidence. Although registration is "permissive," both the certificate and the original work must be on file with the Copyright Office before a copyright owner can sue for infringement. ss. 408(b), 411a). Key evidence in the litigation, then, will be the certificate, the original work, and the allegedly infringing work. And the adjudication will often turn on the factfinder's direct comparison of the original and the infringing works, i.e., on the factfinder's "good eyes and common sense" in comparing the two works "total concept and overall feel."* [Citation omitted].

---

[29] See Plaintiff's analysis and cited authority as to Defendants' affirmative defense-based claims in Parts I(C.) & (D.) set forth in her Opposition Memo being filed herewith.

[30] As stated in Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 489 (1984) in pertinent part: *Nor is it necessary that the defendant be aware that the infringing activity violates the copyright laws. Section 504(c)(2) of the 1976 Act provides for a reduction in statutory damages when an infringer proves that he "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright." but the statute provides no general exemption for those who believe their infringing activities are legal.*

As stated in Costello, Erdlen & Co. v. Winslow, King, Richards & Co., 797 F.Supp. 1054, 1056 (D.Mass. 1992): *"A certificate of registration from the Copyright Office constitutes prima facie evidence of ownership."*

In the case at bar, it is indisputable that Ms. Bassett applied for, and received from the U.S. Copyright Office, three Registration Certificates, dated September 29, 2016, which collectively encompassed a total of 53 of her "Works" that she had created and installed in her personal residence as part of its interior decor.[31]

As stated in Justice Ginsberg's above quote, the factfinder ordinarily has to examine the copyright owner's particular Work(s) against the alleged infringers' particular Work(s) at issue in order to assess whether they are so "substantially similar" to one another as to constitute infringement. In the more typical infringement case, there are distinct variations between the litigant parties' respective Works in question. Here, however, it is undisputed that the Mile High-owned porn films and Stills shot on Ms. Bassett's residence incorporated her Copyright-protected Works in photographic form just as they appeared visually in their original form throughout her house.[32]

Ms. Bassett maintains that Defendants failed in their Summary Judgment Motion/Memo's section on the Copyright Infringement Count to successfully present even a litigable issue as to whether they have a viable defense on any grounds as to their liability to Ms. Bassett for their

---

[31] Those three Certificates, along with the accompanying photos of each work submitted with her applications, were included as Exhibits of Defendants' Summary Judgment Exhibits (Doc.# 89).

[32] The issue raised by the Mile High-associated Defendants as to whether some number of their photographic inclusions of Ms. Bassett's Works in their porn films and Stills are too brief, indistinct, or otherwise unrecognizable under the "ordinary observer" test utilized in infringement cases is nothing more than a classic red herring from a general liability standpoint. That argument would **only** be applicable if it extended to **every** instance in which one of her copyright-protected works appeared in their porn films and Stills. That is clearly not the case as the illustrative examples submitted herewith as Exhibits amply demonstrates.

wholesale use of her Copyright-protected Works in their porn films and Stills.  In short, Defendants: (1.) Failed to establish by any admissable evidence that there is any basis for which the U.S. Copyright Office could, or should, have invalidated all three Certificates, along with all of the 53 itemized Works included therein, -- failing to produce a single expert witness report/affidavit, or any other qualified witness who could provide any such testimony and credible conclusion at trial; (2.) Failed to establish, either their right to assert an equitable-based affirmative defense of _de minimis_ copying in the first place in relation to their unclean hands bar, or that their wholesale copying of Ms. Bassett's Works was so trivial and minimal in every instance as to fall below the "three second or more" standard established in the seminal _Ringgold_ decision quoted at length in Plaintiff's Opposition Response being filed herewith; and, (3.) Failed again to establish either their right to assert an equitable-based affirmative defense of fair use copying in the first place, or that their wholesale copying of Ms. Bassett's Works met both the four-part test that applies to most "innocent" infringement cases, as well as the articulated presumption against fair use in relation to a defendant's unauthorized copying of a plaintiff's unpublished work(s) that applies in the case at bar.

It is also to be noted that the Mile High-associated Defendants did not even mention, never mind, address in their Summary Judgment Motion/Memo the issue of the 22,000+ stand alone Stills that were created by Mr. Spafford during his months of employment on the Vineyard for the intended ownership of those Stills by Mile High.  Defendants are also jointly and severally liable for the several thousands of those Stills in which the actors were posed in front of, or beside, one or more of Ms. Bassett's Copyright-protected Works.

Ms. Bassett maintains that she, by contrast, is entitled to Summary Judgment as to Defendants' liability generally on her Count Nine, arising from their unauthorized use of her

Copyright-protected Works in their porn films and Stills.  It would then seemingly become

necessary in the course of preparing the case for trial to seek further instructions, and rulings

prospectively, as to how to identify and organize the particular film segments and individual Stills

to be presented to the jury/factfinder for damages assessment purposes.

Ms. Bassett maintains that she is entitled additionally via Summary Judgment to a

determination that the copyright infringement in the case at bar was committed by the Mile High-

associated Defendants on a willful and knowing basis.

## V.  Conclusion

For the foregoing reasons, Ms. Bassett maintains that she is entitled to Summary Judgment

against the Mile High-associated Defendants, jointly and severally, as to each of the four Counts

addressed herein.

LEAH BASSETT

By her attorney,

Date:  December 23, 2019

/s/ John A. Taylor
John A. Taylor, Esq.
BBO# 493400
18 Central Square
Bristol, NH  03222
(603) 530-2160
jataylor317@gmail.com

## Certificate of Service

The undersigned John A. Taylor, Esq. hereby certifies that a copy of this responsive
pleading, along with its accompanying Affidavit (with Exhibits), will be transmitted on the
above-stated date, electronically to the registered counsel of record as identified on the Notice of
Electronic Filing, as well as to those attorneys known to be representing named Co-Defendants in
this matter who have not yet filed their respective Appearance.

/s/ John A. Taylor
John A. Taylor, Esq.

-31-