UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                      )
LEAH BASSETT,                         )
                                      )
                 Plaintiff,           )
                                      )
        v.                            )
                                      )        Civil Action
MONICA JENSEN, JON BLITT,             )        No. 18-10576-PBS
MILE HIGH DISTRIBUTION, INC.,         )
JOSHUA SPAFFORD, APRIL CARTER,        )
GAMMA ENTERTAINMENT, WILLIAM GRAY,    )
and FIORE J. BARBINI,                 )
                                      )
                 Defendants.          )
_____)
```

**MEMORANDUM AND ORDER**

May 11, 2020

Saris, D.J.

**INTRODUCTION**

Plaintiff Leah Bassett rented her Martha's Vineyard home to Defendant Joshua Spafford for personal residential purposes. Unbeknownst to Bassett, the property was then used as a set for pornographic videos and photographs, as well as housing for cast and crewmembers.

In March 2018, Bassett filed this suit alleging ten counts: (I) breach of contract, (II) trespass, (III) negligence, (IV) violations of Chapter 93A, (V) civil conspiracy, (VI) civil fraud, (VII) infliction of emotional distress, (VIII) interference with advantageous business relations, (IX)

copyright infringement, and (X) civil RICO violations. An
eleventh count of (XI) defamation was added in May 2018.

Three defendants — Monica Jensen, Jon Blitt and Mile High
Distribution, LLC (collectively, "Defendants"[1]) — have moved for
summary judgment on all claims. Bassett cross-moved for summary
judgment on four counts — Chapter 93A, civil conspiracy,
infliction of emotional distress, and copyright infringement.

After hearing, the Court **ALLOWS IN PART** (Counts I, II, III,
VI, X, XI) and **DENIES IN PART** (Counts IV, V, VII, and VIII)
Defendants' motion for summary judgment (Docket No. 86). The
Court defers ruling on Count IX pending Plaintiff's submission
within 45 days of an analysis of all appearances of her
copyrighted works in Defendants' films. The Court also **DENIES**
Bassett's motion for partial summary judgment as to Counts IV,
V, and VII (Docket No. 99) and defers ruling as to Count IX.

## FACTUAL BACKGROUND

The parties have filed cross-motions for summary judgment.
With respect to Defendants' motion, the following facts are
presented in the light most favorable to the Plaintiff, unless
otherwise noted.

---

[1] Although Bassett named additional defendants in this
action, including Spafford, no other defendant remaining in the
case has entered an appearance.

## I.   <u>Lease Agreement</u>

In October 2014, Leah Bassett signed an agreement with
Joshua Spafford to lease her Martha's Vineyard residence from
October 4, 2014 until May 15, 2015. The lease was "for use as a
personal residence, excluding all other uses." Dkt. 89-1 at 2.
The lease also provided that the residence was to be "used and
occupied only by the members of the Tenant's family." <u>Id.</u> The
lease prohibited Spafford from assigning or subletting the
property without prior consent. Although Bassett would be out of
the country for the term of her lease, several members of her
family lived on the same private road as her property and
periodically assisted Spafford with tasks like clearing snow
from the driveway.

## II.   <u>Use of Bassett's Property</u>

Spafford had come to Martha's Vineyard to work as a still
photographer and camera man for Monica Jensen, an adult film
director with the professional pseudonym of Nica Noelle. Jensen
was directing pornographic films for distribution by Mile High
Distribution, Inc. ("Mile High"), a Quebec-based adult film
distribution company.

Spafford initially rented Bassett's house for his own
residential purposes, believing that filming would take place at
other locations on the island. However, Jensen soon pressured
him to use Bassett's residence as both a filming location and as

housing for cast and crew. Jensen promised to cover the property's rental costs and threatened to fire Spafford if he did not agree.

According to Defendants, Bassett's home and household items appear in scenes from nine films that were distributed by Mile High, as well as still images accompanying five other films. Scenes showing Bassett's home also appear in two compilation titles that were distributed by Mile High. Bassett asserts that she has found twenty-one films featuring scenes or stills from her house. In addition, cast members took promotional photos at the property that they posted on their own social media accounts.

The extent of Jon Blitt's role in Mile High during this period and his involvement with Jensen's projects is disputed. Blitt asserts he was helping to run Mile High on behalf of his father, who was ill, but was not an employee and had no direct involvement in Jensen's activities on Martha's Vineyard. Bassett claims Blitt held a managerial position at Mile High, where he developed and then directly oversaw two "brands" of pornographic films, titled "Icon Male" and "Transsensual," which included the films directed by Jensen on Martha's Vineyard.

### III. **Breaking of Lease**

On March 15, 2015, over five months into the lease, Spafford sent Bassett an email that he had been "let go from

[his] job" and would be "completely unable to finish [his] payments on [the] lease from March to the end (May)." Dkt. 89-2 at 2. He wrote that the house was "in good condition" but that there were clothes, photography gear, and bags of garbage left behind. Id. He also wrote that he had disabled all the carbon monoxide alarms when they went off in the middle of the night, including one alarm in Bassett's locked master closet.

The next day, on March 16, 2015, Bassett's mother went to check on the property. She saw "strangers, not authorized guests, unpacking their luggage." Dkt. 89-3 at 2. Bassett's mother then encountered Jensen, who said she was subletting the property. Soon after, Jensen spoke with Bassett by phone and said she had paid Spafford for the February and March rent. Jensen offered to take over the lease for the remaining months. At this time, Bassett did not know Jensen was an adult film director or that her residence had been used as an adult film set. On March 20, 2015, Bassett's mother and stepmother sent her photographs of the condition of the house, including some damage to the property.

Bassett responded to Spafford by email on March 22, 2015. She informed Spafford that he was in breach of the lease agreement and owed "a minimum of $7,933" for unpaid rent and incidentals, as well as additional charges for damage to the property, which had not yet been assessed. Dkt. 89-3 at 3-4. She

told Spafford that his "story about the alarm sounding, even if true, isn't grounds for breaking and entering" into the bedroom closet. Id. at 3. Bassett informed Spafford that she would accept $4,000 to settle his debt but would pursue legal action if he refused her offer or did not respond within a week.

Bassett first learned pornographic movies had been filmed in her house on March 26, 2015. While in discussions with Jensen about continuing the lease, Bassett received an email from an address she did not recognize. She searched the name online and discovered Jensen's pseudonym, as well as her affiliation with Mile High. To her distress, Bassett saw her own house in online promotional materials.

The next day, on March 27, 2020, Jensen emailed Bassett and offered to "pay [Bassett] a sum of money . . . in exchange for a signed release." Dkt. 98-3 at 8. Jensen still did not disclose that the house had been used to shoot pornographic films and images, although Bassett now knew. Bassett refused the offer and told Jensen to vacate the premises.

## IV.  Post-Lease Events

In May 2015, Bassett returned home and "spent weeks" repairing the damage to her property. Dkt. 98-3 at 9. Bassett was nonetheless able to rent her house during the summer season and "did not lose any rental income" in the summers of 2015, 2016, or 2017. Dkt. 89-4 at 8-9. She believes she lost income in

the summer of 2018 because she "had to cancel [her] rental website when [she] filed the lawsuit because of the bad publicity." Id. at 9.

In the meantime, Bassett was "experiencing anxiety, inability to sleep, [and] lack of concentration" in the wake of these events. Dkt. 89-27 at 4. She became "paranoid" and suffered from "sadness and anxiety [that was] deep, dark and seemingly endless." Dkt. 98-3 at 8. In September 2015, she began to see a therapist. Her therapist, a licensed social worker, diagnosed Bassett with Post-Traumatic Stress Disorder ("PTSD"), although the diagnosis later shifted to "acute distress disorder." Dkt. 98-2 at 30, 35. In 2018 and 2019, Bassett was prescribed medications for anxiety and depression.

## V.   **Bassett's Copyright Filings**

On September 30, 2016, a year and a half after learning about the pornographic movies, Bassett filed three certificates of registration with the United States Copyright Office under the category of "Unpublished Collection." The collections are (1) "Bathroom 1 Drawing, et al.," which comprises twenty-one drawings, paintings, and photographs; (2) "Handsewn and Designed Slipcover 2, et al.," which comprises twenty-two works, including handsewn slipcovers and pillows, wall hangings, and collages; and (3) "Table 1 Hand-painted Top, et al.," which

comprises ten works, including painted tabletops, a fireplace, and items of pottery. Dkt. 89-18 to 89-23.

Bassett registered the copyrights because she "knew that there was a possibility [she] would have to file a lawsuit." Dkt. 89-4 at 38. She had never sought registration before because she "never had to sue anybody for using [her] artwork." Id. The works were "solely being used to add decorative touches to [Bassett's] personal home in a manner that [she] felt would be warm and aesthetically pleasing." Dkt. 89-17 at 5.

At one point, Bassett had a website at LeahBassett.com, as well as Facebook and Instagram pages, showing her artwork. However, she took the pages down before filing the present suit because she was fearful of Jensen "attacking [her] in some way online." Dkt. 89-4 at 63. She also had an Etsy page offering her work for sale, which she closed before filing suit. Bassett never sought to promote or sell any of the works in her copyrights on these sites.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87

(1st Cir. 2018) (quoting <u>Cherkaoui v. City of Quincy</u>, 877 F.3d
14, 23-24 (1st Cir. 2017)). A material fact is one with the
"potential of changing a case's outcome." <u>Doe v. Trs. of Bos.
Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018).

"The court must view the facts in the light most favorable
to the non-moving party and draw all reasonable inferences in
[its] favor." <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st
Cir. 2018). When parties cross-move for summary judgment, the
court must evaluate each motion "separately, drawing inferences
against each movant in turn." <u>Lawless v. Steward Health Care
Sys., LLC</u>, 894 F.3d 9, 21 (1st Cir. 2018) (quoting <u>EEOC v.
Steamship Clerks Union</u>, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   Copyright Claims

Defendants argue the Court may grant summary judgment on
Bassett's copyright claim on several independent bases, namely:
(1) the registrations are invalid because the items were not
"unpublished" collections or do not qualify for copyright
protection; (2) the use of any validly copyrighted items is de
minimis; (3) any use is fair use; and (4) Bassett has stated no
recoverable damages. Jon Blitt also seeks dismissal in his
personal capacity.

A. **Validity and Scope of Copyrights**

"[A] certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid." Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 40 (1st Cir. 2012) (citation omitted).

Defendants first argue that Bassett's copyrighted works were previously published on her website and/or online store, rendering their registration as "unpublished collections" invalid. See Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC, 925 F.3d 1140, 1145-46 (9th Cir. 2019) (affirming summary judgment based on invalidity of "unpublished collection" of designs that had previously been sold).

While Bassett admits she had a website and an Etsy store, Defendants have put forth no evidence that any of the copyrighted works appeared on those sites. Bassett flatly denies that she ever "sought to sell, reproduce, license or otherwise seek a profit from any of the 53 works that were included in [the] 3 [copyright] applications." Dkt. 98-3 ¶ 33. Defendants are not entitled to summary judgment based on invalidity of Bassett's "unpublished collections."

Defendants next contend that the registrations are at least partially invalid because many of the copyrighted works either are not original or serve only a utilitarian purpose. See Feist

10

Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 347 (1991)
("[C]opyright protection may extend only to those components of
a work that are original to the author."); Yankee Candle Co. v.
Bridgewater Candle Co., 259 F.3d 25, 34-35 (1st Cir. 2001)
(noting copyright protection does not extend to "an essentially
functional design choice").

"Courts assessing the applicability of the Copyright Act's
protections to allegedly unique works frequently note that the
'originality' bar is set quite low." Gregory, 689 F.3d at 47.
Most of the works in Bassett's registrations are entitled to
copyright protection under this "light burden." Id. (citation
omitted). The works titled as drawings, paintings, photographs,
wall hangings, collages, and pottery exceed the low originality
bar. The designs on the tabletops also qualify to the extent the
color and placement of the stenciled designs are original to
Bassett. See Star Athletica, L.L.C. v. Varsity Brands, Inc., 137
S. Ct. 1002, 1012 (2017) ("[A] feature of the design of a useful
article is eligible for copyright if, when identified and
imagined apart from the useful article, it would qualify as a
pictorial, graphic, or sculptural work either on its own or when
fixed in some other tangible medium.")

While the functionalist elements of the fireplace are not
copyrightable, the aesthetic design choices are. Defendants
argue the fireplace is not "attributable" to Bassett because her

father testified that a former boyfriend designed it, not
Bassett. Bassett testified that she co-designed the fireplace
and submitted sketches of its design. Whether the fireplace is
attributable to Basset is a disputed issue of fact appropriate
for determination by a factfinder.

Finally, the slipcovers and pillows do not surpass the low
originality bar. Those works were made from fabric not designed
by Bassett and their shapes were chosen for the functional
purpose of covering items of furniture also not designed by
Bassett. Those works are not entitled to copyright protection
and will not be considered in the Court's further analysis.

**B. De Minimis Doctrine**

Defendants next argue that any use of Bassett's validly
copyrighted works is de minimis and therefore falls outside the
scope of the Copyright Act's protections. In the First Circuit,
"de minimis copying is best viewed not as a separate defense to
copyright infringement but rather as a statement regarding the
strength of the plaintiff's proof of substantial similarity."
Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53,
59 (1st Cir. 2009).

In a seminal case, the Second Circuit explained that where,
as here, copyrighted material is undisputedly featured in
another work, the question is "whether the admitted copying
occurred to an extent sufficient to constitute actionable

copying, i.e., infringement." Ringgold v. Black Entm't
Television, Inc., 126 F.3d 70, 75 (2d Cir. 1997). A primary
factor in cases "involving visual works" is "the observability
of the copied work — the length of time the copied work is
observable in the allegedly infringing work and such factors as
focus, lighting, camera angles, and prominence." Id.

In Ringgold, a television show featured a poster of a
copyrighted artwork, called "Church Picnic," in the background
of a scene. The Second Circuit described the work's appearance:

> In the scene, at least a portion of the poster is shown a
> total of nine times. In some of those instances, the poster
> is at the center of the screen, although nothing in the
> dialogue, action, or camera work particularly calls the
> viewer's attention to the poster. The nine sequences in
> which a portion of the poster is visible range in duration
> from 1.86 to 4.16 seconds. The aggregate duration of all
> nine sequences is 26.75 seconds.

Id. at 73.

The court noted that, by regulation, even "background" uses
of copyrighted materials require payment of a license fee. Id.
at 77. (citing 7 C.F.R. § 253.8 (1996)). It found that "the
principal four-to-five-second segment in which almost all of the
poster is clearly visible, albeit in less than perfect focus,
reenforced [sic] by the briefer segments in which smaller
portions are visible, all totaling 26 to 27 seconds, are not de
minimis copying." Id. The court also noted that "Church Picnic"
would be "recognizable as a painting, and with sufficient

observable detail for the average lay observer to discern African-Americans in Ringgold's colorful, virtually two-dimensional style." Id. (citation omitted). Ringgold did not create a bright-line rule requiring thematic relevance, as Defendants have suggested.

Defendants cite a series of post-Ringgold cases that further defined the contours of the de minimis doctrine. See Sandoval v. New Line Cinema Corp., 147 F.3d 215, 216, 218 (2d Cir. 1998) (finding de minimis the appearance of copyrighted photographs for a total of 35.6 seconds where, due to poor lighting, great distance, and lack of focus, the photographs were "not displayed with sufficient detail for the average lay observer to identify even the subject matter of the photographs, much less the style used in creating them"); Gottlieb Dev. LLC v. Paramount Pictures Corp., 590 F. Supp. 2d 625, 630 (S.D.N.Y. 2008) (finding de minimis the appearance of copyrighted pinball machine design in the background of a three-and-a-half-minute scene where it appeared "for seconds at a time," "always partially obscured," and no "character ever refer[red] to it"); Gayle v. Home Box Office, Inc., 17-CV-5867 (JMF), 2018 WL 2059657, at *3 (S.D.N.Y. May 1, 2018) (finding de minimis the two-to-three-second use of plaintiff's graffiti in a television show where it was "at best, shown in the background at an

oblique angle and in low, uneven light" such that it was "next to impossible to notice when viewing the episode in real time").

On the current record, the Court is unable to determine whether Defendants' use of Bassett's copyrighted work is de minimis. At hearing, Plaintiff's counsel proposed several sources to determine which works appeared in Defendants' films and to what extent, but none is sufficient for the Court to determine whether Bassett can meet her burden of proof.

The first is an affidavit by Stephanie Lahar analyzing the appearance of Bassett's works in a representative film, "My TS Student." Dkt. 98-4. However, the affidavit uses a numbering system to identify each copyrighted work without a corresponding key. It is impossible for the Court to determine whether the works that were featured are ones that pass the originality bar. Furthermore, the Court cannot determine the detail in which the works are visible, a key component of the Ringgold analysis.

Second, Bassett offers as exhibits screenshots from Defendants' films. Dkt. Nos. 98-6, 98-8, 98-10, 98-11, 98-12, 98-13, 98-14. In those screenshots, her works are "recognizable as" decorative art and "with sufficient observable detail" to see the content and style of the work. See Ringgold, 126 F.3d at 77. However, the Court is unable to determine the length of time the works appear in that manner.

Another attached exhibit lists the works that appear in each scene of various films. It too is insufficient because it does not track how long or the detail in which each work appears. Dkt. 98-3 at 18-25.

Finally, Bassett points to her own affidavit filed with her earlier motion for a preliminary injunction. Dkt. 62-1. Although that affidavit provides the aggregate length of time that her works are visible in a number of films, it fails to identify the specific works and in what level of detail they appear.

Thus, each source in the current record lacks critical information that the Court would need to undertake a de minimis analysis under Ringgold. The Court requires a document describing which of Bassett's copyrighted works appear in which films, for how long, and in what level of detail. This analysis should include representative screenshots. Because the de minimis doctrine relates to an element of plaintiff's claim, Situation Mgmt. Sys., 560 F.3d at 59, Bassett bears the burden of proof and must provide this analysis to the Court within 45 days if she intends to pursue her copyright claim.

### C. Fair Use

Defendants next assert the affirmative defense of fair use, on which they bear the burden of proof. See Gregory, 689 F.3d at 59. A court analyzing fair use considers four non-exhaustive statutory factors:

1. The purpose and character of the use, including whether
   such use is of a commercial nature or is for nonprofit
   educational purposes;

2. The nature of the copyrighted work;

3. The amount and substantiality of the portion used in
   relation to the copyrighted work as a whole; and

4. The effect of the use upon the potential market for or
   value of the copyrighted work.

17 U.S.C. § 107. The Court addresses each factor in turn.

### i.   Purpose and Character of Use

The primary inquiry as to the purpose and character of an

infringing use is "whether and to what extent the new work is

'transformative.'" Gregory, 689 F.3d at 59 (citation omitted). A

work is transformative if it "adds something new, with a further

purpose or different character, altering the first with new

expression, meaning, or message." Id. (quoting Campbell v.

Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994)).

Defendants do not argue that their use was transformative,

but rather stake their fair use claim on the "incidental" nature

of their use. The Ringgold court explicitly rejected an

"incidental use" argument, writing that it "could be said of

virtually all set decorations, thereby expanding fair use to

permit wholesale appropriation of copyrighted art for movies and

television." 126 F.3d at 80. Instead, the Second Circuit found

that defendants' use of "Church Picnic" was not transformative

where it was used for "decorative effect . . . precisely as a

poster purchaser would use it to decorate a home." Id. at 79. Similarly, here, Bassett's works were featured in Mile High films as decorative elements, precisely how Bassett used them in her home. Furthermore, the use here was "of a commercial nature," which weighs against fair use in the first factor. See 17 U.S.C. § 107.

The first factor of purpose and character weighs in Bassett's favor.

### ii.  Nature of Copyrighted Work

The nature of the copyrighted work has two aspects: "first, the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination and second, whether it is unpublished, in which case the right of first publication is implicated." Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000) (citations omitted).

The first aspect weighs in Bassett's favor — her copyrighted works are artistic rather than factual. The second aspect weighs somewhat in Bassett's favor. Bassett's copyrights are for "unpublished collections," but she never intended to sell her works, so Defendants did not usurp her opportunity to publish. See Núñez, 235 F.3d at 24 (noting this factor weighs less where copyrighted works are not "confidential or secret"). On the whole, the second factor weighs in Bassett's favor.

### iii. **Amount and Substantiality of Work Used**

The "amount and substantiality of the portion used in relation to the copyrighted work as a whole" is a "pliable" factor, not a "cold calculation[] of the percentage of a work used versus unused." Gregory, 689 F.3d at 62; see also Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 188 (D. Mass. 2007) ("This factor weighs less when considering a photograph — where all or most of the work often must be used in order to preserve any meaning at all — than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value.")

Here, some of Bassett's copyrighted works appear in full in screenshots from Defendants' films. This factor weighs in Bassett's favor.

### iv. **Effect on Potential Marked or Value of Work**

Where no market exists for a copyrighted work because the copyright holder "[n]ever tried to sell" it, the fourth factor favors fair use. See Núñez, 235 F.3d at 25. Market effect is "the single most important element of fair use." Gregory, 689 F.3d at 64 (quoting Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 566 (1985)).

The fourth factor favors Defendants. By her own testimony, Bassett never intended to sell her copyrighted works.

### v.   **Fair Use Conclusion**

Three factors weigh in favor of Bassett and one factor —
albeit the "most important" one, Gregory, 689 F.3d at 64 —
weighs for Defendants. Balancing the factors, Defendants are not
entitled to summary judgment on fair use.

### D. Damages

Defendants also argue that, even assuming Bassett can show
infringement, she has stated no recoverable damages.

Under the Copyright Act, a plaintiff who proves
infringement may recover one of either (1) compensable damages
pursuant to 17 U.S.C. § 504(b) or (2) statutory damages pursuant
to 17 U.S.C. § 504(c). Bassett is not entitled to "statutory
damages" under 17 U.S.C. §504(c) because she did not register
her copyrights prior to the infringement. See 17 U.S.C. § 412
("[N]o award of statutory damages . . . shall be made for . . .
any infringement of copyright in an unpublished work commenced
before the effective date of its registration").

She may, however, be entitled to certain forms of
compensable damages. Compensable damages under 17 U.S.C.
§ 504(b) include "(1) actual damages, which consist of all
income and profits lost as a consequence of the infringement;
and (2) any nonduplicative profits earned by the defendant as a
consequence of the copyright infringement." Bruce v. Weekly
World News, Inc., 310 F.3d 25, 28 (1st Cir. 2002).

One form of actual damages recoverable by a copyright holder is a "reasonable fair market licensing fee[.]" Id. In her summary judgment briefing, Bassett seeks a reasonable licensing fee. Because all damages discovery was stayed in this case, Bassett has not had the opportunity to develop the factual record regarding what fee, if any, Defendants would have paid to license her copyrighted materials. If the Court determines that Defendants' use of Bassett's copyrighted work was greater than de minimis, it will authorize further discovery on this issue.

Bassett also seeks "profits . . . attributable to the infringement," which are recoverable as compensable damages under 17 U.S.C. § 504(b) to the extent they are not duplicative of actual damages. See Bruce, 310 F.3d at 28. The Court declines to address this form of damages until it can discern which films, if any, feature Bassett's work in a capacity that is greater than de minimis.

**E. Jon Blitt's Individual Liability**

Jon Blitt argues he cannot be held liable for copyright infringement in his personal capacity. The Copyright Act permits vicarious liability of a corporate officer where, among other cases, "the officer was the dominant influence in the corporation, and determined the policies which resulted in the infringement." Marvin Music Co. v. BHC Ltd. P'ship, 830 F. Supp. 651, 654-55 (D. Mass. 1993).

Blitt's role in Mile High Productions is a disputed issue
of fact. Blitt admits that he was helping to run Mile High
during the events in question while his father was ill. Bassett
asserts that Blitt developed the "Icon Male" and "Transsensual"
brands, which featured the films made at Bassett's house. Joshua
Spafford told Blitt they were improperly shooting out of
Bassett's home. Spafford also said Blitt "let[] [Jensen's]
behaviour [] slide because she is a 'golden cow'" who brought in
high profits for Mile High. Dkt. 98-2 at 27.

The reasonable inference in Bassett's favor is that Blitt
"determined the policies [at Mile High] which resulted in the
infringement" during the relevant period.

## II. <u>Infliction of Emotional Distress</u>

Massachusetts law recognizes both intentional and negligent
infliction of emotional distress. To prevail on a claim of
intentional infliction of emotional distress ("IIED"), a
plaintiff must prove:

> (1) the defendant either intended to inflict emotional
> distress or knew or should have known that emotional
> distress was the likely result of [defendant's] conduct;
> (2) that the conduct was "extreme and outrageous" and
> beyond all possible bounds of decency and was "utterly
> intolerable in a civilized community"; (3) that the
> defendant's actions caused the plaintiff's emotional
> distress and (4) that the plaintiff sustained severe
> emotional distress.

<u>McGrath v. Town of Sandwich</u>, 22 F. Supp. 3d 58, 70 (D. Mass.
2014) (citation omitted).

Defendants first contend that their conduct was not "extreme and outrageous." "[T]here is an issue for the jury if reasonable people could differ on whether the conduct is 'extreme and outrageous.'" Vittands v. Sudduth, 730 N.E.2d 325, 335 (Mass. Ct. App. 2000) (citation omitted). A reasonable juror could find renting a residential home and then filming commercial pornographic films over many months while housing cast and crew members, all without the homeowner's consent, to be "beyond all possible bounds of decency." McGrath, 22 F. Supp. 3d at 70.[2]

Defendants next argue that even if their conduct was extreme and outrageous, it did not cause Bassett's distress because Bassett admitted that the stress of bringing this lawsuit was "definitely a big part of [her] emotional distress." Dkt. 89-4 at 44. Although Bassett cannot recover for emotional distress caused by this lawsuit, record evidence supports Bassett's position that Defendants' conduct directly caused her severe emotional distress. Bassett sought mental health counseling in September 2015, long before she filed this suit.

---

[2] By contrast, Defendants' post-lawsuit conduct of allegedly refusing to take down infringing videos and labeling Bassett as homophobic falls into the category of "insults, indignities, threats, annoyances [or] petty oppressions" which cannot form the basis of an IIED claim. See Roman v. Tr. of Tufts Coll., 964 N.E.2d 331, 341 (Mass, 2012) (citation omitted).

The element of intent presents the hardest inquiry. Defendants' intent was that Bassett never learn of their use of her residence as a pornographic film set. Nonetheless, a factfinder could reasonably conclude that Defendants recklessly disregarded that they were likely to cause Bassett emotional distress. See Nancy P. v. D'Amato, 517 N.E.2d 824, 827 (Mass. 1988) (noting in relation to an IIED claim by the mother and brother of a child whom the defendant sexually abused that although "[i]t was [Defendant's] hope that they would never learn of his misconduct[,] . . . it would be a question for the trier of fact whether [Defendant] acted recklessly, indifferent to the likely effect of his conduct on family members who would be apt in time to learn of his outrageous conduct"). Here, there is evidence in the record that Defendants knew that Bassett's family lived on the same private road as her property, were warned that the local press might be aware of their activities, and caused damage to Bassett's property. A reasonable factfinder could conclude that Defendants should have known Bassett was "apt in time to learn of [their] outrageous conduct." See id.

The elements of a claim for negligent infliction of emotional distress ("NIED") are:

> (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.

Opalenik v. LaBrie, 945 F. Supp. 2d 168, 196 (D. Mass. 2013)

(quoting Sullivan v. Bos. Gas Co., 605 N.E.2d 805, 807 (Mass.

1993)).

As to NIED, Defendants contest only the element of

"physical harm manifested by objective symptomatology." Under

Massachusetts law, for a plaintiff to survive summary judgment

on the physical harm requirement, she "must corroborate [her]

mental distress claims with enough objective evidence of harm to

convince a judge that [her] claims present a sufficient

likelihood of genuineness to go to trial." Sullivan, 605 N.E.2d.

at 810. The testimony from Bassett's therapist that Bassett

frequently felt ill and was unable to sleep as a result of these

events — leading to diagnoses of anxiety and acute distress

disorder — meets that threshold. See id. (favorably citing case

where "headaches, insomnia, loss of appetite and muscle tension

for several months" was sufficient).

### III. Interference with Contractual Relations

Under Massachusetts law, a plaintiff claiming tortious

interference with contractual relations must establish that (1)

she "had a contract with a third party," (2) "which the

defendant knowingly induced the third party to break," (3) the

interference "was improper in motive or means," and (4) the

interference caused the plaintiff harm. Sindi v. El-Moslimany,

896 F.3d 1, 23 (1st Cir. 2018) (quoting Abramian v. Pres. & Fellows of Harvard Coll., 731 N.E.2d 1075, 1088 (Mass. 2000)).

A reasonable factfinder could conclude that Defendants induced Spafford to break his contract with Bassett when Jensen, as an agent of Mile High and Blitt, persuaded or coerced Spafford to allow commercial filming on the property, to house cast and crew members, and to sublet the residence to Jensen, all in knowing violation of the lease agreement. Jensen employed "improper means" when she threatened to fire Spafford if he did not breach the lease agreement. See United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990) (listing "us[ing] threats" as an example of "improper means"). Finally, Defendants' interference caused Bassett harm because Bassett terminated the lease two months early in response to Spafford's breaches, losing rental income.

Bassett also alleges that Defendants interfered with prospective leases because Bassett has declined to seek winter rentals since Defendants' actions. A plaintiff claiming tortious interference with prospective economic advantages must produce "competent evidence of a specific business relationship, the consummation of which was reasonably likely." Sindi, 896 F.3d at 25. Here, Bassett concedes that no identifiable prospective lessee has refused to rent her property because of Defendants' conduct. Bassett's decision not to seek renters during winter

months does not involve a "specific business relationship" with which Defendants interfered. See id. Defendants are entitled to summary judgment on this portion of Bassett's claim.

Only Defendants' interference with Bassett and Spafford's lease agreement survives their motion for summary judgment.

### IV.  Chapter 93A

Chapter 93A provides a private cause of action to two categories of plaintiffs. Section 9, on which Bassett relies in her complaint, provides a private cause of action to "Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of [unfair or deceptive acts or practices in the conduct of any trade or commerce]." Mass. Gen. Laws ch. 93A §§ 2, 9.

Section 11 provides relief for "[a]ny person who engages in the conduct of any trade or commerce" and suffers a loss of money or property as a result of the use of unfair deceptive acts or practices "by another person who engages in any trade or commerce." Mass. Gen. Laws ch. 93A § 11. "By their terms . . . the two sections of chapter 93A that create private rights of action are mutually exclusive." Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000).

Defendants argue Bassett cannot invoke § 9 because, in the only commercial transaction to which she was a party in this

case, she acted as a landlord and so was "engage[d] in the conduct of [] trade or commerce." See id. ("[S]ection 9 affords no relief to persons engaged in trade or commerce").

However, certain landlord-tenant relationships are "of a private nature, and in no way concern[] a trade or business" for purposes of Chapter 93A. Billings v. Wilson, 493 N.E.2d 187, 188 (Mass. 1986). Significantly, courts have held that in certain circumstances, renting a unit in an owner-occupied residence is of a private nature. Compare id. (finding 93A did not apply to landlord-tenant dispute "concerning the rental of a dwelling unit in an owner-occupied two-family house, where the landlord owns no other rental real property" and "his motivation — that of mitigating the economic burden of supporting his home — is of a personal rather than a business nature") and Young v. Patukonis, 506 N.E.2d 1164, 1168 (Mass. App. Ct. 1987) (finding "owner-occupant of a three-family building, whose primary objective is personal" was not subject to suit as someone engaged in trade or commerce under 93A), with Bahnan, 216 F.3d at 156 (holding landlord could not bring suit under § 9 where he "rented out the subject property, [but] himself lived elsewhere, . . . he applied for and received a business owner's policy, and in the process completed a commercial insurance application in which he described his business as 'apartments'").

Bassett never owned any real estate besides the Martha's
Vineyard home at issue and typically lived there when it was not
rented. The rentals were driven by "financial necessity due to
[her] still outstanding 'construction' mortgage, and the high
real estate taxes [and] property insurance" on Martha's
Vineyard. Dkt 112-3 at 4. There is no evidence that Bassett
rented the home in a business context. The short-term rental of
her own home was a private transaction not "undertaken in the
ordinary course of a trade or business." Billings, 493 N.E.2d at
188. Provided Bassett can meet the other requirements of Chapter
93A, like causation, she may proceed under § 9 as a "person . .
. who has been injured" by Defendant's commercial practices. See
Mass. Gen. Laws ch. 93A § 9; Aspinall v. Philip Morris Co.,
Inc., 813 N.E.2d 476, 491 (Mass. 2004) ("[C]ausation is a
required element of a successful [Chapter] 93A claim.")

     The alleged practice of shooting commercial pornographic
films in a leased home without the owner's consent and in
violation of the lease falls within Chapter 93A's broad
definition of an "unfair or deceptive practice." See Walsh v.
TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) ("Under
Chapter 93A, an act or practice is unfair if it falls within at
least the penumbra of some common-law, statutory, or other
established concept of unfairness; is immoral, unethical,
oppressive, or unscrupulous; and causes substantial injury to

consumers" (cleaned up)); <u>Aspinall</u>, 813 N.E.2d at 486 ("A practice is deceptive, for purposes of [Chapter] 93A, if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted" (cleaned up)).

## V.  Civil Conspiracy

In Massachusetts, a civil conspiracy requires (1) "a common design or an agreement . . . between two or more persons to do a wrongful act" and (2) "proof of some tortious act in furtherance of the agreement." <u>Aetna Cas. Sur. Co. v. P & B Autobody</u>, 43 F.3d 1546, 1564 (1st Cir. 1994). To establish civil conspiracy, a plaintiff must provide "evidence that the defendants agreed together" to commit an underlying tort. <u>Gutierrez v. Mass. Bay Transp. Auth.</u>, 772 N.E.2d 552, 568 (Mass. 2002).[3]

Viewing the evidence in Bassett's favor, Jensen — as an agent of Blitt and Mile High — and Spafford agreed to break the lease agreement and to shoot commercial pornographic videos in Bassett's home without her consent, giving rise to viable tort claims for interference with contractual relations and infliction of emotional distress.

---

[3] Massachusetts also recognizes a "very limited" form of civil conspiracy where "it is the act of agreeing that constitutes the wrong" such as "[c]ollusive behavior among market competitors." <u>Snyder v. Collura</u>, 812 F.3d 46, 52 (1st Cir. 2016). It does not apply here.

## VI.  **Breach of Contract**

"To prevail on a claim for breach of contract, a plaintiff
must demonstrate that (1) there was an agreement between the
parties; (2) the agreement was supported by consideration; (3)
the plaintiff was ready, willing, and able to perform his or her
part of the contract; (4) the defendant committed a breach of
the contract; and (5) the plaintiff suffered harm as a result."
Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016)
(numbering added).

The first and most basic element is at issue here.
Defendants argue that Bassett's breach of contract claim must
fail because they were not parties to her lease agreement with
Spafford, nor was Spafford acting as Defendants' agent when he
signed the lease. The record is undisputed on both counts.
Although Defendants may be liable for interfering with the
contract between Spafford and Bassett, as discussed above, they
cannot be held directly liable for its breach.

## VII. **Trespass**

The elements of trespass under Massachusetts law are "1)
plaintiff's actual possession of the property at issue and 2) an
intentional and illegal entry by defendant." Fed. Ins. Co. v.
Bos. Water & Sewer Comm'n, 583 F. Supp. 2d 225, 229 (D. Mass.
2008). Defendants argue Bassett's trespass claim is barred by
the statute of limitations, which is three years "after the

cause of action accrues." Mass. Gen. Laws ch. 260, § 2A; Doherty
v. Admiral's Flagship Condo. Tr., 951 N.E.2d 936, 940 (Mass. Ct.
App. 2011). Under the Massachusetts "discovery rule," a cause of
action accrues "when an event or events have occurred that were
reasonably likely to put the plaintiff on notice that someone
may have caused her injury." Bowen v. Eli Lilly Co., 557 N.E.2d
739, 741 (Mass. 1990).

Bassett's trespass claim is based on the allegation that
Spafford or another Mile High-affiliated party broke into her
master bedroom closet in order to disable the carbon monoxide
detector within. The locked closet was excluded from a tenant's
authorized use in the lease agreement between Spafford and
Bassett. Dkt. 89-1 at 7. ("The Landlord reserves the right to
the exclusive use of locked storage areas in the closets,
basement and attic for storage of her personal property.")

Bassett knew that someone had forcibly opened the closet to
disable the alarm on March 15, 2015, when Spafford informed her
by email that he had done so. In her return email on March 22,
Bassett referred to this as "breaking and entering." While
Bassett later learned that the trespass occurred in the midst of
filming, the cause of action accrued when she learned there had
been an "intentional and illegal entry," not when she learned
why. See Federal Insurance, 583 F. Supp. 2d at 229.

Because the cause of action accrued more than three years before Bassett filed suit on March 26, 2018, it is barred by the statute of limitations.[4]

## VIII.   **Negligence**

Bassett's common law negligence claim is also subject to a three-year statute of limitations. Doherty, 951 N.E.2d at 940. To fall within the statute of limitations, it must have accrued no earlier than March 26, 2015.

Bassett's negligence claim is based on physical damage caused by "the negligent actions of one or more of the persons present on her premises while in the employ of the Mile High-associated Defendants." Dkt. 1 ¶ 51. The record reflects that Bassett was aware of physical damage to her home at the latest on March 20, 2015, when her mother and stepmother sent her photos documenting damage. Bassett confirmed that she was aware of damage to her home in her March 22, 2015 email to Spafford.

Bassett contends that her negligence claim nonetheless had not accrued because, at that time, she still did not know the full extent of the damage or how it had been caused. "The plaintiff need not know the full extent of the injury before the statute [of limitations] starts to run." Bowen, 557 N.E.2d at

---

[4] Even if Bassett's trespass claim were based on the general unauthorized entry of Jensen and Mile High-affiliated parties, Bassett learned of that entry on March 16, 2015, when her mother encountered "strangers" on the property.

741. As of March 20, 2015, Bassett was "on notice that someone may have caused her injury" so her negligence claim is barred by the statute of limitations. See id.

## IX.  **Civil Fraud**

To prove fraud in Massachusetts, a plaintiff must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." Barrett Assocs., Inc. v. Aronson, 190 N.E.2d 867, 868 (Mass. 1963) (citation omitted). Bassett argues she detrimentally relied on Spafford's false representations that her home would be used only as a residence and that because the films shot in her home are owned by Mile High, Defendants are liable.

It is undisputed that when Spafford first signed the lease, he intended to use it only as a residence, exactly as he represented to Bassett. Spafford made no misrepresentations to Bassett when she agreed to enter into the lease agreement. Although Jensen arguably misrepresented her intentions in seeking to take over the lease from Spafford in March 2015, Bassett declined to extend the lease to Jensen and so did not rely on that misrepresentation to her detriment. Even viewing all the facts in Bassett's favor, Defendants' actions do not meet the elements of fraud under Massachusetts law.

X.   **Civil RICO**

To prevail on a civil RICO claim, a plaintiff must prove
four elements: "(1) conduct (2) of an enterprise (3) through a
pattern (4) of racketeering activity." Giuliano v. Fulton, 399
F.3d 381, 386 (1st Cir. 2005) (citation omitted). The "predicate
acts" for racketeering activity are determined by reference to
the exhaustive list at 18 U.S.C. § 1961(1). Beck v. Prupis, 529
U.S. 494, 497 n.2 (2000). Here, Bassett alleges predicate acts
of "dealing in obscene matter," "mail fraud [or] wire fraud,"
"retaliating against a witness, victim, or informant," and/or
"criminal infringement of a copyright." Dkt. 98 at 24–25.

Bassett is unable to establish the last three of these four
predicate acts. Bassett provides no factual basis for the
predicate act of "mail fraud [or] wire fraud." Bassett also
provides no factual basis for the predicate act of "retaliating
against a witness, victim, or informant." The predicate act of
retaliation requires that someone "kill," "caus[e] bodily
injury," or "damage[] the tangible property" of the witness or
attempt to do one of those acts. 18 U.S.C. § 1513. None of that
occurred here.

As to "criminal infringement of a copyright," that
predicate act requires "willful infringement," meaning a
defendant specifically intended to violate someone's copyright,
rather than simply knew that he was making copies. See United

States v. Liu, 731 F.3d 982, 989-90 (9th Cir. 2013). In

including this predicate act, "Congress did not intend to . . .

subject all multiple acts of intentional infringement to RICO

liability" and instead intended to target "counterfeiting and

piracy organizations." CoStar Realty Info., Inc. v. Field, 612

F. Supp. 2d 660, 676 (D. Md. 2009) (citation omitted).

Defendants' conduct, even if it proves to constitute civil

copyright infringement, does not rise to the level of criminal

infringement.

Finally, Bassett asserts that Defendants have committed

predicate acts of "dealing in obscene matter," which is a

predicate offense if it is "chargeable under State law and

punishable by imprisonment for more than one year," 18 U.S.C.

§ 1961(1)(A), or would be indictable under federal criminal

statutes prohibiting the mailing, import, or production for sale

of "obscene, lewd, lascivious, or filthy . . . film[s]," 18

U.S.C. §§ 1461-65. On its face, one or more of the federal

statutes may apply to Defendants' business, which distributes

adult pornographic films for sale, including through the mail.

Based on the Court's review, these statutes are now rarely used

to prosecute cases involving adult pornography, but they are not

dead letter. See Alexander v. United States, 509 U.S. 544 (1993)

(considering forfeiture challenges related to prosecution of

"adult entertainment" business in Minnesota where obscenity

statutes were prosecuted independently and served as predicate for criminal RICO); Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46 (1989) (upholding constitutionality of prosecution of adult bookstores under state criminal RICO statute).

Bassett's claim nonetheless fails because the type of injury she suffered from Defendants' predicate acts was limited in scope and time. In order to constitute a "pattern" of racketeering, predicate acts must amount to or pose a threat of continued criminal activity. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). Continuity can be open- or closed-ended. Id. at 237, 241. For "open-ended" continuity, a RICO plaintiff must show "a realistic prospect of continuity over an open-ended period yet to come." Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 45 (1st Cir. 1991). For "closed-ended" continuity, a plaintiff must show "a series of related predicates extending over a substantial period of time." Giuliano v. Fulton, 399 F.3d 381, 387 (1st Cir. 2005) (quoting H.J. Inc., 492 U.S. at 239). The First Circuit has "consistently declined to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims." Id. at 390.

In addition, a civil RICO plaintiff must have been "injured . . . by reason of" the predicate RICO acts. 18 U.S.C. § 1964(c). Pursuant to this section, a civil RICO plaintiff must show both but-for and proximate causation. Anza v. Ideal Steel

Supply Corp., 547 U.S. 451, 457 (2006). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Id. at 461.

Bassett was arguably directly injured by Defendants' predicate act of sending obscene films through the mail because it compounded the reach of Defendants' alleged civil copyright infringement. But the injuries Bassett has standing to pursue were the result of a "single, narrow scheme" targeting only one victim within a closed timeframe. See Giuliano, 399 F.3d at 390.

Defendants unequivocally assert they have removed from distribution all films and photographs within their control that were shot at Bassett's house. Although Bassett previously contended that she continued to find infringing videos and images online, she does not maintain this claim in the affidavits she submitted to the summary judgment record. And even if other individuals continue to distribute Defendants' films without authorization, there is no evidence such unauthorized distribution was part of these Defendants' scheme. Finally, Bassett's vague references to other homeowners or copyright holders who suffered similar harm do not transform her highly fact-specific injuries into a RICO scheme.

## XI.  **Defamation**

The four elements of a defamation claim under Massachusetts
law are:

> (1) that "[t]he defendant made a statement, concerning the
> plaintiff, to a third party"; (2) that the statement was
> defamatory such that it "could damage the plaintiff's
> reputation in the community"; (3) that "[t]he defendant was
> at fault in making the statement"; and (4) that "[t]he
> statement either caused the plaintiff economic loss . . .
> or is actionable without proof of economic loss."

Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (quoting

Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510-11 (Mass. 2003)).

Statements of pure opinion are constitutionally protected

and cannot be considered "defamatory" because "they are not

susceptible of being proved true or false." Piccone v. Bartels,

785 F.3d 766, 771 (1st Cir. 2015). Even if an opinion implies a

provably false assertion of fact, that statement will not be

actionable if "it is plain that the speaker is expressing a

subjective view, an interpretation, a theory, conjecture, or

surmise, rather than claiming to be in possession of objectively

verifiable facts." Riley v. Harr, 292 F.3d 282, 289 (1st Cir.

2002) (quoting Gray v. St. Martin's Press, Inc., 221 F.3d 243,

248 (1st Cir. 2000)). A speaker is protected from defamation

liability if he "communicates the non-defamatory facts that

undergird his opinion." Piccone, 785 F.2d at 771.

Bassett's defamation claim is based on statements in a

social media post by Jensen and a blog by a Mile High production

manager, William Gray aka "Billy Santoro."[5] Jensen posted on social media that she was "Fighting homophobic and transphobic bullshit," but made no direct reference to Bassett or this lawsuit. Dkt. 89-25 at 6.

Gray's blog post explicitly discussed Bassett's lawsuit and described it as filed by "a viciously homophobic and transphobic woman." Dkt. 11 ¶ 65. This statement "express[es] a subjective view, . . . rather than claiming to be in possession of objectively verifiable facts." See Riley, 292 F.3d at 289. Gray's assessment of Bassett's character was based on her filing this lawsuit. A reasonable reader would not infer that the author possessed further information not accessible to others. See Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 730-31 (1st Cir. 1992). Instead, the assertion that Bassett was motivated by prejudice "reasonably could be understood only as [Gray's] personal conclusion about the information presented, not as a statement of fact." Id. at 730.

## BASSETT'S MOTION FOR SUMMARY JUDGMENT

Bassett cross-moves for summary judgment on four counts: copyright infringement, infliction of emotional distress, Chapter 93A and civil conspiracy. In analyzing Bassett's cross-

---

[5] Gray is a named co-defendant but has not filed an appearance in this case.

motion, the Court must view the evidence in the light most favorable to Defendants. See Lawless, 894 F.3d at 21.

Beginning with infliction of emotional distress (Count VII), there remain disputed issues of fact on several elements of Bassett's IIED claim. A reasonable factfinder could decide that Defendants should not have known Bassett was likely to learn of their activities and suffer distress, as required to meet the intent element. A reasonable factfinder could also determine that Defendants' actions were not so "utterly intolerable in a civilized community" as to meet the extreme and outrageous element. McGrath, 22 F. Supp. 3d at 70. Bassett did not seek summary judgment as to NIED.

Bassett's viable claim for civil conspiracy (Count V) relies on the facts underlying her tort claims for infliction of emotional distress and interference with contractual relations. In addition to the disputed issues of fact regarding IIED discussed above, there remain disputed facts on the interference claim, such as whether Jensen knew the terms of Spafford's lease, whether she threatened Spafford, and whether she was acting as an agent of Jon Blitt and Mile High. Finally, there are disputed issues as to whether Defendants' acts were unfair and deceptive and caused Bassett injury (Count IV).

Because the Court requires further submissions from Bassett to analyze the de minimis doctrine, it defers ruling on Count IX, the copyright infringement claim.

### ORDER

Defendants' motion for summary judgment (Dkt. 86) is **ALLOWED** as to Counts I (Breach of Contract), II (Trespass), III (Negligence), VI (Civil Fraud), X (Civil RICO), and XI (Defamation) and **DENIED** as to Counts IV (Chapter 93A), V (Civil Conspiracy), VII (Infliction of Emotional and Mental Distress), and VIII (Interference with Contractual Relations). Bassett's motion for partial summary judgment (Dkt. 99) is **DENIED** as to Counts IV, V, and VII.

The Court defers ruling on both parties' motions as to the copyright claim (Count IX) pending Bassett's submission, within 45 days, of a spreadsheet or other analysis that describes exactly how long each copyrighted work appears in each film, with accompanying screenshots for each period of time. The stay on damages discovery remains in place until the Court rules on the copyright claim.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge